PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 07-4046

———————

IN RE:  INSURANCE BROKERAGE
ANTITRUST LITIGATION (MDL No. 1663)

OptiCare Health Systems, Inc., Comcar Industries, Inc.,
Sunburst Hospitality Corporation, Robert Mulcahy,
Golden Gate Bridge, Highway and Transportation District,
Glenn Singer, Redwood Oil Company,
Omni Group of Companies, Bayou Steel Corporation,
Clear Lam Packaging, Inc., Cellect, LLC, Enclave, LLC,
Gateway Club Apartments, Ltd., Michigan Multi-King, Inc.,
City of Stamford, Belmont Holdings Corporation,
Tri-State Container Corporation,
                                          Appellants

D.C. Civil Action No. 04-cv-5184
MDL No. 1663

———————

Nos. 08-1455 & 08-1777

———————

IN RE: EMPLOYEE BENEFIT INSURANCE
BROKERAGE ANTITRUST LITIGATION (MDL 1663)

Maryann Waxman, on behalf of herself
and all others similarly situated,
Golden Gate Bridge, Highway and Transportation District,
Christopher Bare, David Boros, Cynthia Brandes,
Hans Fuson, Sharon Gehringer, Larry Hayes,
Brannen Henn, Robert H. Kimball, Wayne Moran,
Alicia A. Pombo, Clear Lam Packaging Inc.,
Connecticut Spring & Stamp Company,
City of Danbury, Connecticut,
Fire District of Sun City West,
Hollander Home Fashions Corporation,
                                    Appellants

D.C. Civil Action No. 05-cv-1079
MDL No. 1663

_____

On Appeal from the United States District Court
for the District of New Jersey
(Honorable Honorable Garrett E. Brown, Jr.)

_____

Argued April 21, 2009
Before:  SCIRICA, FISHER and
GREENBERG, *Circuit Judges*.

2

(Filed August 16, 2010)

ELLEN MERIWETHER, ESQUIRE (ARGUED)
BRYAN L. CLOBES, ESQUIRE
Cafferty Faucher LLP
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103

JOE R. WHATLEY, JR., ESQUIRE (ARGUED)
EDITH M. KALLAS, ESQUIRE
Whatley Drake & Kallas LLC
1540 Broadway, 37th Floor
New York, New York 10036

CHARLENE P. FORD, ESQUIRE
Whatley Drake & Kallas LLC
2001 Pennsylvaniark Place North, Suite 1000
Birmingham, Alabama 35203
        Attorneys for Appellants

DANIEL J. LEFFELL, ESQUIRE
ANDREW C. FINCH, ESQUIRE
DAVID J. FRIAR, ESQUIRE
Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

3

KENNETH A. GALLO, ESQUIRE
Paul Weiss Rifkind Wharton & Garrison LLP
2001 K Street, N.W., Suite 600
Washington, D.C. 20006

 Attorneys for Appellees,

 American International Group, Inc.; American International Specialty Lines Insurance Company; Lexington Insurance Company; AIG Casualty Company f/k/a Birmingham Fire Insurance Company of Pennsylvania; American Home Assurance Company; National Union Fire Insurance Company of Pittsburgh, Pa.; National Union Fire Insurance Company of Louisiana; American International Insurance Company; The Insurance Company of the State of Pennsylvania; AIU Insurance Company; Commerce and Industry Insurance Company; New Hampshire Insurance Company; The Hartford Steam Boiler Inspection and Insurance Company; Illinois National Insurance Co.; AIG Life Holdings (US), Inc. f/k/a American General Corporation; AIG Excess Liability Insurance Company Ltd. f/k/a Staff Excess Liability Company, Ltd.; AIG Life Insurance Company; The United States Life Insurance Company in the City of New York

SETH P. WAXMAN, ESQUIRE (ARGUED)
WILLIAM J. KOLASKY, ESQUIRE
JONATHAN E. NUECHTERLEIN, ESQUIRE
Wilmer Cutler Pickering Hale & Dorr LLP

4

1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

PAUL A. ENGELMAYER, ESQUIRE
ROBERT W. TRENCHARD, ESQUIRE
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue, 30th Floor
New York, New York 10022

ANDREA J. ROBINSON, ESQUIRE
JOHN J. BUTTS, ESQUIRE
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
        Attorneys for Appellees,
        The Hartford Financial Services Group, Inc.; Hartford Fire Insurance Co.; Twin City Fire Insurance Co.; Pacific Insurance Co., Ltd.; Nutmeg Insurance Co.; The Hartford Fidelity & Bonding Co.; Hartford Life and Accident Insurance Company; Hartford Life Group Insurance Company; Hartford Life Insurance Company

DONALD A. ROBINSON, ESQUIRE
LEDA DUNN WETTRE, ESQUIRE
Robinson Wettre & Miller LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102

5

RICHARD C. GODFREY, ESQUIRE
LESLIE M. SMITH, ESQUIRE
DANIEL E. LAYTIN, ESQUIRE
ELIZABETH A. LARSEN, ESQUIRE
Kirkland & Ellis LLP
300 North LaSalle Street, Suite 2400
Chicago, Illinois 60654
  Attorneys for Appellees,
  Aon Corporation; Aon Broker Services, Inc.; Aon Risk Services Companies, Inc.; Aon Risk Services, Inc. U.S.; Aon Risk Services, Inc. of Maryland; Aon Risk Services, Inc. of Louisiana; Aon Risk Services of Texas, Inc.; Aon Risk Services, Inc. of Michigan; Aon Group, Inc.; Aon Services Group, Inc.; Aon Re, Inc.; Affinity Insurance Services, Inc.; Aon Re Global, Inc.; Aon Consulting, Inc.

LIZA M. WALSH, ESQUIRE
MARC D. HAEFNER, ESQUIRE
Connell Foley LLP
85 Livingston Avenue
Roseland, New Jersey 07068

H. LEE GODFREY, ESQUIRE
NEAL S. MANNE, ESQUIRE
JOHNNY CARTER, ESQUIRE
Susman Godfrey LLP
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096

6

JEREMY S. BRANDON, ESQUIRE
Susman Godfrey LLP
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Attorneys for Appellees,
ACE Limited; ACE INA Holdings, Inc.; ACE USA, Inc.;
ACE American Insurance Co.; Westchester Surplus
Lines Insurance Co.; Illinois Union Insurance Co.;
Indemnity Insurance Co. of North America; ACE Group
Holdings, Inc.; ACE US Holdings, Inc.; Westchester Fire
Insurance Company; INA Corporation; INA Financial
Corporation; INA Holdings Corporation; ACE Property
& Casualty Insurance Co.; Pacific Employers Insurance
Co.

EAMON O'KELLY, ESQUIRE
JOHNS F. COLLINS, ESQUIRE
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, New York 10019

DAVID J. GRAIS, ESQUIRE
Grais & Ellsworth LLP
70 East 55th Street
New York, New York 10022
Attorneys for Appellees,
American Re Corporation; American Re-Insurance
Company; Munich-American Risk Partners; American

Alternative Insurance Corporation

MICHAEL L. WEINER, ESQUIRE
PAUL M. ECKLES, ESQUIRE
Skadden Arps Slate Meagher & Flom LLP
Four Times Square
New York, New York 10036
    Attorneys for Appellees,
    AXIS Specialty Insurance Company; AXIS Surplus Insurance Company; AXIS Capital Holdings Ltd.

MICHAEL L. McCLUGGAGE, ESQUIRE
BETH L. FANCSALI, ESQUIRE
Wildman Harrold Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606
    Attorneys for Appellees,
    CNA Financial Corp.; The Continental Insurance Co.; Continental Casualty Co.; American Casualty Co. of Reading, PA

LAZAR P. RAYNAL, ESQUIRE
McDermott Will & Emery LLP
227 West Monroe Street, Suite 5200
Chicago, Illinois 60606
    Attorney for Appellees,
    Chicago Insurance Co.; Fireman's Fund Insurance Company; National Surety Corp.

PETER R. BISIO, ESQUIRE
Hogan Lovells US LLP
555 13th Street, N.W.
Washington, D.C. 20004
  Attorney for Appellees,
  The Chubb Corporation; Federal Insurance Company;
  Executive Risk Indemnity Inc.; Vigilant Insurance
  Company

LOUIS G. CORSI, ESQUIRE
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, New York 10271-0079
  Attorney for Appellees,
  Crum & Forster Holdings Corp.;
  United States Fire Insurance Company

JOHN L. THURMAN, ESQUIRE
Farrell & Thurman PC
172 Tamarack Circle
Skillman, New Jersey 08558

ROBERT A. ALESSI, ESQUIRE
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, New York 10005-1702
 Attorneys for Appellees,
 Greenwich Insurance Company; Indian Harbor Insurance
 Company; XL Capital Ltd.; X.L. America, Inc.; XL
 Insurance America, Inc.

ALAN L. KILDOW, ESQUIRE
SONYA R. BRAUNSCHWEIG, ESQUIRE
JAROD M. BONA, ESQUIRE
DLA Piper US LLP
90 South Seventh Street, Suite 5100
Minneapolis, Minnesota 55402
 Attorneys for Appellees,
 Wells Fargo & Co.; Acordia, Inc.

JONATHAN M. WILAN, ESQUIRE
Hunton & Williams LLP
1900 K Street, N.W., Suite 1200
Washington, D.C. 20006

JOHN J. GIBBONS, ESQUIRE
MICHAEL R. GRIFFINGER, ESQUIRE
Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102

10

Attorneys for Appellee,
Hilb, Rogal & Hobbs Company

RICHARD C. PEPPERMAN II, ESQUIRE
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attorney for Appellees,
Willis Group Holdings Limited; Willis Group Limited;
Willis North America, Inc.; Willis of New York, Inc.;
Willis of Michigan, Inc.

KEVIN J. FEE, ESQUIRE
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue, 18th Floor
New York, New York 10017

BRIAN E. ROBISON, ESQUIRE
Vinson & Elkins LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Attorneys for Appellees,
Liberty Mutual Holding Company, Inc.; Liberty Mutual
Insurance Co.; Liberty Mutual Fire Insurance Co.;
Wausau Underwriters Insurance Co.; Employers
Insurance Co. of Wausau; Wausau Business Insurance
Co.; Wausau General Insurance Co.

11

MICHAEL J. GARVEY, ESQUIRE
PAUL C. CURNIN, ESQUIRE
DAVID ELBAUM, ESQUIRE
BRYCE L. FRIEDMAN, ESQUIRE
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
        Attorneys for Appellees,
        The Travelers Companies, Inc.; St. Paul Fire and Marine
        Insurance Company; Gulf Insurance Company; St. Paul
        Mercury Insurance Company; Travelers Casualty and
        Surety Company of America; The Travelers Indemnity
        Company; Athena Assurance Company; Travelers
        Property Casualty Corp.


HENRY WEISBURG, ESQUIRE
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
        Attorney  for Appellees,
        Munich Reinsurance


MICHAEL M. MADDIGAN, ESQUIRE
PAUL B. SALVATY, ESQUIRE
O'Melveny & Myers LLP
400 South Hope Street, 15th Floor
Los Angeles, California 90071

SAMUEL P. MOULTHROP, ESQUIRE
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
    Attorneys for Appellees,
    Life Insurance Company of North America; Connecticut
    General Life Insurance Company

JAMES W. CARBIN, ESQUIRE
Duane Morris LLP
744 Broad Street, Suite 1200
Newark, New Jersey 07102
    Attorney for Appellees,
    MetLife, Inc.; Metropolitan Life Insurance Company;
    Paragon Life Insurance Company; General American
    Life Insurance Company; New England Life Insurance
    Company; Citicorp Life Insurance Company; Travelers
    Life and Annuity Company; Travelers Insurance
    Company; Reinsurance Group of America, Inc.

EDWARD G. BIESTER III, ESQUIRE
JEFFREY S. POLLACK, ESQUIRE
Duane Morris LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103
    Attorneys for Appellees,
    MetLife, Inc.; Metropolitan Life Insurance Company;

13

Paragon Life Insurance Company

DOUGLAS S. EAKELEY, ESQUIRE
JOHN R. MIDDLETON, ESQUIRE
MATTHEW SAVARE, ESQUIRE
SCOTT L. WALKER, ESQUIRE
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
    Attorneys for Appellees,
    Prudential Financial, Inc.;
    The Prudential Insurance Company of America

PATRICK W. SHEA, ESQUIRE (ARGUED)
Paul Hastings Janofsky & Walker LLP
75 East 55th Street
New York, New York 10022

STEVEN P. DEL MAURO, ESQUIRE
McElroy Deutsch Mulvaney & Carpenter LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
    Attorneys for Appellees,
    The Unum Group Corporation; Unum Life Insurance
    Company of America; Provident Life and Accident
    Insurance Company

STEPHEN P. YOUNGER, ESQUIRE
LAURA J. WOOD, ESQUIRE
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
    Attorneys for Appellees,
    Universal Life Resources; ULR Insurance Services Inc.;
    Benefits Commerce; Douglas P. Cox

RACHEL L. GERSTEIN, ESQUIRE
ROBERT H. PEES, ESQUIRE
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
    Attorneys for Appellees,
    USI Holdings Corporation; USI Consulting Group, Inc.;
    USI Services Corporation f/k/a USI Insurance Services
    Corp.

KEVIN P. RODDY, ESQUIRE
Wilentz Goldman & Spitzer, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
    Attorney for *Amicus Curiae*-Appellants at 07-4046,
    National Association of Shareholder and Consumer
    Attorneys (NASCAT)

EUGENE R. ANDERSON, ESQUIRE
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York 10020

      Attorney for *Amicus Curiae*-Appellants at 07-4046,
      United Policyholders

------

OPINION OF THE COURT

------

SCIRICA, *Circuit Judge*.

      This appeal from orders of dismissal under Federal Rule of Civil Procedure 12(b)(6) involves multiple putative class actions alleging massive conspiracies throughout the insurance industry. Plaintiffs are purchasers of commercial and employee benefit insurance, and defendants are insurers and insurance brokers that deal in those lines of insurance. According to plaintiffs, defendants entered into unlawful, deceptive schemes to allocate purchasers among particular groups of defendant insurers. The complaints assert that conspiring brokers funneled unwitting clients to their co-conspirator insurers, which were insulated from competition; in return, the insurers awarded the brokers contingent commission payments—concealed from the insurance purchasers and surreptitiously priced into insurance premiums—based on the volume of premium dollars steered their way. As a result of this scheme, plaintiffs allege they paid

16

inflated prices for their insurance coverage and were generally denied the benefits of a competitive market. The question on appeal is whether plaintiffs have adequately pled either a per se violation of § 1 of the Sherman Act (plaintiffs have foresworn a full-scale rule-of-reason analysis) or a violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act. Concluding they had not, the District Court dismissed the complaints. We will affirm in large part, vacate in part, and remand for further proceedings.

## I. Procedural History and Plaintiffs' Allegations

This litigation followed on the heels of a public investigation and enforcement action. In October 2004, the New York State Attorney General filed a civil complaint in state court against insurance broker Marsh & McLennan ("Marsh"), alleging "that Marsh had solicited rigged bids for insurance contracts, and had received improper contingent commission payments in exchange for steering its clients to a select group of insurers." *In re Ins. Brokerage Antitrust Litig.*, Nos. 04-5184, 05-1079, 2006 WL 2850607, at *1 (D.N.J. Oct. 3, 2006) (citing *People v. Marsh & McLennan Cos.*, No. 04/403342 (N.Y. Sup. Ct. Oct. 14, 2004)). The next month, a group of attorneys general and state insurance departments began a broader investigation of insurance-industry practices. Private parties also filed numerous federal actions, which are the subject of this appeal.

The private actions were transferred by the Judicial Panel

17

on Multidistrict Litigation to the United States District Court for the District of New Jersey for consolidated pretrial proceedings. *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371 (J.P.M.L. 2005); *see* 28 U.S.C. § 1407. The District Court severed and realigned the actions into two consolidated dockets—the first pertaining to claims regarding property and casualty insurance (the "Commercial Case"), and the second pertaining to claims regarding employee benefits insurance (the "Employee Benefits Case").

> The plaintiffs in the Commercial Case are a proposed class of businesses, individuals, and public entities who, between August 26, 1994 and September 1, 2005, engaged the services of the Broker Defendants to obtain advice with respect to the procurement or renewal of commercial property and casualty insurance and entered into or renewed an insurance policy with the Insurer Defendants. The plaintiffs in the Employee Benefits Case are both employers who utilized the services of the Broker Defendants to obtain group insurance coverage from the Insurer Defendants for their employees as part of their employee benefits plans and employees who obtained insurance from the Insurer Defendants through the employers' benefits plans.

18

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 249 (3d Cir. 2009) (affirming, inter alia, the District Court's approval of plaintiffs' settlement agreements with two defendants in this litigation).[1]

In accordance with the District Court's restructuring, plaintiffs filed a separate consolidated amended complaint in each of the Commercial and Employee Benefits cases. Each complaint alleged violations of the Sherman Act, 15 U.S.C. § 1, and the RICO Act, 18 U.S.C. § 1962(c), (d), as well as violations of various state-law antitrust statutes and common-law duties. Shortly thereafter, defendants moved to dismiss the Sherman Act and RICO claims in both cases under Federal Rule

---

[1]This statement paraphrases the description of the proposed plaintiff classes given by the District Court. *See In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2892700, at *2 (D.N.J. Sept. 28, 2007). The complaints, however, arguably define the proposed classes to include not only those persons or entities who bought insurance from a defendant insurer through a defendant broker, but also those persons or entities who bought insurance from *any* insurer through a defendant broker. *See* Commercial Case Second Amended Complaint (Comm. SAC) ¶ 555; Employee Benefits Case Second Amended Complaint (EB SAC) ¶ 585. This discrepancy is not relevant to our disposition of this appeal.

19

of Civil Procedure 12(b)(6).[2]

On October 3, 2006, the District Court granted the motions and dismissed the claims without prejudice. *Ins. Brokerage*, 2006 WL 2850607. Defendants had asserted in their moving papers that they were immune from Sherman Act liability under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, which "provides a statutory antitrust exemption for activities that (1) constitute the 'business of insurance,' (2) are regulated pursuant to state law, and (3) do not constitute acts of 'boycott, coercion or intimidation.'" *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1133 (3d Cir. 1993) (quoting *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 219–20 (1979)); *see* 15 U.S.C. §§ 1012(b), 1013(b). The District Court rejected this argument on the ground that defendants' alleged conduct was not part of the "business of insurance" within the meaning of the Act. 2006 WL 2850607, at *7–10. But the court nonetheless dismissed both the Sherman Act and RICO claims because it found the complaints lacked the requisite factual specificity.

In granting leave to amend, the District Court instructed plaintiffs to file in each case a supplemental statement of

[2]In the Employee Benefits Case only, plaintiffs also brought claims under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(2), alleging defendants had breached fiduciary duties imposed by the statute. These claims are not before us. *See infra* note 3.

20

particularity for their federal antitrust claims and an amended RICO case statement for their RICO claims. Plaintiffs did so, and defendants again moved to dismiss. On April 5, 2007, the District Court again granted the motions, but it once again allowed plaintiffs an opportunity to amend their pleadings. *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1100449 (D.N.J. Apr. 5, 2007) (antitrust claims); *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980 (D.N.J. Apr. 5, 2007) (RICO claims). In response, plaintiffs filed a Second Amended Complaint ("SAC") in each of the Commercial and Employee Benefits cases, as well as a Revised Particularized Statement ("RPS") and Amended RICO Case Statement ("ARCS") augmenting the Second Amended Complaint's allegations. For a third time, defendants moved to dismiss under Rule 12(b)(6). In orders dated August 31 and September 28, 2007, the District Court again dismissed the antitrust and RICO claims—this time with prejudice. Applying the pleading standard set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), which had been decided on May 21, 2007, the District Court concluded that plaintiffs' allegations in both the Commercial and the Employee Benefits cases were insufficient with respect to both the Sherman Act and RICO claims. *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2533989 (D.N.J. Aug. 31, 2007) (antitrust claims); *In re. Ins. Brokerage Antitrust Litig.*, 2007 WL 2892700 (D.N.J. Sept. 28, 2007) (RICO

21

claims). Plaintiffs filed a timely notice of appeal in each case.[3]

Plaintiffs' pleadings are of a substantial volume. The complaint in each case is more than 200 pages (including attached exhibits), and to this total must be added the pages in

---

[3]The District Court exercised jurisdiction under 28 U.S.C. §§ 1331, 1367. We have jurisdiction under 28 U.S.C. § 1291. The Sherman Act and RICO claims were the only federal causes of action asserted in the Commercial complaint. Having dismissed both claims in its August 31 and September 28 opinions, the District Court declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed the Commercial complaint in its entirety. 2007 WL 2892700, at *34; *see* 28 U.S.C. § 1367(c). The Employee Benefits complaint also included claims that the insurer defendants had breached their fiduciary duties under ERISA. The District Court subsequently disposed of these ERISA claims when it granted defendants' motion for summary judgment, *In re Ins. Brokerage Antitrust Litig.*, 2008 WL 141498 (D.N.J. Jan. 14, 2008), after which it declined to exercise supplemental jurisdiction over the state-law claims and dismissed the Employee Benefits complaint in its entirety, *In re Ins. Brokerage Antitrust Litig.*, No. 05-1079 (D.N.J. Feb. 13, 2008).

Although plaintiffs originally appealed the District Court's summary judgment order regarding the ERISA claims, they expressly waived that issue in their opening brief. Plaintiffs' Employee Benefits (EB) Br. 10.

22

the Revised Particularized Statements and Amended RICO Case Statements. Significantly, the District Court allowed discovery to proceed while the motions to dismiss were pending. Plaintiffs' amended pleadings were thus able to draw on documents produced and depositions taken pursuant to these discovery orders, as well as material unearthed in the course of the public investigations.

As reflected by the length of this opinion—and of the caption—this is extraordinarily complex litigation involving a large swath of the insurance provider and brokerage industries, elaborate allegations of misconduct, and challenging legal issues. The District Court skillfully managed the consolidated proceedings. We take particular note of the court's thorough treatment of defendants' motions to dismiss, which comprised five separate opinions examining three successive rounds of pleadings. The court's patient and meticulous analysis has greatly aided our review.

## A. Antitrust Claims

### 1. Broker-Centered Conspiracies

In each complaint, plaintiffs allege the existence of a number of broker-centered antitrust conspiracies. As the name suggests, at the center of each alleged conspiracy was a defendant broker, who colluded with its defendant insurer-partners to steer its clients, purchasers of insurance, to particular insurers in exchange for the payment of contingent commissions. In the Commercial Case, plaintiffs allege six such

23

conspiracies, centered on defendant brokers Marsh,[4] Aon Corporation, Wells Fargo & Company, HRH, Willis Group, and Gallagher, respectively. In the Employee Benefits Case, plaintiffs allege five broker-centered conspiracies, led respectively by Marsh,[5] Aon, Universal Life Resources,

---

[4]While this appeal was pending, the District Court approved a settlement agreement between the plaintiffs and the Marsh Defendants. (In the Commercial Case, the Marsh Defendants comprise Marsh & McLennan Companies, Inc.; Marsh Inc.; Marsh USA, Inc.; Marsh USA Inc. (Connecticut); and Seabury & Smith, Inc. In the Employee Benefits Case, the Marsh Defendants comprise Marsh & McLennan Companies, Inc.; Marsh Inc.; Marsh USA, Inc.; Marsh USA Inc. (Connecticut); Mercer, Inc.; Mercer Human Resource Consulting LLC; Mercer Human Resource Consulting of Texas, Inc.; and Seabury & Smith, Inc.) *See In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2009 WL 411877 (D.N.J. Feb. 17, 2009), *appeal docketed*, No. 09-1821 (3d Cir. Mar. 30, 2009). Per the settling parties' joint motions, we dismissed the instant appeal as to the Marsh Defendants without prejudice. *See In re Ins. Brokerage Antitrust Litig.*, Nos. 07-4046, 08-1455, 08-1777 (3d Cir. June 30, 2008).

[5]*See supra* note 4.

24

Gallagher, and Willis Group.[6]

According to the complaints, the broker-centered conspiracies proceeded in two stages. First, "[b]eginning in the mid-to-late 1990s, each of the Broker Defendants," in "a dramatic change" from prior practice, "began to form so-called 'strategic partnerships' with certain insurance companies, to which it would then allocate the bulk of its business." Comm. SAC ¶ 83. The broker and each of its co-conspiring insurers agreed, "and each of the conspiring insurers horizontally agreed," that the broker "would 'consolidate' its business by directing the bulk of its premium volume to its 'strategic partner' co-conspirators, thereby eliminating hundreds of other

---

[6]The defendant-broker names given here encompass related and/or subsidiary companies, as detailed in Comm. SAC ¶¶ 24–36 and EB SAC ¶¶ 34–45. The names of the defendant insurers allegedly conspiring with each broker can also be found in the complaints; in the interest of brevity, we will not reproduce them here. *See* Comm. SAC ¶¶ 95, 157, 201, 236, 262, 326; EB SAC ¶¶ 106, 139, 175, 239, 271. The number of insurers in each alleged broker-centered conspiracy ranges from three to thirteen. (These numbers refer to parent entities and do not include the subsidiary/related companies also named as defendants. *See* Comm. SAC ¶¶ 37–63 (listing subsidiary/related insurers in the Commercial Case); EB SAC ¶¶ 46–57 (listing subsidiary/related insurers in the Employee Benefits Case).)

25

insurers from competing equally with the conspiring insurers for the majority" of the broker's business. *Id.* ¶ 158. In the second stage, the insurer-members of each conspiracy each agreed with the broker, "and agreed horizontally among themselves, to reduce or eliminate competition for that secured business among the conspiring ['strategic partner'] insurers." *Id.*[7]

As alleged by plaintiffs, a major focus of the second stage of the conspiracies was protecting the incumbent business of each insurer. To maximize insurers' retention of existing customers, the conspiracies allegedly employed a variety of "incumbent protection devices." Specifically, plaintiffs aver that brokers facilitated the non-competitive allocation of customers to insurers by giving insurers "last looks" and "first looks" on bids.[8] The complaints also assert that each insurer in each broker-centered conspiracy knew the identity of the

---

[7]The quoted language is drawn from the description of the Aon-centered conspiracy in the Commercial complaint but is generally applicable to all of the alleged broker-centered conspiracies. *See* Comm. SAC ¶¶ 66–67; EB SAC ¶¶ 76–77.

[8]Plaintiffs do not specifically define these terms, but from context we infer that a "last look" affords a bidder the ability to make the final bid with knowledge of all previous bids, and a "first look" allows a bidder the opportunity to bid without competition (for example, guaranteeing a sale to the bidder if it can match a certain price).

broker's other "strategic partners." The brokers also revealed to each insurer detailed information about the arrangements between the broker and its other insurer-partners, including information about the size of the contingent commissions those partners were paying to the broker, and even the amount of premium volume steered by the broker to the other insurers. These facts, plaintiffs contend, evince the existence of an agreement between the insurers and the broker—and among the insurers themselves—to reap inflated profits by stifling competitive bidding and protecting incumbent business, in violation of § 1 of the Sherman Act.

These incumbent protection devices, plaintiffs claim, were common to all of the broker-centered conspiracies. In the Commercial Case only, plaintiffs also allege that insurers in the Marsh-centered conspiracy acceded to broker requests to provide "false" bids that were intentionally higher than the bids of the insurer to which the broker wished to award the business. For example, the complaint relates a statement by a former employee of a defendant insurer that his employer had agreed to "provide[] losing quotes" to its broker-partner in exchange for, among other things, the broker's "getting 'quotes from other [insurance] carriers that would support the [employer, at least when it was the incumbent carrier] as being the best price.'" *Id.* ¶ 109. The employee of another insurer allegedly stated that "she provided protective quotes when the broking plan called for it '[t]o show, to pretend to show competition where there is none.'" *Id.* ¶ 119. This employee was allegedly told by the

27

broker that the insurer "should provide protective quotes so that [it] would not face competition on its own renewals." *Id.* This bid-rigging behavior facilitated the customer allocation scheme by deceiving insurance customers into believing they were receiving the best possible price in a competitive market. According to plaintiffs, insurers were willing to assist co-conspiring insurers in this way because they expected to be the beneficiary of such bid rigging where their own incumbent business was concerned.

## 2. Global Conspiracy

In addition to the broker-centered conspiracies, each complaint alleges a "global conspiracy" among all of the defendants: "[W]hile engaging in their separate 'hub and spoke' schemes [i.e., the broker-centered conspiracies] to create supra-competitive premiums and contingent commissions, each of the Broker 'hubs' simultaneously agreed horizontally not to compete with each other by disclosing any competing broker's contingent commission arrangements, or the consequent premium price impact of those arrangements, in an effort to win those brokers' customers' business." *Id.* ¶ 354. Although each broker, plaintiffs claim, knew that the other brokers were using contingent commission arrangements to obtain outsized profits, each "also knew that exposing another broker's contingent commission arrangements to the other broker's customers would lead to retaliation, thereby threatening the first broker's own contingent commission scheme and supra-competitive profits." *Id.* ¶ 355. "Therefore," plaintiffs allege, the brokers "agreed

28

horizontally" to maintain a mutually beneficial silence. *Id.* ¶ 362. Plaintiffs further allege that the defendant insurers were "complicit[]" in this horizontal agreement among the brokers, *id.* ¶ 353, and that they also agreed "horizontally with each other[] not to disclose the Broker-Centered Conspiracies and resulting supra-competitive premiums to the brokers' customers," *id.* ¶ 359.

As evidence of this asserted "global" agreement in the Commercial Case, plaintiffs point to allegations that each broker-centered conspiracy operated in a similar way and that the brokers incorporated similar standardized confidentiality provisions into their respective contingent commission agreements with insurers, which prohibited disclosing the terms of the contingent commission agreements to insurance customers. Furthermore, plaintiffs allege that the brokers' membership in the Council of Insurance Agents & Brokers (CIAB), a trade association, "afforded them many opportunities to exchange information and allowed Defendants to adopt collective policies towards nondisclosure of rival brokers' contingent commissions." *Id.* ¶ 364.

Plaintiffs in the Employee Benefits Case also rely on these types of allegations to support their claim of a global conspiracy. They find additional support, however, in the similar way in which insurers, at the alleged behest of the brokers, accounted for the expense of contingent commissions on Schedule A of Form 5500, a document that must, under ERISA, be filed with the Internal Revenue Service and the

29

Department of Labor. According to plaintiffs, instead of reporting the commissions as "a variable, case-specific cost," insurers treated them "improperly as a non-reportable fixed cost (overhead)." EB SAC ¶ 305. This reporting technique allegedly yielded two advantages to defendants. First, they "were enabled to evade their disclosure requirements under ERISA and mislead their clients." *Id.* Second, by classifying contingent commissions as a fixed cost spread across all lines of an insurer's business, "the Insurer Defendants artificially raised the price of all lines of insurance, rather than substantially raising the cost of insurance" obtained through the co-conspiring brokers, which would have rendered that insurance blatantly uncompetitive with insurance obtained through other, non-conspiring brokers. *Id.* ¶ 306. Not only, plaintiffs allege, did defendants adopt a similar approach to accounting for the contingent commission agreements, but employees of the defendants also sometimes exchanged information about how they completed Form 5500. Plaintiffs claim these allegations support an inference of an agreement not to disclose contingent commissions properly in order to conceal the existence of defendants' anticompetitive practices.

## B. RICO Claims

Plaintiffs contend that defendants' alleged customer allocation schemes also violated the RICO statute. In the Commercial Case, plaintiffs assert the existence of six RICO enterprises, which correspond to the six broker-centered conspiracies identified in the antitrust claims. "Alternatively,

30

Plaintiffs allege that CIAB is a legal entity which constitutes a RICO enterprise . . . ." Comm. SAC ¶ 512. According to the complaint, the defendants utilized these enterprises to engage in a pattern of racketeering activity consisting of numerous acts of mail and wire fraud that served to conceal and misrepresent defendants' customer allocation schemes.

The Employee Benefit complaint alleges similar predicate acts of racketeering and adds allegations that defendants misrepresented information reported on Form 5500 and otherwise violated ERISA through their use of contingent commissions. Here, plaintiffs allege the existence of five RICO enterprises congruent with the five alleged broker-centered antitrust conspiracies.

## II. Discussion

We exercise plenary review of the District Court's orders granting defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009). This Rule authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 8(a)(2), a complaint need present "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (omission in *Twombly*); *see* Fed. R. Civ. P. 8(a)(2). To comply

with this general pleading standard, the complaint, "construe[d] . . . in the light most favorable to the plaintiff," *Gelman*, 583 F.3d at 190 (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)), must contain "'enough factual matter (taken as true) to suggest' the required element[s]" of the claims asserted, *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

## A. Antitrust Claims

### 1. Plausibility Under *Twombly*

#### a. Legal Standards

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. As we have explained, this statutory language imposes two essential requirements on an antitrust plaintiff.[9] "First, the plaintiff must show that the defendant was a party to a 'contract, combination

---

[9]In addition to the following two requirements, the plaintiffs in any antitrust case "must prove antitrust injury, which is to say (1) injury of the type the antitrust laws were intended to prevent and (2) that flows from that which makes defendants' acts unlawful." *A.D. Bedell Wholesale Co. v. Phillip Morris Inc.*, 263 F.3d 239, 247 (3d Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1997) (emphasis omitted)).

32

. . . or conspiracy.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). Instead of assigning each of these last three terms a distinct meaning, courts have interpreted them collectively to require "some form of concerted action," *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999) (internal quotation marks omitted), in other words, a "'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme,'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Put more succinctly, "[t]he existence of an agreement is the hallmark of a Section 1 claim." *Baby Food*, 166 F.3d at 117; *see InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.").[10]

---

[10]"Congress used th[e] distinction between concerted and independent action to deter anticompetitive conduct and compensate its victims, without chilling vigorous competition through ordinary business operations. . . . [U]nlike independent action, '[c]oncerted activity inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2209 (2010) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768–69 (1984)).

In addition to demonstrating the existence of a "conspiracy," or agreement, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade."[11] *Mack Trucks*, 530 F.3d at 218; *see Flat Glass*, 385 F.3d at 356 ("Despite its broad language, Section 1 only prohibits contracts, combinations or conspiracies that *unreasonably* restrain trade."). "[T]he usual standard" applied to determine whether a challenged practice unreasonably restrains trade is the so-called "rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007). Under this standard, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Mack Trucks*, 530 F.3d at 225 (internal quotation marks omitted). Significantly, under a rule-of-reason analysis, the plaintiff "bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005). Because of "the difficulty of isolating the [actual] market effects of challenged conduct," *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993), successful attempts to meet this burden typically include a demonstration of defendants' market power, as "a judgment about market power is [a] means by which the

---

[11]"The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *Am. Needle*, 130 S. Ct. at 2206.

effects of the [challenged] conduct on the market place can be assessed," *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 110 n.42 (1984) (quoting the Solicitor General's "correct[]" observation). *Cf. FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (internal quotation marks omitted)). If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits.[12] *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001) (describing an analysis in which courts "balance the effect of the alleged anti-competitive activity against its competitive purposes within the

---

[12]In the event a genuinely disputed issue of fact exists regarding the reasonableness of the restraint, the determination is for the jury. *See Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 343 (1982) ("[T]he rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."); 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1909b (2d ed. 2005) ("[O]nce the court decide[s] that the rule of reason should apply, disputed factual questions about reasonableness should be left to the jury.").

35

relevant product and geographic markets"); *see also Leegin*, 551 US. at 886 ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.").

Judicial experience has shown that some classes of restraints have redeeming competitive benefits so rarely that their condemnation does not require application of the full-fledged rule of reason. Paradigmatic examples are "horizontal agreements among competitors to fix prices or to divide markets." *Leegin*, 551 U.S. at 886 (citations omitted). Once a practice has been found to fall into one of these classes, it is subject to a "per se" standard. As the Supreme Court has explained, these practices

> are ordinarily condemned as a matter of law under an "illegal *per se*" approach because the probability that these practices are anticompetitive is so high; a *per se* rule is applied when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found.

*NCAA*, 468 U.S. at 100 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979)); *see Brown Univ.*,

36

5 F.3d at 670 ("*Per se* rules of illegality are judicial constructs, and are based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition." (internal citation omitted)). Under the per se standard, plaintiffs are relieved of the obligation to define a market and prove market power. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (citing *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464–65 (3d Cir. 1998); 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1910a (2d ed. 2005); *see also* 7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1509c, at 403–04 (2d ed. 2003) ("Little is lost when the court condemns a restraint that was harmless because the defendants lacked power but that was socially useless in any event."). Once a defendant's practice has been found to fall into one of the recognized classes, it is "conclusively presumed to unreasonably restrain competition." *Flat Glass*, 385 F.3d at 356 (internal quotation marks omitted).[13]

---

[13]When evaluating tying arrangements, in which a firm "sell[s] one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)," *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992) (en banc), courts have applied a modified version of the per se standard. Unlike the "truly per se rules" explicated above, in which no inquiry is made into market structure, actual anticompetitive effects, or possible justifications, "[t]he 'per se' rule against tying goes only

37

While pleading exclusively per se violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy. If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed. *E.g.*, *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.2 (2006) (declining to conduct a rule of reason analysis where plaintiffs "ha[d] not put forth a rule of reason claim"). *See generally* 11 Hovenkamp, *supra*, ¶ 1910b (discussing the cost-benefit analysis involved in deciding whether to pursue an exclusively per se theory of liability).

Some restraints of trade are "highly suspicious" yet

halfway . . .: the inquiry into tying product market structure . . . is still required, but if the defendant is found to have market power there, the plaintiff is, in theory, relieved of proving actual harm to competition and of rebutting justifications for the tie-in." *Id.* at 477; *see U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 n.2 (1st Cir. 1993) (stating that tying might better be described as a "quasi" per se offense, "since some element of [market] power must be shown and defenses are effectively available") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992)). *See generally* 7 Areeda & Hovenkamp, *supra*, ¶ 1510a (explicating various different meanings of "per se" language in antitrust jurisprudence).

"sufficiently idiosyncratic that judicial experience with them is limited." 11 Hovenkamp, *supra*, ¶ 1911a. Per se condemnation is inappropriate, but at the same time, the "inherently suspect" nature of the restraint obviates the sort of "elaborate industry analysis" required by the traditional rule-of-reason standard. *Gordon*, 423 F.3d at 210. Courts have devised a "quick look" approach for these cases. *See Dagher*, 547 U.S. at 7 n.3; *Cal. Dental Ass'n. v. FTC*, 526 U.S. 756, 770 (1999) (stating that a "'quick-look' analysis" is appropriate where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *see also* 11 Hovenkamp, *supra*, ¶ 1911a ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive."). Under a quick look analysis, which is essentially an abbreviated form of the rule of reason, *Cal. Dental*, 526 U.S. at 770, "competitive harm is presumed and the defendant must set forth some competitive justification for the restraints," *Gordon*, 423 F.3d at 210. If no plausible justification is forthcoming, the restraint will be condemned. *Brown Univ.*, 5 F.3d at 669. "If the defendant offers sound procompetitive justifications, however, the court must proceed to weigh the overall reasonableness of the restraint using a full-

scale rule of reason analysis." *Id.*[14]

Here, plaintiffs abjure "a full-scale rule of reason analysis." They claim instead that defendants' behavior was per se unlawful, or that, at the very least, it is susceptible to condemnation under a "quick look" analysis. Plaintiffs do not

---

[14]As the above discussion ought to make clear, the respective analyses conducted under the rule of reason, per se, and quick look standards are not categorically different. In every case, "the essential inquiry" is "whether or not the challenged restraint enhances competition." *Cal. Dental*, 526 U.S. at 780 (internal quotation marks omitted). Under a traditional rule-of-reason analysis, a court requires "actual market analysis," *id.* at 779–80, and carefully balances all of the factors bearing on that ultimate question. In applying per se or quick look analysis, courts make judgments based on judicial experience with certain types of restraints and market contexts, without demanding such extensive inquiry into the market in which the specific restraint at issue operates. But "there is often no bright line separating" the three standards. *Id.* at 779 (quoting *NCAA*, 468 U.S. at 104 n.26). "What is required . . . is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one." *Id.* at 781.

40

dispute that in order to succeed under either of these approaches, they need to show the existence of a horizontal agreement, that is, an agreement between "competitors at the same market level." *In re Pharmacy Benefits Managers Antitrust Litig.*, 582 F.3d 432, 436 n.5 (3d Cir. 2009); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."). Under the Supreme Court's jurisprudence, virtually all vertical agreements now receive a traditional rule-of-reason analysis. *See Leegin*, 551 U.S. 877; *see also Gordon*, 423 F.3d at 210 (rejecting quick look analysis and applying rule of reason where restraint was vertical).[15] In the factual context

_____

[15]In *Leegin*, the Supreme Court overruled its earlier holding that vertical price-fixing agreements were subject to per se condemnation. 551 U.S. at 881–82 (overruling *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)). Earlier, in *Continental T.V., Inc. v. GTE Sylvania Inc.*, the Court had ruled that non-price vertical restraints must be analyzed under the traditional rule of reason rather than a per se standard. 433 U.S. 36 (1977); *see Leegin*, 551 U.S. at 901. Tying arrangements, however, appear to remain an exception to the general rule that vertical restraints are reviewed under the full-scale rule of reason. *See supra* note 13; *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 593–94 (7th Cir. 2008) (explaining that despite a series of Supreme Court decisions

of this case, a horizontal agreement means an agreement among the insurers in the broker-centered conspiracies, and an agreement among either the brokers or the insurers in the global conspiracy. Agreements between brokers and insurers, on the other hand, are vertical and would have to be analyzed under the traditional rule of reason, which plaintiffs have disclaimed.[16]

subjecting various vertical restraints to the rule of reason, including *Leegin*, tying is still reviewed under a modified per se standard).

[16]Although plaintiffs' First Amended Complaints (FAC) expressly pled a rule-of-reason claim in the alternative, *see, e.g.*, Comm. FAC ¶ 530; EB FAC ¶ 454, their Second Amended Complaints omit any reference to the rule of reason, and their moving papers and appellate arguments make clear they are alleging exclusively per se violations. In their initial motions to dismiss, defendants contended that the First Amended Complaints had not adequately defined a market or pled anti-competitive effects and had thus failed to state a claim under the rule of reason. In response, plaintiffs did not assert that they had, in fact, met these requirements; they argued only that "where plaintiffs allege *per se* claims," these requirements do not apply. Plaintiffs' Memorandum of Law in Opposition to Defendants Motions to Dismiss 43 n.26, filed in the District Court as No. 04-5184, Dkt. Entry # 344. In a subsequent submission, plaintiffs explicitly stated that the allegations in their complaints were "subject to *per se* antitrust analysis, not

42

Plaintiffs' obligation to show the existence of a horizontal agreement is not only an ultimate burden of proof but also bears on their pleadings. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2)). Because Federal Rule of Civil Procedure 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief," courts evaluating the viability of a complaint under Rule 12(b)(6) must look beyond conclusory statements and determine whether the complaint's well-pled factual allegations, taken as true, are "enough to raise a right to relief above the speculative level."

---

evaluation under the rule of reason." Plaintiffs' Reply Brief in Support of Motion for Class Certification 1, filed in the District Court as No. 04-5184, Dkt. Entry # 506. Plaintiffs have never disputed the District Court's determination that "[b]ecause Plaintiffs have alleged the Section 1 claim as a *per se* violation, even at the pleading stage Plaintiffs must set forth sufficient facts evidencing a horizontal conspiracy involving market or customer allocation in order for their claim to survive a motion to dismiss." 2007 WL 1100449, at *10; *see also* Defendants' Comm. Br. 10 (stating that on appeal, "[a]s in the district court, Plaintiffs have abandoned any argument that [the complaints] state[] a claim under the rule of reason"). Plaintiffs argue only that they have, in fact, adequately pled such horizontal conspiracies.

43

*Twombly*, 550 U.S. at 555 & n.3. The test, as authoritatively formulated by *Twombly*, is whether the complaint alleges "enough fact[] to state a claim to relief that is plausible on its face," *id.* at 570, which is to say, "'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity],'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556) (alteration in *Arista Records*).[17]

---

[17]*Twombly* affirms that Rule 8(a)(2) requires a statement of facts "suggestive enough" (when assumed to be true) "to render [the plaintiff's claim to relief] plausible," that is, "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *Twombly*, 550 U.S. at 556. *Iqbal*, which reiterated and applied *Twombly*'s pleading standard, endorses this understanding. *See Iqbal*, 129 S. Ct. at 1949–51. Although *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009), stated that *Twombly* and *Iqbal* had "repudiated" the Supreme Court's earlier decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), *see Fowler*, 578 F.3d at 211, we are not so sure. Clearly, *Twombly* and *Iqbal* inform our understanding of *Swierkiewicz*, but the Supreme Court cited *Swierkiewicz* approvingly in *Twombly*, *see* 550 U.S. at 555–56, and expressly denied the plaintiffs' charge that *Swierkiewicz* "runs counter" to *Twombly*'s plausibility standard, *id.* at 569–70. As the Second Circuit has observed, *Twombly* "emphasized that its holding was consistent with [the Court's] ruling in *Swierkiewicz* that 'a heightened pleading requirement,' requiring

As we have recognized, this plausibility standard is an interpretation of Federal Rule of Civil Procedure 8. *Phillips*, 515 F.3d at 234; *see Twombly*, 550 U.S. at 557 (stating that the plausibility standard "reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" (alteration in original)). *Twombly*'s importance to the case before us, however, goes beyond its formulation of the general pleading standard. *Twombly* is also an essential guide to the application of that standard in the antitrust context, for in *Twombly* the Supreme Court also had to determine whether a Sherman Act claim alleging horizontal conspiracy was adequately pled.[18]

---

the pleading of 'specific facts beyond those necessary to state [a] claim and the grounds showing entitlement to relief,' was 'impermissibl[e].'" *Arista Records*, 604 F.3d at 120 (quoting *Twombly*, 550 U.S. at 570 (alterations in *Arista Records*). In any event, *Fowler*'s reference to *Swierkiewicz* appears to be dicta, as *Fowler* found the complaint before it to be adequate. 578 F.3d at 212; *see also id.* at 211 ("The demise of *Swierkiewicz*, however, is not of significance here.").

[18]As the Supreme Court has noted, "[c]ontext matters in notice pleading," *Phillips*, 515 F.3d at 232, and what suffices to withstand a motion to dismiss necessarily depends on substantive law and the elements of the specific claim asserted. *See Iqbal*, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief [so as to satisfy the *Twombly*

The *Twombly* plaintiffs had alleged that defendant telephone companies had "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet service markets and

standard] will . . . be a context-specific task . . . ."); *see also id.* at 1947 ("In *Twombly*, the Court found it necessary first to discuss the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements [the] plaintiff must plead to state [his discrimination] claim . . . ." (internal citation omitted)). The touchstone of Rule 8(a)(2) is whether a complaint's statement of facts is adequate to suggest an entitlement to relief under the legal theory invoked and thereby put the defendant on notice of the nature of the plaintiff's claim. *See Twombly*, 550 U.S. at 565 n.10 (noting that "a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 [of the Sherman Act] context would have little idea" how to answer). Some claims will demand relatively more factual detail to satisfy this standard, while others require less. *See Arista Records*, 604 F.3d at 120 (stating that the Supreme Court's recent pleading decisions "require factual amplification [where] needed to render a claim plausible" (internal quotation marks omitted) (alteration in original)). As discussed below, the question of the sufficiency of the complaint in *Twombly* turned largely on the doctrinal fact that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see Twombly*, 550 U.S. at 554–57.

46

ha[d] agreed not to compete with one another and otherwise allocated customers and markets to one another." *Twombly*, 550 U.S. at 551 (internal quotation marks omitted). The Court found, however, that this sort of "wholly conclusory statement of claim," *id.* at 561, was insufficient to plead an entitlement to relief. *Id.* at 564 & n.9; *see id.* at 556–57 ("Without more, . . . a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). The Court therefore proceeded to examine the entirety of the complaint's allegations, in order to determine whether the complaint contained "enough factual matter (taken as true) to suggest that an agreement was made," in other words, "enough to render a § 1 conspiracy plausible." *Id.* at 556.

In conducting this inquiry, the Court looked to well-settled jurisprudence establishing what is necessary to satisfy the conspiracy requirement of a § 1 claim at various post-pleading stages of litigation. *Id.* at 554 (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537 (1954) (affirming denial of directed verdict); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) (same); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (addressing whether the record evidence of agreement was sufficient to withstand a motion for summary judgment)). The crux of this case law is that evidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement. Indeed, "[e]ven 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and

47

their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Id.* at 553–54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)) (alterations in *Twombly*).[19]  Parallel conduct is, of course, consistent with the existence of an agreement; in many cases where an agreement exists, parallel conduct—such as setting prices at the same level—is precisely the concerted

_____

[19]In a highly concentrated market, "any single firm's price and output decisions will have a noticeable impact on the market and on its rivals," such that when any firm in that market "is deciding on a course of action, any rational decision must take into account the anticipated reaction of the other firms." *Flat Glass*, 385 F.3d at 359 (internal quotation marks omitted); *see* 6 Areeda & Hovenkamp, *Antitrust Law* ¶ 1429 (2d ed. 2003). According to this "theory of interdependence . . . firms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action." *Flat Glass*, 385 F.3d at 359.  Although this oligopolistic behavior, or "conscious parallelism," is often adverse to consumer interests, courts have nonetheless found that it is not, without more, sufficient evidence of a § 1 violation, both because it is not an agreement within the meaning of the Sherman Act, and because it is resistant to judicial remedies. *Id.* at 359–60. *But see* Richard A. Posner, *Antitrust Law* 51–100 (2d ed. 2001) (arguing that "conscious parallelism," or "tacit collusion," should sometimes suffice to prove a § 1 violation).

action that is the conspiracy's object. But as the Supreme Court has long recognized, parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554; *see Matsushita*, 475 U.S. at 594 (warning that "mistaken inferences" of conspiracy from ambiguous circumstantial evidence may "chill the very conduct the antitrust laws are designed to protect"); *see also supra* note 10. In order "to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition," *Flat Glass*, 385 F.3d at 357, and in order to enforce the Sherman Act's requirement of an agreement, the Supreme Court has required that "a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently," *Twombly*, 550 U.S. at 554; *see also Matsushita*, 475 U.S. at 597 n.21 ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

Some courts have denominated these facts, the presence of which may indicate the existence of an actionable agreement, as "plus factors." *Flat Glass*, 385 F.3d at 360. Although "[t]here is no finite set of such criteria . . .[,] [w]e have identified . . . at least three such plus factors: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'" *Id.* (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-*

49

*Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993)). As we have cautioned, however, care must be taken with the first two types of evidence, each of which may indicate simply that the defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism. *Id.* at 360–61; *see* 6 Areeda & Hovenkamp, *Antitrust Law* ¶ 1434c1 (2d ed. 2003); *see also Baby Food*, 166 F.3d at 135 ("[E]vidence of action that is against self-interest or motivated by profit must go beyond mere interdependence.").[20] The third factor, "evidence implying a traditional conspiracy," consists of "non-economic evidence 'that there was an actual, manifest agreement not to compete,'" which may include "'proof that the defendants got together and exchanged assurances of common

[20]In fact, "in actual practice, most courts rely on the *absence* of motivation or offense to self-interest to preclude a conspiracy inference" from ambiguous evidence or mere parallelism. 6 Areeda & Hovenkamp, *supra*, ¶ 1434c2; *see, e.g.*, *Matsushita*, 475 U.S. at 596–97 ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Southway Theatres v. Georgia Theatre Co.*, 672 F.2d 485, 494 (5th Cir. Unit B 1982) (The "basic rule" is "that the inference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants.").

50

action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Flat Glass*, 385 F.3d at 361 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002); 6 Areeda & Hovenkamp, *supra*, ¶ 1434b); *see* 6 Areeda & Hovenkamp, *supra*, ¶ 1416, at 103 (referring generally to "an overt act more consistent with some pre-arrangement for common action than with independently arrived-at decisions").

One important question raised by *Twombly* is what is the relationship between this summary judgment (and directed judgment) jurisprudence governing the kind of evidentiary facts necessary to support a finding of conspiracy, on the one hand, and the "antecedent" issue, *Twombly*, 550 U.S. at 554, of a § 1 plaintiff's pleading burden, on the other. We think *Twombly* aligns the pleading standard with the summary judgment standard in at least one important way: Plaintiffs relying on circumstantial evidence of an agreement must make a showing at both stages (with well-pled allegations and evidence of record, respectively) of "something more than merely parallel behavior," *id.* at 560, something "plausibly suggest[ive of] (not merely consistent with) agreement," *id.* at 557. *See id.* at 557 n.5 (noting that a plaintiff's pleadings must cross the line "between the factually neutral and the factually suggestive"). "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at

51

557. Put differently, allegations of conspiracy are deficient if there are "obvious alternative explanation[s]" for the facts alleged. *Id.* at 567.[21]

A corollary of this proposition is that plaintiffs relying on

---

[21]Although *Twombly*'s articulation of the pleading standard for § 1 cases draws from summary judgment jurisprudence, the standards applicable to Rule 12(b)(6) and Rule 56 motions remain distinct. In expounding this distinction, some judges and commentators have opined that "[e]ven in those contexts in which an allegation of [conspiracy based on] parallel conduct will not suffice to take an antitrust plaintiff's case to the jury, it will sometimes suffice to overcome a motion to dismiss and permit some discovery, perhaps leaving the issue for later resolution on a motion for summary judgment." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 329 (2d Cir. 2010) (Newman, J., concurring). One of *Twombly*'s formulations of the plausibility pleading standard—calling for "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," 550 U.S. at 556—appears to support this view. *See also supra* note 17. In any case, a claim of conspiracy might appear plausible in light of the well-pled facts in the complaint, only to appear deficient at the summary judgment stage, when (1) the plaintiff can no longer rely on mere allegations but must adduce evidence, and (2) the defendant's uncontroverted evidence is also added to the picture.

parallel conduct must allege facts that, if true, would establish at least one "plus factor," since plus factors are, by definition, facts that "tend[] to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Flat Glass*, 385 F.3d at 360 (internal quotation marks omitted); *accord Lum v. Bank of Am.*, 361 F.3d 217, 230 (3d Cir. 2004) (describing plus factors as "circumstances under which . . . the inference of rational independent choice [is] less attractive than that of concerted action" (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977)).[22]

_____

[22]*Twombly* did not explicitly use the term "plus factor" in formulating its pleading standard. But the Court did note that the lower-court decision under review had held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." *Twombly*, 550 U.S. at 553 (quoting 425 F.3d 99, 114 (2d Cir. 2005) (emphasis in original)). The basis for the Court of Appeals' conclusion was that parallel conduct alone was sufficient to plead a § 1 conspiracy, as long as the court could conceive of some set of facts "that would permit a plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." 425 F.3d at 114, *rev'd*, 550 U.S. 544. In reversing, the Supreme Court expressly rejected that premise and retired the "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), on which the Court of Appeals had relied. *Twombly*, 550 U.S. at 561–63. By

53

It bears noting that, consistent with summary judgment analysis, plus factors need be pled only when a plaintiff's claims of conspiracy rest on parallel conduct. Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate. *See Twombly*, 550 U.S. at 564 (distinguishing "independent allegation[s] of actual agreement" from "descriptions of parallel conduct").[23] But this does not

---

repudiating this premise, the Supreme Court necessarily rejected the proposition that plaintiffs may plead conspiracy on the basis of mere parallelism—and thus necessarily required the pleading of plus factors. As *Twombly* put it, "[a] statement of parallel conduct . . . needs some . . . further circumstance," or "further factual enhancement," to plead a plausible § 1 claim. 550 U.S. at 557. Moreover, as discussed below, the crucial deficiency in the *Twombly* complaint was that the plaintiffs could not demonstrate what we have identified as an important plus factor, *see Petruzzi's*, 998 F.2d at 1244, namely that the defendants' alleged parallel conduct was contrary to their self-interest. Accordingly, although a plaintiff still need not plead specific evidence, *see supra* note 17, *Twombly* abrogates our earlier statements, *see, e.g., Lum*, 361 F.3d at 230, that a theory of agreement resting on parallel conduct need not plead facts that, if true, would constitute plus factors.

[23]Courts devised the requirement of "plus factors" in the context of offers of proof of an agreement that rest on parallel conduct, i.e., circumstantial evidence. On appeals from

54

summary judgment, we have stated that direct evidence of a conspiracy, such as a document or conversation explicitly manifesting the existence of the agreement in question—"evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted," *Baby Food*, 166 F.3d at 118—obviates the need for such a showing. *Rossi*, 156 F.3d at 466 (citing *Petruzzi's*, 998 F.2d at 1233); *see also Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007) (providing examples of direct evidence of conspiracy). "This is because when the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate." *Rossi*, 156 F.3d at 466 (citing *Petruzzi's*, 998 F.2d at 1233); *see, e.g., Mack Trucks*, 530 F.3d at 222 (noting that a statement by a vice president of the defendant was "direct evidence of collusion, which, if believed, requires no further inference"); *see also Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008) (implying the same distinction between the treatment of direct and circumstantial evidence), *cert. denied,* 129 S. Ct. 2055 (2009); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003) (same). Put differently, direct evidence of conspiracy, if credited, removes any ambiguities that might otherwise exist with respect to whether the parallel conduct in question is the result of independent or concerted

55

mean that a § 1 claim will be considered adequately pled because of the bare possibility that discovery might unearth direct evidence of an agreement. The Court of Appeals' opinion in *Twombly* had pointed to that possibility as a ground for denying dismissal. 425 F.3d at 114. But the Supreme Court expressly rejected this reasoning, stating that "this approach to pleading would dispense with any showing of a 'reasonably founded hope' that a plaintiff would be able to make a case." *Twombly*, 550 U.S. at 562 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). After *Twombly*, if a plaintiff expects to rely exclusively on direct evidence of conspiracy, its complaint must plead "enough fact to raise a reasonable expectation that discovery will reveal" this direct evidence. *Id.* at 556. And if the plaintiff alternatively expects to rest on the circumstantial evidence of parallel behavior, the complaint's statement of facts must place the alleged behavior in "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be

---

action.

       *Twombly* noted that no such direct allegations appeared in the complaint before it. *See* 550 U.S. at 565 n.11 (observing that plaintiffs do not "directly allege illegal agreement" but rather "proceed exclusively via allegations of parallel conduct"); *see also id.* at 565 n.10 ("Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred . . ., the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies.").

56

independent action." *Id.* at 557.[24] In other words, regardless of whether the plaintiff expects to prove the existence of a conspiracy directly or circumstantially, it must plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.[25]

---

[24]Sometimes, of course, discovery will uncover both direct and circumstantial evidence of agreement. We do not imply that a plaintiff must commit to a single method of proof at the pleading stage, but merely that a plaintiff must put forth *some* statement of facts suggestive of unlawful conspiracy. "[O]nce a claim has been stated adequately, it may be supported by showing any set of [evidentiary] facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

[25]*Twombly* thus abrogates our earlier holdings that § 1 plaintiffs can survive a motion to dismiss without alleging facts supporting a plausible inference of conspiracy. *See, e.g.*, *Bogosian*, 561 F.2d at 446. *Bogosian* correctly observed that "[i]t is not necessary to plead evidence." *Id.* at 446; *accord id.* at 458 (Aldisert, J., dissenting); *see also supra* note 17. But we think the opinion is at odds with *Twombly* insofar as it absolves plaintiffs of the obligation "to plead the facts upon which the[ir] claim is based." *Id.* at 446 (majority opinion). *Bogosian*'s formulation of the pleading standard appears to have derived from the view that a complaint is sufficient so long as "it does not appear to a certainty that plaintiffs can prove no set of facts which . . . would entitle them to reach the jury," *id.,* that is, it

57

Because *Twombly* dismissed the antitrust claim before it, the Court did not provide specific examples of allegations that would satisfy its plausibility standard. Nonetheless, the Court did point in general terms to "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided

appears to reflect precisely the pervasive misapprehension of Federal Rule of Procedure 8(a)(2) that led the *Twombly* Court to "retire" the oft cited language from *Conley v. Gibson*. *See Twombly*, 550 U.S. at 560–63. Based on this pre-*Twombly* understanding of "the precept that the complaint be liberally construed," *Bogosian* found it sufficient that the complaint provided a statement of alleged consciously parallel conduct by the defendants, along with the unelaborated assertion that the defendants had entered into a "combination." *Bogosian*, 561 F.2d at 445–46. The opinion did not examine whether the allegation of concerted action was plausible in light of the context in which the parallel conduct was situated, instead deferring until after discovery the question of whether such conduct might in fact be perfectly consistent with each defendant's independent self-interest. *Id.* at 446. *Twombly*, we think, clearly demands more scrutiny of a § 1 complaint. As the dissent in *Bogosian* maintained, "an allegation of consciously parallel behavior, without more, [does] not state a Sherman Act claim," *id.* at 459 (Aldisert, J., dissenting), and a plaintiff cannot merely assert that the defendants' actions were concerted without alleging facts plausibly suggesting an agreement.

58

by an advance understanding among the parties." 550 U.S. at 556 n.4 (citing 6 Areeda & Hovenkamp, *supra*, ¶ 1425, at 167–85). More significantly, the shortcomings identified in the *Twombly* complaint provide an important—albeit negative—gloss on the governing standard.

The *Twombly* plaintiffs proffered two basic theories of anticompetitive collusion. First, they charged that the defendant regional telephone companies (ILECs) conspired to "inhibit the growth of upstart" competitors (CLECs). 550 U.S. at 550. Second, they asserted that the ILECs agreed not to compete with one another so as to preserve the preexisting regional monopoly each enjoyed. *Id.* at 551.

At the outset of its analysis, the Court remarked that the complaint's sufficiency would "turn[] on the suggestions raised by [defendants' alleged] conduct when viewed in light of common economic experience." *Id.* at 565. Under this lens, the complaint's first theory immediately revealed its inadequacy because "nothing in the complaint intimate[d] that the resistance to the upstart[ CLECs] was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. . . . [T]here [was] no reason to infer that the companies had agreed among themselves to do what was only natural anyway . . . ." *Id.* at 566. A rudimentary economic analysis also fatally undermined the complaint's second charge, namely that the ILECs agreed not to enter one another's markets. The Court recognized that "[i]n a traditionally unregulated industry with low barriers to entry, sparse

59

competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement." *Id.* at 567. But in the telecommunications industry at issue in *Twombly*, monopoly had been "the norm . . ., not the exception." *Id.* at 568. Noting that "[t]he ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword," the Court found that "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* In fact, "the complaint itself" bolstered this conclusion. *Id.* Not only did it "not allege that competition [against other ILECs] as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period," but "the complaint [was] replete with indications that any CLEC faced nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements" of federal law. *Id.* In short, both "common economic experience" and the complaint's own allegations showed that each defendant ILEC was independently motivated to behave in the ways alleged. Accordingly, neither of plaintiffs' theories successfully pled a § 1 conspiracy because in each case, defendants' parallel conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (summarizing *Twombly*).

In sum, *Twombly* makes clear that a claim of conspiracy

predicated on parallel conduct should be dismissed if "common economic experience," or the facts alleged in the complaint itself, show that independent self-interest is an "obvious alternative explanation" for defendants' common behavior. For our present purposes, we find this guidance sufficient.

### b. Assessing the Sufficiency of Plaintiffs' Pleadings

As the Supreme Court has instructed, we begin by identifying the complaints' bare assertions that the insurers or brokers entered into horizontal agreements. *See, e.g.*, Comm. SAC ¶ 158 ("[T]he Insurers members of the . . . Broker-Centered Conspiracy all agreed with [the Broker], and agreed horizontally among themselves, to reduce or eliminate competition for [the Broker's] secured business among the conspiring insurers."); *id.* ¶ 354 ("[T]he Broker 'hubs' simultaneously agreed horizontally not to compete with each other . . . ."). Because these conclusory averments do not "show[]" but merely "assert[]" plaintiffs' entitlement to relief, *Twombly*, 550 U.S. at 555 n.3, they cannot carry plaintiffs' pleading burden. *See id.* at 556–57 ("Without more, . . . a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *cf. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254–55 (3d Cir. 2010) (holding that it was inadequate for the complaint to state in "a conclusory manner" that "Defendants, each with all of the others, have entered into two interrelated conspiracies" and that "every Dealer knew that every other Dealer agreed, or would agree, to th[e] same [allegedly

unlawful] plan" (emphasis omitted)). Accordingly, we must examine the entirety of the complaints' factual allegations and determine whether, taken as true, they support a plausible inference of horizontal conspiracy.

### i. The Broker-Centered Conspiracies

### (a) Conspiracies Not Involving Bid Rigging

As the District Court recognized, plaintiffs' "broker-centered conspiracies" are alleged as hub-and-spoke conspiracies, with the broker as the hub and its insurer-partners as the spokes. This type of conspiracy has "a long history in antitrust jurisprudence." *Dentsply Int'l*, 602 F.3d at 255 (citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939)) (discussing general hub-and-spoke model). "[T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). Here, the District Court found plaintiffs had not adequately alleged the existence of a "wheel" or "rim" (that is, a horizontal agreement) connecting the insurer-spokes. 2007 WL 2533989, at *17; *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction.") (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)); *cf.*

*Dentsply Int'l*, 602 F.3d at 255 (concluding that "even assuming the Plaintiffs have adequately identified the hub (Dentsply) as well as the spokes (the Dealers), . . . the amended complaint" fails to allege adequately "an agreement among the Dealers themselves").

Plaintiffs' allegations in support of horizontal conspiracy in the broker-centered schemes fall into two different categories. First, plaintiffs assert that the very nature of the contingent commission agreements between the broker and each of its insurer-partners implies an agreement among the brokers. Second, plaintiffs rely on specific details about the operation of the customer steering schemes, particularly the "devices" used to ensure that a particular piece of business was placed with the designated insurer. With the exception of the bid rigging alleged in the Marsh-centered commercial conspiracy, we agree with the District Court that plaintiffs' allegations do not give rise to a plausible inference of horizontal conspiracy.

Contrary to plaintiffs' arguments, one cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker. As the District Court concluded, the first stage of the alleged broker-centered conspiracies—the consolidation of the groups of insurers to which each broker referred business—evinces nothing more than a series of vertical relationships between the broker and each of its "strategic partners." 2007 WL 2533989, at *15.

63

According to the complaints, the defendant brokers decided to consolidate the pool of insurers to which they referred business in order to improve efficiency and extract higher commissions from each of their insurer-partners. As defendants point out, "[o]nce a broker decided to organize its business in this fashion, each insurer had sound, independent business reasons to pay contingent commissions to become and remain a 'preferred insurer.' Paying such commissions helped the insurer to compete for and retain a larger share of its partners' business than if it had no such vertical relationships." Defendants' EB Br. 38. In short, the obvious explanation for each insurer's decision to enter into a contingent commission agreement with a broker that was consolidating its pool of insurers was that each insurer independently calculated that it would be more profitable to be within the pool than without. The complaints themselves reinforce this conclusion with their portrait of a concentrated brokerage market, in which a handful of brokers controlled the majority of client business, and an unconcentrated, more competitive market of insurers vying for premium dollars. Comm. SAC ¶¶ 70–76; EB SAC ¶¶ 67–73. According to plaintiffs' own account, "[t]he Insurer Defendants are thus largely dependent on the Broker Defendants to assure access to business and protect their market share." EB SAC ¶ 73; *accord* Comm. SAC ¶ 76; *see also id.* ¶ 73 ("The close bond between broker and client gives brokers tremendous influence, and often decisive control, over the placement of their clients' insurance business."). Given this economic landscape, each insurer had an obvious incentive to enter into the "strategic

partnerships" offered by the defendant brokers, irrespective of the actions of its competitors.

Refusing to concede this point, plaintiffs argue that the parallel decisions of insurers to join the broker-centered conspiracies plausibly imply a horizontal agreement among the insurers because "an insurer would not pay enormous contingent commissions in order to access premium volume if its major rivals were getting the same access for free." Plaintiffs' EB Reply Br. 8 (emphasis omitted). This contention is implausible. Although each insurer would be motivated to achieve the best deal possible with the broker—and would doubtless like to obtain terms as least as favorable as those negotiated by other insurers—the determinative consideration would be whether the insurer is better off paying contingent commissions for privileged access to the broker's clients than it would be saving those payments and foregoing the broker's assistance in winning and retaining business. Especially in light of the market dynamics alleged by plaintiffs, the obvious explanation for the decision of the defendant insurers to enter into contingent commissions agreements with the consolidating brokers is that each insurer found that the benefits justified the costs. In fact, the complaints relate incidents in which insurers who were reluctant to conform to the contingent commission demands of a broker nonetheless did so when faced with the prospect of losing their privileged access to the broker's book of business. *See, e.g.*, Comm. SAC ¶¶ 135–140; EB SAC ¶¶ 163–168; *id.* ¶¶ 214–226. These anecdotes only strengthen the obvious

65

conclusion that no horizontal agreement was necessary to induce the insurers to become "strategic partners."

Moreover, plaintiffs' argument proves too much. If the parallel decisions by several insurers to pay contingent commissions imply a horizontal agreement, then it is difficult to see why parallel decisions to pay standard commissions (that is, a fixed percentage of each policyholder's premium payment) would not also imply an agreement. For that matter, plaintiffs' logic would divine a horizontal agreement from virtually any parallel expenditures for marketing services, on the mistaken ground that a firm would not pay for advertising, for example, in the absence of an agreement with its competitors to enter into similar contracts with the advertising company. *Cf. Twombly*, 550 U.S. at 566 (noting that "resisting competition is routine market conduct," and that "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing").[26] The District Court

---

[26]Plaintiffs distinguish contingent commissions from advertising costs on two grounds, neither of which is relevant. First, plaintiffs stress that unlike advertising, which is procompetitive, the customer allocation schemes allegedly linked to the contingent commission payments were antagonistic to competition. This response, however, misunderstands the thrust of the advertising analogy. Even assuming defendants' practices unreasonably restrained trade, plaintiffs' § 1 claims

correctly found that the brokers' alleged consolidation of the insurers with which they did business did not plausibly imply an agreement susceptible to per se condemnation.

Plaintiffs seek to bolster the inference of horizontal agreement with allegations of information-sharing among the members of each putative broker-centered conspiracy. Plaintiffs assert numerous instances, for example, in which a broker communicated the details of its contingent commission

_____

must also plausibly suggest that these practices were the product of an agreement among the insurers. The advertising analogy illustrates plaintiffs' failure to satisfy this element of their pleading burden; parallel conduct, such as the payment of contingent commissions, does not plausibly imply the existence of an agreement when each defendant had a strong, independent motive to engage in that conduct.

Second, plaintiffs allege that contingent commission agreements were not customary before the brokers' decisions in the 1990's to consolidate their pool of insurers, and that the insurers received no additional benefits in exchange for these payments. Even if that is true, however—and the complaints' assertions of increasing premium revenue by defendant insurers during the proposed class period suggest otherwise—the point is that, once the brokers had undertaken that consolidation, insurers had much to lose if they did not become a "strategic partner," which provided each of them with an independent business reason to pay brokers contingent commissions.

67

agreement with one insurer-partner to other insurer-partners, in violation of confidentiality provisions forbidding such disclosures. In plaintiffs' view, these alleged disclosures helped defendants to police the broker-centered conspiracies by assuring each conspiring insurer that none of the other insurer-partners was "cheating" by taking more than the allegedly agreed-upon share of premium volume.

But there is a significant obstacle to plaintiffs' attempts to infer a horizontal agreement from this sharing of information. The complaints allege only that the brokers made the disclosures; there are no allegations that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker. Furthermore, there are obvious reasons for each broker to share this information with its insurer-partners, reasons that have nothing to do with preexisting agreements of any kind. The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner. Either match the "market" price for my premium volume, a broker might threaten, or I will transfer your share of my business to other, higher-commission-paying insurer-partners. This tactic would seem to be an effective way for brokers to exploit the leverage that, according to the complaints, they enjoyed over the insurers. And in fact, the complaints show that brokers used the information in precisely this way. *See, e.g.*, EB SAC ¶ 126 (recounting an incident in which a broker "reveals [to a

68

particular insurer] that the bonus compensation arrangement it was seeking from [that particular insurer] had been agreed to by the other conspiring Insurers, and that [the particular insurer] should offer terms like those put forth by another Insurers [sic]"). Just as a manufacturer's practice of informing each of its distributors of the identities of its other distributors—as well as the prices they paid and the volume of product they received—would not plausibly imply a horizontal agreement among the distributors, the disclosure of information alleged here fails to plausibly suggest a conspiracy among the insurers. It is true that *if* a horizontal conspiracy of the sort asserted by plaintiffs existed, the exchange of information alleged could conceivably serve the "policing" function plaintiffs describe. But it does not follow that this disclosure of information plausibly implies such a conspiracy; it is at least equally consistent with unconcerted action.[27]

---

[27]Plaintiffs contend that "[i]t strains credulity to insist that an insurer, which repeatedly and systematically receives confidential information about a rival's contingent commission arrangements and premium volume, would not expect and understand that its rivals were being provided with the same information about its business." Plaintiff's EB Reply Br. 13. But the allegation that insurers knew that the brokers would disclose the details of their vertical agreements to other insurer-partners does not imply that insurers intended that the information be so disclosed, let alone that they had entered into a horizontal agreement with other insurers. Plaintiffs' reliance

The manufacturer analogy highlights a basic fallacy that undergirds much of plaintiffs' argumentative strategy. Plaintiffs repeatedly insist that

> when [an] insurer knows that it is buying competitive protections for its incumbent business and it knows that other insurers are not getting a real opportunity on its incumbent business, and it knows that there are other partners of the broker who have the same competitive protections bought with the same contingent commissions, it is a fair inference . . . that this describes . . . a horizontal conspiracy.

Tr. of Oral Arg. 15–16. "Competitive protections" sound vaguely sinister, but what insurers were allegedly buying was a portion of the client business controlled by the broker.

--------

on *United States v. Container Corp. of America*, 393 U.S. 333 (1969), is thus inapposite. In *Container Corp.*, the Supreme Court found that the exchange among competitors of information about the prices they charged to customers constituted a horizontal conspiracy to limit price competition in violation of the Sherman Act. The disclosure of information alleged here, by contrast, is vertical and, unlike the exchange in *Container Corp.*, does not give rise to an inference of harm to competition. *See id.* at 337; *see also id.* at 338 ("Price is too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition.").

70

Whatever portion of that business one insurer buys is, of course, a portion unavailable to other insurers. Each contract between an insurer and the broker is, in this sense, a restraint of trade, but only in the way that every contract is a restraint of trade. *See Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence."); *cf. Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2208 (2010) ("[E]ven though, read literally, § 1 would address the entire body of private contract, that is not what the statute means." (internal quotation marks omitted)). A similar restraint occurs when a manufacturer signs a contract with a distributor, agreeing to sell the distributor a certain percentage of the manufacturer's product. This arrangement alone does not signify an agreement to unreasonably restrain trade, let alone a horizontal agreement to unreasonably restrain trade. Nor would an inference of horizontal conspiracy arise from the fact that each distributor knows which of its competitors have purchased the remaining portions of the manufacturer's product, as well as the specific terms of the other deals. Here, plaintiffs claim the brokers' ability to "guarantee" insurers certain amounts of premium volume depended on deceiving their clients into believing that the brokers had solicited competitive bids from the insurers, and that in a given transaction, the insurer recommended by the broker was the one who had made the most attractive offer. These allegations of fraud, however, involve only the manner in which the brokers obtained the "product" they sold to insurers;

71

they do not make the sales themselves an antitrust violation.[28] Contrary to plaintiffs' contentions, the allegations that each insurer knew about the "competitive protections" purchased by the other insurer-partners manifestly do not "describe[] . . . a horizontal conspiracy" to unreasonably restrain trade.

Plaintiffs maintain that this conclusion is at odds with the holdings in two hub-and-spoke-conspiracy cases, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000). In *Interstate Circuit*, a theater chain company, Interstate, wrote to each of eight movie distributors, asking them to meet certain conditions in exchange for the theater company's "continued exhibition of the distributors' films in its . . . first-run theatres" at a prescribed price of admission. 306 U.S. at 216–17. The conditions operated to restrict the terms under which the distributors could license their films to subsequent-run theatres, Interstate's competitors. Although there was no evidence of any direct communications among the eight distributors, the letter sent to each distributor listed all eight distributors as addressees; in other words, "from the beginning each of the distributors knew that the proposals were under consideration by the others." *Id.*

---

[28] *See infra* note 31 and accompanying text. We discuss below plaintiffs' argument that the specific means allegedly used to steer clients, e.g., first looks, last looks, and the solicitation of intentionally uncompetitive bids, imply a horizontal agreement among the insurers.

at 222. Each distributor accepted Interstate's proposed terms. The district court found this evidence proved concerted action by the distributors in violation of § 1 of the Sherman Act, and the Supreme Court affirmed. Plaintiffs cite *Interstate Circuit* for the proposition that an actionable horizontal conspiracy does not require direct communication among the competitors.

We do not dispute this principle, but it does not relieve plaintiffs of the obligation to "allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Dentsply Int'l*, 602 F.3d at 254 (quoting *Copperweld*, 467 U.S. at 771). Key to *Interstate Circuit*'s conspiracy finding was its determination that each distributor's decision to accede to Interstate's demands would have been economically self-defeating unless the other distributors did the same: "Each was aware that . . . without substantially unanimous action . . . there was risk of a substantial loss of the business and good will . . . ." *Interstate Circuit*, 306 U.S. at 222. In the absence of common action, agreeing to Interstate's demands would have meant reducing output (specifically, surrendering the distributor's share of the subsequent-run theater business) with no reasonable prospect of countervailing benefits; only collective conduct by the distributors could exert the market power necessary to increase profits in the first-run arena. The Court stated that it would "tax[] credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes

73

in their business methods without some understanding that all were to join, and we reject as beyond the range of probability that it was the result of mere chance." *Id.* at 223.

As noted, however, in the circumstances alleged here, the rationality of each insurer's decision to enter into a "strategic partnership" with the broker does not presuppose concerted action. The advantages of the partnership to the insurers flowed from the broker's control of its clients' business, not the market power of the insurers. If anything, an insurer here would prefer that fewer of its competitors participate in the scheme, as it would then enjoy that much more of the broker's steered business. *See, e.g.*, Comm. SAC ¶ 242 (noting that one of broker HRH's insurer-partners preferred that HRH have only three other partners, whereas HRH wanted four). The opportunity to become a broker's "strategic partner" was an opportunity for the insurer to increase output, not reduce it.

*Toys "R" Us* is likewise distinguishable. There, Toys "R" Us, a toy retailer, invited manufacturers to stop selling toys to wholesale toy clubs, which competed with Toys "R" Us. The manufacturers did so. The Court of Appeals for the Seventh Circuit affirmed the FTC's finding of § 1 conspiracy among the manufacturers. The court acknowledged that the "agreements between [Toys "R" Us] and the various manufacturers were, of course, vertical agreements," 221 F.3d at 932, which could not in themselves constitute a per se violation. But the court determined that the FTC's finding of a horizontal agreement among the manufacturers was warranted under the

74

circumstances. The evidence showed that the manufacturers were "reluctan[t] to give up a new, fast-growing, and profitable channel of distribution," *id.* (quoting FTC opinion); they "were in effect being asked by [Toys "R" Us] to reduce their output . . ., and as is classically true in such cartels, they were willing to do so only if [Toys "R" Us] could protect them against cheaters," *id.* at 936. In fact, the FTC had direct evidence, in the form of statements by the manufacturers' executives, that each manufacturer agreed to Toys "R" Us's proposal on the explicit condition that its competitors do the same. *Id.* As the Seventh Circuit noted, *Toys "R" Us* "is a modern equivalent of the old *Interstate Circuit* decision." *Id.* at 935. In both cases, the evidence clearly indicated that the defendants would not have undertaken their common action without reasonable assurances that all would act in concert.

Here, the parallel vertical agreements are of a different sort. Interstate and Toys "R" Us solicited exclusive-dealing agreements from movie distributors and toy manufacturers, respectively, in an attempt to exploit the latters' collective market power. Plaintiffs here do not allege that the insurers possessed market power (as noted, plaintiffs instead emphasize the brokers' market power, *see* Comm. SAC ¶ 76; EB SAC ¶ 73), nor that each broker wanted its insurer-partners to deal exclusively with it (the complaints show that some insurers had contingent commission agreements with multiple brokers[29]).

---

[29]*See supra* note 6.

Instead, plaintiffs' allege that brokers demanded contingent commissions in exchange for given amounts of broker-controlled business. And the complaints show that each insurer had an incentive to pay these commissions based solely on the brokers' ability to guarantee delivery of premium volume. Each insurer's share of the market thus depended on its ability to gain the broker's favor, not on the choices of its competitors.

Plaintiffs' attempt to compare their allegations with the facts of *Interstate Circuit* and *Toys "R" Us* is thus misguided. If anything, the fundamentally different factual contexts in those cases reinforce our view that the alleged information-sharing by the brokers here does not plausibly support a claim of horizontal conspiracy.[30]     We believe the alleged contingent

_____

[30]Plaintiffs place special emphasis on the alleged information-sharing in the HRH- and Wells Fargo/Acordia-centered commercial conspiracies, but these allegations do not overcome the basic deficiency we have just described. Plaintiffs allege that HRH allocated its book of business among three insurers and assert that "[t]he number of [insurers] to which HRH allocated its business was discussed among and agreed to by the three chosen insurers." Comm. SAC ¶ 242. When we search for additional information about this putative agreement, we find mostly allegations common to the other broker-centered conspiracies, namely that each insurer-partner knew the identities of the others and the details of their similar contingent commission agreements with the broker. Plaintiffs' pleadings

commission agreements between brokers and insurers—which form the backbone of plaintiffs' alleged "broker-centered conspiracies"—find a more apt analogue in the facts of *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998). In *NYNEX*, plaintiff

---

suggest that one insurer wanted HRH to have one fewer insurer-partner than HRH originally had in mind. *See* Comm. RPS ¶ 281 ("During its negotiations with HRH, [the insurer] was aware of the existence of other proposed carrier partners and expressed concern that HRH was considering consolidating its business with four Insurers rather than only three, which [the insurer] preferred."). But this vertical effort to persuade HRH (with apparent success) to *exclude* the participation of a competitor hardly implies horizontal conspiracy among the insurers. (It also stands in stark contrast to the hub-and-spoke conspiracies found in *Interstate Circuit* and *Toys "R" Us*, in which each firm's motivation to enter into the vertical agreement was contingent on all of its competitors' doing the same.) To the contrary, the obvious alternative explanation for the insurer's behavior is a desire to maximize its piece of HRH's guaranteed-premium-volume pie.

Similarly, the allegations in the Well Fargo/Acordia conspiracy indicate only that the insurer-partners knew one another's identities, and knew that each was benefitting in similar ways from the broker's ability to steer business. They do not imply that any insurer-partner's agreement with Wells Fargo/Acordia was dependent on the conduct of its competitors.

Discon alleged that Material Enterprises, a NYNEX subsidiary, had switched its purchase of certain services from Discon to AT&T Technologies, one of Discon's competitors, despite the fact that Discon was the less expensive servicer. According to Discon, the transaction was part of a fraudulent scheme in which Material Enterprises "could pass the higher prices on to New York Telephone, which in turn could pass those prices on to telephone consumers in the form of higher regulatory-agency-approved telephone service charges. At the end of the year, Material Enterprises would receive a special rebate from AT&T Technologies, which Material Enterprises would share with its parent, NYNEX." *Id.* at 132. The scheme allegedly allowed New York Telephone, a lawful monopoly, to circumvent regulatory restrictions on the telephone services charges it could impose on consumers, to the profit of the participating entities. Discon alleged that Material Enterprises refused to choose it as the service provider, despite its lower price, because it refused to go along with the scheme. The Supreme Court "concede[d] Discon's claim that the petitioners' behavior hurt consumers by raising telephone service rates" but refused to apply a rule of per se condemnation to this vertical restraint, noting further that the consumer injury "naturally flowed" not so much from a less competitive market for removal services as from New York Telephone's exercise of its lawfully held market power "combined with a deception worked upon the regulatory agency." *Id.* at 136. Rather than § 1 of the Sherman Act, the Court suggested, a more appropriate remedy might be found in "other laws, for example 'unfair competition' laws, business tort

78

laws, or regulatory laws, [which] provide remedies for various competitive practices thought to be offensive to proper standards of business morality." *Id*. at 137 (internal quotation marks omitted).

Here, too, the "strategic partnerships" alleged by plaintiffs imply only a vertical restraint. Furthermore, the complaints show that the injury to purchasers of insurance "naturally flowed" primarily from the nature of the broker-client relationship and the ability it afforded brokers to deceive clients about the quality and competitive status of the bids received from insurers. Contingent commission agreements were the means by which the brokers converted this power into profit, ultimately at their clients' expense; contingent commissions were the "rebate" insurers paid to brokers. But none of the allegations examined to this point give reason to believe that the broker-centered schemes were underwritten by horizontal agreements among the insurer-partners. Purchasers may have some cause of action against the defendants for their alleged deception and unfair trade practices, *see id.* (listing possible legal remedies), but plaintiffs' allegations of parallel contingent-commissions-for-guaranteed-premium-volume agreements between each broker and its insurer-partners do not adequately plead a per se violation of § 1 of the Sherman Act.[31]

---

[31]Hovenkamp's discussion of *NYNEX* is also relevant to this case:

> [T]he allegations in [*NYNEX*] contained an

79

The gravamen of plaintiffs' allegations lies in what the District Court described as the second stage of the asserted schemes: the operation of the "incumbent protection rackets" within each broker-centered conspiracy. Even if the parallel

> element of fraud, but many thousands of contracts
> have exchanged exclusivity for kickbacks or some
> deception on consumers or third parties. An
> agreement giving a waste removal or towing
> company an exclusive right to the buyer's
> business in exchange for a secret rebate or
> kickback does not injure competition simply
> because of the fraud. Such a holding would cross
> the line from antitrust to consumer protection.
> And while protecting consumers from such
> schemes is certainly a worthy goal of legal policy
> generally, it is not an antitrust goal.

11 Hovenkamp, *supra*, ¶ 1902d, at 223. Here, too, the basic scheme alleged by plaintiffs is one in which defendant brokers exchanged exclusivity (premium volume) for kickbacks (contingent commissions). To be sure, here the brokers dealt "exclusively" with multiple parties—the exclusive dealing involved individual insurance policies (most notably those already placed with a particular insurer and up for possible renewal), rather than a broker's entire roster of clients—but this difference does not materially alter the basic exclusivity-for-kickbacks model. It merely presents multiple, parallel instantiations of that model.

decisions to become strategic partners of the broker do not in themselves bespeak a horizontal agreement, plaintiffs contend their allegations about the "devices" used to conduct the customer-steering schemes suffice to meet the *Twombly* threshold.

According to the complaints, several of the devices that allegedly facilitated the schemes are common to all of the broker-centered conspiracies. For instance, plaintiffs allege that brokers often afforded insurer-partners "first looks" and "last looks" in bidding on policies. Once again, however, the practices identified by plaintiffs are strictly vertical in nature. On the complaint's own account, first and last looks were techniques utilized by brokers to ensure that a given client's policy was placed (or remained) with a designated insurer-partner. *See, e.g.*, Comm. SAC ¶ 88 ("Broker Defendants shielded their insurer partners from normal competition by agreeing not to bid renewals competitively, or by limiting the circumstances under which renewals could be marketed. Broker Defendants also routinely promised to provide competitive advantages to Insurer partners, by disclosing other carriers' bids, providing first or last looks, and other methods."). The complaints describe "[t]he close bond between broker and client," which "gives brokers tremendous influence, and often decisive control, over the placement of their clients' insurance business. Given the high degree of financial investment and trust placed in their broker, clients will rarely if ever seek quotes from insurers other than those recommended by the broker." *Id.*

¶ 73. In other words, the complaints themselves provide obvious reasons to conclude that the brokers were able to steer clients to preferred insurers without the need for any agreement among the insurers. Whatever the vices of these steering techniques, they do not give rise to a plausible inference of horizontal conspiracy.

Also insufficient are two allegations of certain "bid manipulation" within the broker-centered conspiracies in the Employee Benefits Case. In the first example, the complaint asserts only that a broker unilaterally refused to submit an insurer's bid to the client. In the second, a broker successfully persuaded one of its insurer-partners not to withdraw a bid the insurer had come to view as unacceptably low. If the insurer had withdrawn the bid, another, non-partner insurer would have become a "finalist," an outcome the broker wished to avoid. To allay the insurer-partner's concerns, the broker assured it that it would not end up winning the contract because another insurer had submitted an even lower bid. Shortly afterward, the broker placed a large account with the insurer-partner. Neither example provides a plausible basis for inferring anything more than vertical agreements between brokers and individual insurers.

In the Employee Benefits Case, plaintiffs allege that defendant insurers used similar strategies to evade their obligation to report contingent commission payments on Form 5500. But the asserted fact that the insurers intended to violate their reporting obligations, and that they all adopted the same

82

deceptive reporting model, does not plausibly suggest a horizontal agreement. If anything, the allegations suggest that each insurer would be independently motivated to evade the requirement, and that each had access to the same effective model of how to accomplish this deception. *Cf. In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (observing that "similarities in contractual language . . . do not constitute 'plausible grounds to infer an agreement'" because "[s]imilar contract language can reflect the copying of documents that may not be secret"). The insurers would be disinclined to expose their competitors' reporting violations for fear of calling attention to their own self-interested deception. *Cf. Twombly*, 550 U.S. at 568 (finding that the failure of the defendants to compete in one another's regions was most plausibly explained by the fact that the defendants "liked the world the way it was, and surely knew the adage about him who lives by the sword").

In sum, the allegations discussed thus far do not provide "plausible grounds to infer" a horizontal agreement. *Id.* at 556. This does not mean that defendants' alleged treatment of insurance purchasers was praiseworthy—or even lawful—but that it fails to plead a per se violation of § 1 of the Sherman Act. Plaintiffs have pled facts showing that brokers deceptively steered their clients to preferred insurer-partners in order to obtain contingent commission payments from those partners, but this in itself is insufficient to plausibly imply a horizontal conspiracy.

83

### (b) Bid-Rigging Allegations

There is, however, one notable exception to this conclusion. In the Marsh-centered commercial conspiracy, plaintiffs provide detailed allegations of bid rigging by the insurer-partners.[32] According to these allegations, insurers furnished purposefully uncompetitive sham bids on policies in order to facilitate the steering of business to other insurer-partners, on the understanding that the other insurers would later reciprocate. Bid rigging—or more specifically, as alleged in this case, bid rotation[33]—is quintessentially collusive behavior

---

[32]Apart from the multiple, detailed incidents of bid rigging in the Marsh-centered commercial conspiracy, plaintiffs appear to allege one incident of bid rigging in each of the Willis-centered and Gallagher-centered commercial conspiracies. Comm. SAC ¶¶ 275, 336. In their briefs and at oral argument, however, plaintiffs's bid-rigging discussion appears to be limited to Marsh and its insurer-partners. *See, e.g.*, Tr. of Oral Arg. 12 (affirming that "[t]he specific instances of bid rigging . . . occurred with respect to the Marsh broker centered conspiracies [sic]").

[33]*See United States v. Heffernan*, 43 F.3d 1144, 1146 (7th Cir. 1994) (contrasting bid rotation, in which "for each job the competitors agree which of them shall be the low bidder, and the others submit higher bids to make sure the designated bidder wins," with identical bidding, in which the competitors all agree to bid the same price).

subject to per se condemnation under § 1 of the Sherman Act. *See United States v. All Star Indus.*, 962 F.2d 465, 469–73 (5th Cir. 1992); *see also United States v. Heffernan*, 43 F.3d 1144, 1147 (7th Cir. 1994) (citing *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317 (4th Cir. 1982)) (noting that bid rotation may be especially anticompetitive because it "eliminate[s] all competition rather than just price competition"); 12 Hovenkamp, *Antitrust Law* ¶ 2006, at 77 (2d ed. 2005) ("[B]id-rigging and bid rotation schemes are really nothing more than output or market share agreements.").[34] This point does not quite end our inquiry, as plaintiffs do not seek to hold defendants liable for a bid-rigging conspiracy, but instead proffer the alleged bid rigging as circumstantial evidence of a "broader" agreement. Accordingly, we must assess the bid-rigging allegations, like the other alleged circumstantial

---

[34]As one treatise explains:

> A strong inference of coordinated behavior arises when a participant actively seeks to lose a bid. Deliberate sacrifice of a contract implies an unusual confidence that the winning party will return the favor. Moreover, spurious bidding indicates an awareness of wrongdoing coupled with a desire to hide it by simulating normal bidding. A spurious bid is almost always anticompetitive . . . .

6 Areeda & Hovenkamp, *supra*, ¶ 1420b, at 140.

evidence discussed above, to determine whether, if true, they plausibly imply the existence of the horizontal agreement on which plaintiffs' claim is predicated (and if so, whether *that* agreement is subject to per se condemnation). For the reasons that follow, we believe the bid-rigging behavior does plausibly suggest concerted action by the insurers; it proffers "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Twombly*, 550 U.S. at 556—more specifically, a horizontal agreement among the insurers not to compete for one another's incumbent business.

The District Court did not find the bid-rigging allegations sufficient to imply any sort of horizontal agreement among Marsh's insurer-partners, even one to rig bids. The court appears to have believed that because Marsh, the broker, was the one who directed the insurers to provide sham bids, the bid rigging was not indicative of an agreement among insurers but simply reflected the desire by individual insurers to propitiate Marsh in order to ensure that Marsh would continue to steer premium volume their way. *See* 2007 WL 2533989, at *16–17 (acknowledging that "Plaintiffs presented a panoply of facts . . . which allege that certain actions were taken by the Insurer Defendants at the request of the Broker Defendants, such as . . . protective bidding and bid-rigging," but concluding that "[t]he fact that Broker Defendants demanded or expected certain behavior from the Insurer Defendants does not necessarily amount to a horizontal agreement amongst the Defendant

86

Insurers.").[35]

We agree that plaintiffs' allegations portray a conspiracy masterminded and directed by defendant broker Marsh, but this fact does not make implausible the inference of a horizontal agreement among the insurers. If the defendant insurers supplying sham bids were truly indifferent as to whether Marsh's other insurer-partners would ever reciprocate, then the bid rigging might not plausibly imply a horizontal agreement.[36] On a motion to dismiss, however, we must assume the truth of the complaint's statement of facts, and the complaint here sets forth a plausible basis for inferring that each bid-rigging defendant's decision not to compete was conditioned on an expectation of reciprocity from its competitors—and not based purely on independent motivation or broker Marsh's behavior, as the District Court concluded. *See* Comm. SAC ¶ 109

---

[35]We note that, under *Twombly*, the test is not whether plaintiffs' allegations *necessarily* amount to an unlawful horizontal agreement, but rather whether they plausibly imply—that is, "raise a reasonable expectation that discovery will reveal evidence of"—such an agreement. 550 U.S. at 556.

[36]This aspect of the District Court's reasoning as to why the bid rigging does not imply a horizontal agreement is more fully developed in its evaluation of the RICO claims. *See* 2007 WL 2892700, at *21. Accordingly, the bulk of our analysis on this point occurs in Section II.B.2.a.i. *infra*.

87

(quoting statement by a former employee of a defendant insurer to the effect that the Insurer had agreed to "provide[] losing quotes" to its broker-partner in exchange for, among other things, the broker's "getting 'quotes from other [insurance] carriers that would support the [Insurer, at least when it was the incumbent carrier] as being the best price'").

The fact that Marsh, an entity vertically oriented to the insurers, appears to be a *sine qua non* of the alleged horizontal agreement is not necessarily an obstacle to plaintiffs' claim. As one of our sister courts of appeals has written, "defendants cannot escape the per se rule [for certain horizontal restraints of trade] simply because their conspiracy depended upon the participation of a 'middle-man', even if that middleman conceptualized the conspiracy, orchestrated it . . . and collected most of the booty." *All Star*, 962 F.2d at 473.

The conspiracy alleged in *All Star* has some striking similarities with the broker-centered conspiracy alleged here. In *All Star*, a criminal prosecution for antitrust conspiracy in the specialty pipe industry, the government's theory was that defendant Texas Pipe Bending Company (TPB), which performed fabrication jobs on a cost-plus basis, coordinated a bid-rigging scheme among defendant pipe distributors. The distributor(s) designated to win a particular bid would be protected by higher bids submitted by the other bidders, and the winning distributors rebated some portion of their sales revenue—which was significantly inflated over the price that would have prevailed in competitive bidding—to TPB. *Id.* at

88

467–68. In both *All Star* and (as alleged) this case, competitors agreed to submit intentionally uncompetitive bids in order to dictate the firm to which a particular contract would be awarded, as well as (by implication if not design) the price of that contract. This conduct plausibly implies a horizontal conspiracy, and the fact that here it was the broker, Marsh, that allegedly designated the winner and solicited the sham bids does not alter that conclusion. Marsh may have been an essential conduit and coordinator, but the insurers' agreement to provide protective bids to one another was also instrumental to the operation of the asserted broker-centered conspiracy. Even if the broker could have allocated customers on its own, without enlisting the assistance of other insurer-partners, the alleged willingness of those partners not only to refrain from competing with one another, but also actively to assist in the deceptive steering practices, plausibly suggests that customer allocation could be the result not only of vertical collusion, but also of a horizontal agreement among the insurers.[37] The anticompetitive danger inherent in insurers' alleged concerted efforts to rotate bids is not necessarily mitigated by the fact that the broker

---

[37]As noted, it may be more precise to say that allegations of brokers' unilateral acts of fraud against their clients, while undeniably asserting a form of consumer injury, do not plead an injury to *competition*, which is adequately alleged in the Marsh-centered scheme only by virtue of the well-pled horizontal agreement among the insurer-spokes. *See supra* note 31 and accompanying text.

managed the details of each bid, nor by the likelihood that the horizontal collusion would not have occurred without the broker's involvement.

On appeal, defendants do not dispute that the bid-rigging allegations plausibly imply a horizontal agreement among the insurers. For several reasons, however, they contend this agreement is insufficient to support plaintiffs' antitrust claims. Defendants do not deny that plaintiffs have set forth particularized allegations of unlawful bid rigging, but they contend that plaintiffs have no standing to challenge this activity because plaintiffs do not assert that the bids were rigged on any of the policies they purchased. Plaintiffs, in turn, insist that this argument misses the point, since their claim is not that defendants engaged in an actionable bid-rigging conspiracy; as noted, the alleged horizontal agreement on which they base their § 1 claim is *not* an agreement to rig bids. Instead, they complain of a "broader scheme" of "incumbent protection," and the incidents of bid rigging are alleged as evidence of this "broader scheme." Tr. of Oral Arg. 70.[38]

---

[38]At oral argument, counsel for plaintiffs explained: "[T]he defendants take a lot of time talking about how we can't win in a big [sic] rigging scheme because we didn't allege a bid rigging scheme. And that's right. We have [instead] alleged an agreement among these participants in the Marsh broker-centered conspiracies . . . to protect each other's incumbent business." Tr. of Oral. Arg. 72; *see also* Letter from Plaintiffs

To evaluate the merit of this argument—that is, to determine whether the bid-rigging allegations satisfy *Twombly*'s pleading standard—it is necessary to identify the scope of this "broader scheme" with precision. This imperative derives from the requisite elements of a claim under § 1 of the Sherman Act. As noted, since plaintiffs have elected to forego a rule-of-reason analysis, they must adequately plead (1) a horizontal agreement among insurers (2) to engage in an unreasonable restraint of trade.[39] Plaintiffs might be able to allege some sort of horizontal

_____

to the District Court, No. 04-5184, Dkt. Entry # 669, at 2 ("[P]laintiffs do not allege that defendants are liable under the antitrust laws because they engaged in 'bid-rigging.' Instead, the theory of the Complaint is that defendants are liable under the antitrust laws because they participated in a conspiracy to allocate customers, using, on some occasions, bid-rigging, last looks and other manipulative devices as overt acts to achieve the conspiracies' end.").

[39]Furthermore, because of the way plaintiffs have pled their claim, plaintiffs must plead a type of horizontal restraint that can be deemed unreasonable without evaluation of market power. *See Leegin*, 551 U.S. at 886 ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices or to divide markets." (internal citations omitted)); *cf. R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 162 (9th Cir. 1989) (en banc) (Norris, J., dissenting) (citing *NCAA*, 468 U.S. 85) (noting that the Supreme Court has "recognized a

91

agreement among defendants, the object of which would nonetheless not amount to an unreasonable restraint of trade. Alternatively, they might be able to allege that defendants engaged in activity unreasonably restraining trade, but nonetheless fail to plead that this conduct was the product of an agreement. In both cases, plaintiffs would have failed to plead a § 1 claim. Accordingly, we must define the object of the horizontal agreement alleged in the complaint. *See generally* 6 Areeda & Hovenkamp, *supra*, ¶ 1409, at 54 (noting the importance of "ask[ing] precisely (1) who was in agreement with whom, and (2) about what?").

Having reviewed the complaint, we believe it asserts two different conceptions of this horizontal agreement. According to the broader of the two conceptions, Marsh's insurer-partners agreed that Marsh would deliver to each insurer an amount of premium volume necessary to trigger the payment of a contingent commission under the vertical agreement between Marsh and that insurer. *See* Comm. SAC ¶ 130 ("[Premium] volume threshold commitments reflected a tacit agreement among the conspiring parties that Marsh was guaranteeing the delivery of a specified minimum amount of premium volume."). Reading the complaint in the light most favorable to plaintiffs,

---

caveat to the *per se* rule against horizontal restraints on competition[,] holding that some horizontal relationships have unique aspects that can create procompetitive justifications for particular horizontal restraints").

we find such a horizontal agreement implausible. Given the context presented by plaintiffs, it is not plausible that the insurers agreed among themselves that a third party, the broker, would guarantee delivery of differing amounts of premium volume to each of them. Perhaps such a claim would be coherent if the insurers had power to extract such guarantees from the broker, but the complaint demonstrates in abundant detail that it was Marsh who held the reins. Plaintiffs note that the contingent commission thresholds were established in vertical agreements between the broker and each insurer, and they recount stories of insurers who balked at Marsh's demands and refused to continue to pay contingent commissions, only to relent and agree to resume payments after Marsh steered a significant volume of business away from them. At the same time, however, plaintiffs incongruously assert that the contingent commission thresholds in Marsh's contracts with each of its insurer-partners were somehow the product of an agreement among *all* of the insurers. This attempt to bootstrap vertical contracts into horizontal conspiracy is at odds with both "common economic experience," *Twombly*, 550 U.S. at 565, and the complaint's own factual allegations, *cf. id.* at 568.

The complaint also posits a narrower agreement among Marsh's insurer-partners, namely, an agreement not to compete for other partners' incumbent business. *See, e.g.*, Comm. SAC ¶ 89 ("[T]he Broker Defendants orchestrated a horizontal agreement among rival Insurers not to compete for each others' [sic] customers."). Unlike the previous alleged agreement, this

93

one is not necessarily incompatible with the complaint's account of a market in which Marsh pulled most of the strings and called most of the shots. The complaint alleges that Marsh prepared broking plans "when an account was up for renewal. The broking plans assigned the business to a specific insurer at a target price and outlined the coverage. . . . If the incumbent Insurer hit the 'target', it would get the business . . . ." *Id.* ¶ 117. An agreement by the insurers not to compete with the incumbent designated by Marsh would obviously facilitate Marsh's placement goals. That the bid-rigging allegations refer not to closed, bilateral agreements in which insurers X and Y each help the other win a specific account, but rather to open-ended agreements in which insurer X provides "protection" of Y's "renewal" or "incumbent" account in exchange for an assurance of similar assistance from some other insurer (not necessarily Y) plausibly supports the inference that the bid rigging was in service of a broader agreement not to compete for one another's incumbent business. As we have seen, plaintiffs allege that the customer allocation schemes employed other mechanisms that do not appear to have entailed a horizontal agreement among the insurers, but this does not alter the fact that the bid-rigging allegations plausibly imply a "broader" horizontal non-competition agreement designed to aid the posited (broader still) customer allocation scheme instigated by Marsh.

Nonetheless, one might reasonably ask (especially in light of the allegations involving the other broker-centered schemes) whether the insurers had an opportunity to compete in

94

the first place—that is, an opportunity other than that afforded by Marsh's solicitations of sham bids. An agreement not to compete necessarily presupposes the existence of an opportunity *to* compete, and if the only opportunities for insurers to compete were Marsh's requests for rigged bids,[40] then the alleged bid rigging could not imply a "broader" horizontal agreement not to compete for incumbent business. And in fact, certain allegations in the complaint might be read to suggest that the solicitation of rigged bids provided the *only* opportunity for insurers to compete, that Marsh would either steer clients to the target insurers on its own, or, in the rare cases when clients required it to show them bids from multiple insurers,[41] would solicit sham

_____

[40]The complaint shows how in providing these intentionally non-competitive bids, the insurers necessarily passed up the opportunity to compete. According to the complaint, one insurer who was dissatisfied by Marsh's protection of its own incumbent business contemplated supplying competitive bids in response to Marsh's request for non-competitive offers. "If we can not get proper protection," the insurer stated, "we will go hard after [another insurer's incumbent business] that we feel [Marsh is] protecting. We will no longer provide [Marsh] with protective quotes for [that insurer] but will put out quotes that [Marsh] will be forced to release . . . ." Comm. SAC ¶ 107.

[41]*See* Comm. SAC ¶ 73 ("Given the high degree of financial investment and trust placed in their broker, clients will rarely if ever seek quotes from insurers other than those recommended

95

bids from other insurer-partners. *See, e.g., id.* ¶ 109 ("Marsh would protect the incumbent of an excess casualty risk by not sending submissions on that risk out to competition, or by getting quotes from other carriers that would support the incumbent as being the best price." (internal quotation marks omitted)).

In reviewing a motion to dismiss, however, we "construe the complaint in the light most favorable to the plaintiff." *Phillips*, 515 F.3d at 233 (internal quotation marks omitted).[42]

---

by the broker.").

[42]As the Supreme Court reiterated in *Iqbal*, the *Twombly* standard does not impose a "probability requirement." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556); it does not require as a general matter that the plaintiff plead facts supporting an inference of defendant's liability more compelling than the opposing inference. *Twombly* requires the plaintiff to plead only enough "factual content [to] allow[] the court to draw [a] *reasonable* inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). Accordingly, "[i]t remains an acceptable statement of the standard [for reviewing a motion to dismiss under Rule 12(b)(6)] . . . that courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d. at 233 (internal quotation

96

Accordingly, we do not interpret the complaint as disavowing the possibility of opportunities to compete beyond those afforded by Marsh's bid-rigging requests. In any case, defendants themselves have not advanced a no-other-opportunity-to-compete argument in support of their motion to dismiss. They may, of course, raise this objection at a subsequent stage of the proceedings.

Defendants argue that plaintiffs have alleged only "isolated episodes" of bid rigging. Defendants' Comm. Br. 43. To the extent defendants object that the allegations of bid rigging within the Marsh-centered commercial conspiracy cannot support claims of horizontal agreements within other alleged broker-centered conspiracies, their point is well-taken. But insofar as defendants contend that the bid-rigging allegations do not adequately support the more general allegation of an agreement among the defendant insurers to allocate customers in the Marsh-centered commercial conspiracy, we reject their argument for the reasons given. At this stage of the litigation, Rule 8(a)(2) requires plaintiffs to plead only "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Twombly*,

---

marks omitted). As noted, of course, *Twombly* makes clear that in the specific context of a claim under § 1 of the Sherman Act, it is unreasonable to infer an agreement from allegations of parallel conduct that are equally consistent with independently motivated behavior. *See Twombly*, 550 U.S. at 556–57.

97

550 U.S. at 556,[43] in this case an agreement among the Marsh partner-insurers not to compete for renewal business. We find that the complaint satisfies this standard with respect to those participants in the asserted Marsh-centered commercial conspiracy who allegedly engaged in bid rigging.[44]

---

[43]As the Supreme Court explained:

> In applying the[] general standards [of Rule 8(a)(2)] to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Twombly*, 550 U.S. at 556.

[44]The number of defendants alleged to have engaged in bid rigging appears to be slightly smaller than the number of defendants alleged to be participants in the Marsh-centered commercial conspiracy. *Compare* Comm. SAC ¶ 95 (naming "AIG, ACE, CNA, Chubb, Crum & Forster, Hartford, Liberty Mutual, Travelers, Zurich, Fireman's Fund, Munich, XL and Axis" as defendant insurers in the Marsh broker-centered conspiracy), *with* Plaintiffs' Comm. Br. 78 n.17 (claiming that the defendant insurers that engaged in bid rigging are "AIG,

ACE, Axis, Chubb, XL, Munich/AmRe, Liberty Mutual, St. Paul Travelers, Fireman's Fund, and Zurich"), *and* Comm. RPS ¶¶ 27–56 (detailing bid-rigging allegations).

Our disposition must also take account of the fact that although the complaint's narrative of wrongdoing speaks primarily (if not exclusively) in terms of parent entities or corporate groups, subsidiary corporate entities are also named as individual defendants. *See* Comm. SAC ¶¶ 37–63 (stating that the use of the parent or group entity name is meant to incorporate the subsidiaries by reference). Defendants contend that the bid-rigging allegations are limited to a single line of commercial insurance, namely excess casualty. Plaintiffs appear to concede this point. *See* Plaintiffs' Comm. Reply Br. 11 (referring to the "Marsh Excess Casualty conspiracy"). As noted, without the bid-rigging allegations, plaintiffs have not stated "enough factual matter . . . to suggest that an agreement was made" among the insurers. *Twombly*, 550 U.S. at 556. Accordingly, any subsidiary entities not alleged to have dealt in excess casualty (and thus not alleged to have engaged in bid rigging) must be dismissed, as the complaint fails to plausibly imply that they entered into a horizontal agreement to unreasonably restrain trade.

Plaintiffs argue that subsidiary companies "act[] at the common direction of the parent[]," Plaintiffs' Comm. Reply Br. 12, and that "in reality a parent and a wholly owned subsidiary always have a unity of purpose or a common design," Plaintiffs'

99

EB Reply Br. 35 (quoting *Copperweld*, 467 U.S at 771) (internal quotation marks omitted). Emphasizing these features of the parent-subsidiary relationship, the Supreme Court held in *Copperweld* that parents and subsidiaries could not conspire for purposes of § 1 of the Sherman Act. 467 U.S. at 776; *see Am. Needle*, 130 S. Ct. at 2212 (noting that an "agreement" is cognizable under § 1 only if it "joins together 'independent centers of decisionmaking'" (quoting *Copperweld*, 467 U.S. at 769)). Contrary to plaintiffs' suggestion, however, it does not follow from *Copperweld* that subsidiary entities are automatically liable under § 1 for any agreements to which the parent is a party. As a matter of well-settled common law, a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship. *See* 1 William Meade Fletcher, Cyclopedia of Law of Private Corporations § 33, at 89 (perm. ed. rev. vol. 2006) (observing that "the mere fact that there exists a parent-subsidiary relationship between two corporations [does not] make the one liable for the torts of its affiliates"); *see also Burks v. Lasker*, 441 U.S. 471, 478 (1979) ("Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute."). As plaintiffs allege no other basis for imputing § 1 liability to defendant entities that are not plausibly alleged to be directly liable—that is, are not plausibly alleged to have themselves entered into unlawful

100

Defendants attempt to resist this conclusion with a number of different arguments, but after due consideration we find none have merit. According to defendants, the scheme alleged by plaintiffs is incoherent. To illustrate its implausibility, defendants contrast it with the conspiracy at issue in *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993). The *Petruzzi's* plaintiff alleged a conspiracy to allocate customers in the fat and bone rendering industry. *Id.* at 1228. More specifically, the plaintiff claimed that although the defendant rendering companies would compete for new accounts, once an account was won the non-incumbent defendants would not compete over renewal business and sometimes "put forward sham bids." *Id.* at 1228–29. If any defendant violated the agreement, the remaining conspirators would purportedly punish it through predatory pricing. *Id.* Given the circumstances of the industry, we found that the plaintiff's theory of conspiracy was not only "not implausible," but made "perfect economic sense." *Id.* at 1232.

Defendants contend that at least two salient features distinguish the *Petruzzi's* conspiracy from the one alleged here. First, in *Petruzzi's* the method for allocating business was transparently obvious. Each conspirator could easily ascertain which member of the scheme was entitled to a given account—namely, the incumbent holder of the account. Here, defendants argue, there is no way for an insurer to know with

---

agreements—the antitrust claims against these entities must fail.

which conspirator a given policy should be placed. Plaintiffs propose that the allocation was structured not by particular policies but by premium volume, but defendants insist that such a basis of allocation would be unworkable in light of the various contingent commission incentives detailed in the complaint. In addition to contingent commission payments triggered by a threshold volume of incumbent business retained, the contractual agreements between the brokers and insurers also provided for commission payments based on the overall volume of premium steered to an insurer, growth in volume over a particular benchmark (such as the previous year's level), and the quality of the premium volume (i.e., premiums for policies requiring relatively small indemnification payments for covered losses). Defendants contend that these multifarious incentives would often conflict with the alleged scheme's posited goal of incumbent protection. For example, a broker's placement of a given policy with incumbent insurer X might bring the broker that much closer to the negotiated contingent commission threshold for premium volume renewed with that broker. But placement of that same policy with another insurer might trigger a contingent commission payment for overall premium volume or volume growth—and that commission payment might be larger than the one negotiated with the incumbent. "It defies credulity," defendants insist, "to assert, as Plaintiffs do, that . . . insurers agreed to join conspiracies in which they agreed to allow brokers to unilaterally decide who got what business based on what was most profitable for the brokers." Defendants' Comm. Br. 51.

102

Second, defendants contend that while the scheme in *Petruzzi's* included an obvious mechanism for the conspirators to discipline deviant members, the conspiracy alleged here is "hardly a scheme of market allocation that the insurers could enforce." Tr. of Oral Arg. 43. According to defendants, since virtually all of the power to steer insurance purchasers belonged to the brokers, who operated under the competing incentives created by the variegated contingent commission agreements, there could be no feasible mechanism to enforce a customer allocation scheme.

We agree with defendants that the scheme alleged by plaintiffs appears a good deal more complex than the one in *Petruzzi's*. And as noted, we agree that based on the facts alleged, it is implausible to claim that the defendant insurers came to an agreement together and instigated an arrangement whereby each would receive whatever volume of premium happened to be prescribed by each's contingent commission agreement with Marsh. But as also noted, a narrower horizontal agreement not to compete for one another's incumbent business does not appear incompatible with the larger picture painted by the complaint, in which Marsh was the dominant force.

The complaint also provides a coherent mechanism for disciplining recalcitrant insurers. Consistent with the complaint's general narrative of broker power, it was Marsh that did the enforcing. In a vivid illustration of this enforcement potential, the complaint recounts the following alleged statement from a high-ranking Marsh executive:

103

[I]f an alternative [i.e., a non-incumbent insurer from which Marsh has solicited a sham bid] quotes below [the incumbent insurer's target bid] then they have made a conscious decision to quote below [the incumbent insurer] and pull [the incumbent] down. If that happens, then . . . we will put this guy in open competition on every acct. and CRUCIFY him. Further, we must make sure [the] incumbent [or another insurer] keep[s] this [account] and NOT give it to the alternative and reward them.

Comm. SAC ¶ 118 (emphasis omitted). According to the complaint, insurers who breached the non-competition agreement would not only find themselves deprived of the conspiracy's protection, but their renewal business would be specifically targeted for transfer.

Although we acknowledge that the hub-and-spoke conspiracy alleged by plaintiffs has a more prominent vertical dimension than most, if not all, other examples found in the case law—owing to the relative power of broker Marsh and the relative dependence of its insurer-partners—we believe the complaint contains enough well-pled factual matter to suggest a plausible horizontal agreement among the insurers not to compete for renewal business. On the complaint's own account, the conspiracy was instigated, coordinated, and policed by Marsh, but this does not belie the alleged horizontal agreement. On the contrary, Marsh's influence could create a powerful

104

incentive for exactly such an agreement: join and enjoy renewals at inflated premium rates and without threat of competition, or remain outside the "strategic partnership" and be denied access to Marsh's large and loyal clientele. To be sure, the complaint suggests that Marsh could be a tough master, threatening at times to transfer business to another insurer in order to coerce a more lucrative contingent commission agreement. And in some cases, as defendants suggest, Marsh may even have steered renewal business away from an incumbent insurer-partner in order to realize a more profitable commission offered by another partner.[45] If so, however, this would show only that Marsh, and

---

[45]We find the complaint somewhat ambiguous on this question. Plaintiffs allege that under the customer allocation scheme, "each conspiring insurer would be permitted to keep its own incumbent business." Comm. SAC ¶ 96. But as defendants point out, the alleged contingent commission agreements tied commissions to factors other than incumbent business, which might motivate Marsh to transfer business away from incumbents. Plaintiffs contend that Marsh only used new business and business transferred from non-partner insurers to satisfy these thresholds. More problematic for plaintiffs' claim of guaranteed incumbent protection may be the complaint's statement that Marsh "grouped its preferred insurers into three tiers, classified as A, B, and C tiers, based on how much they were paying in contingent commissions. Tiers A and B were the more preferred markets to which the bulk of premium was allocated." Comm. SAC ¶ 101. It is unclear from the

not the insurers, had the negotiating power to set the terms of participation in the scheme. It does not make implausible the inference, created by the bid-rigging allegations, that insurer-partners agreed not to compete for one another's renewal business. As we have noted, plaintiffs' allegations paint a conspiracy in which the hub, Marsh, held an unusual amount of power and may even have been able economically to "coerce" the insurers into the non-competition agreement. Defendants have failed, however, to show why this feature would preclude per se condemnation of the horizontal agreement. *See* 6 Areeda & Hovenkamp, *supra*, ¶ 1408c ("[S]ociety prefers that coerced parties seek the protection of public authorities rather than help create a cartel.").

Defendants next argue that "even if there were agreements that could have existed among the insurers," the vertical element of the hub-and-spoke conspiracy would defeat plaintiffs' claim. Tr. of Oral Arg. 43. In defendants' view, "horizontal restraints that are ancillary to vertical arrangements, in other words horizontal agreements that exist to facilitate the vertical ones, are judged under the rule of reason which the plaintiffs have disclaimed." *Id.* (citing *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *modified*

---

complaint's brief description whether incumbent business from lower-tier insurers would sometimes be transferred to higher-tier insurers or whether the "premium" mentioned came only from new or non-insurer-partner-held accounts.

106

*and aff'd*, 175 U.S. 211 (1899)). Any horizontal agreement among the brokers, defendants contend, "would plainly have been ancillary to the agreements that those insurers had with the brokers." *Id.* Therefore, the horizontal agreements cannot be condemned per se.

Defendants' contention draws on a fundamental principle of antitrust law but misapplies it here. It is well settled that "ancillary" restraints of trade are less suspicious than "naked" ones, and that to qualify for per se condemnation, a restraint must be of the naked horizontal type. *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985). Ancillary restraints are "those that are part of a larger endeavor whose success they promote." *Id.* at 189; *see* 11 Hovenkamp, *supra*, ¶ 1904 ("To say that a restraint is 'ancillary' is to conclude that it is an essential or at least an important part of some arrangement that has potentially redeeming virtues."). By contrast, a "naked" restraint is one that is not an integral part of an arrangement with redeeming competitive virtues. *See Polk Bros.*, 776 F.2d at 188 (describing naked restraints as "those in which the restriction on competition is unaccompanied by new production or products"); 11 Hovenkamp, *supra*, ¶ 1904. The quintessential example of an ancillary restraint is a restrictive agreement that is an integral part of a joint venture. An agreement by two competing manufacturers to price a product identically, for instance, would be ancillary if manufacture of the product were a collaborative effort between the two firms and the pricing agreement could reasonably be viewed as a

107

necessary condition of the joint venture, which increased output.

As this example indicates, "[d]etermining ancillarity requires [courts] to consider *first*, whether any aspect of the defendants' association contains a significant promise of integration or cooperation yielding an increase in output. *Second*, some determination must be made whether the challenged agreement is an essential part of this arrangement, whether it is important but perhaps not essential, or whether it is completely unnecessary." 11 Hovenkamp, *supra*, ¶ 1908b, at 253 (footnote omitted); *see MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment) ("[A] restraint that is unnecessary to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits. . . . In contrast, where a restraint *is* reasonably necessary to achieve a joint venture's efficiency-enhancing purposes (i.e., ancillary), it will be analyzed under the rule of reason as part of the joint venture because the effects of that restraint are not so plainly anticompetitive as to make a *per se* or quick-look approach appropriate."); *see also* 11 Hovenkamp, *supra*, ¶ 1908b, at 253 ("[T]he 'essentiality' query . . . considers whether the challenged restraint is an inherent feature of the joint venture at all, or simply an unnecessary, output-limiting appendage."); *cf. NCAA*, 468 U.S. at 114 (denying the NCAA's claim that its television plan enhanced the competitiveness of college football television rights because in light of the district court's findings, "it cannot be said that the [challenged] agreement on price is necessary to

market the product at all" (internal quotation marks omitted)). Contrary to defendants' argument, then, a restraint is not automatically deemed ancillary simply because it "facilitates" a procompetitive arrangement.

Defendants are unable to identify among plaintiffs' allegations any procompetitive venture to which the insurers' alleged horizontal agreement not to compete for incumbent business could reasonably be deemed integral. Defendants stress that vertical "preferred provider" agreements, used here by the brokers to consolidate the insurers with which they did business, have consistently been found by courts to have competitive benefits. But defendants cannot explain why a non-competition agreement among those providers is an essential or reasonably necessary component of those agreements; the benefits of preferred provider agreements do not depend on such a horizontal restraint of trade, as other provider agreements well illustrate.[46]

---

[46]*See, e.g.*, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61–64 (1st Cir. 2004) (recognizing potential consumer benefits of, and refusing to apply the per se rule to, a vertical "exclusive dealing" arrangement in which an insurer's pharmacy manager created a "closed network" of pharmacies providing prescription benefits to the insurer's subscribers); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 924, 932 (1st Cir. 1984) (Breyer, J.) (rejecting physicians' antitrust challenge to health insurer's

Defendants also contend that the insurers competed with one another to win a favored position with Marsh. *See supra* note 45 (discussing Marsh's classification of its insurer-partners into hierarchical tiers). Without doubt, according to the complaint's allegations, Marsh's ability to guarantee competition-free access to business—in part by enforcing a non-competition agreement among its insurer-partners—motivated the insurers to pay Marsh larger commissions in order to receive a larger slice of the competition-free premium pie. We fail to see, however, how this kind of rivalry among the insurers would increase output in the market for insurance.[47]

---

preferred provider organization, which allegedly put pressure on doctors to join "because of the large number of [patient] subscribers," and emphasizing that there was no "evidence of a horizontal conspiracy"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1203–04 (7th Cir. 1981) (describing procompetitive benefits of insurance companies' contracting with a specific set of "preferred" auto repair shops for repair work at prescribed rates).

[47]The facts in the seminal case of *Addyston Pipe* offer a useful comparison. There, a cartel of pipe manufacturers rigged bids for pipes sold principally to municipalities. The winning bidder would pay a "bonus" to the other bidders. First, the amount of the winning bid was determined, and then the bidders conducted a *competitive* bid among themselves to determine who was willing to pay the largest bonus to the others. The

110

Furthermore, defendants' argument proves too much. If all "horizontal agreements that exist to facilitate . . . vertical ones," Tr. of Oral Arg. 43, must be tested by the rule of reason, then per se condemnation of hub-and-spoke conspiracies would appear to be impossible. In all hub-and-spoke conspiracies, the horizontal agreement among the spokes supports the agreements between the hub and each spoke, and vice versa. *See, e.g.*, *Interstate Circuit v. United States*, 306 U.S. 208 (1939); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000); *United States v. All Star Indus.*, 962 F.2d 465 (5th Cir. 1992).

---

winner of that competition obtained the right to submit the winning bid in the rigged auction. The structure of the scheme meant that the most efficient or lowest-cost manufacturer—and thus the one able to pay the largest bonus to the others—would generally win the rigged bid, just as in a competitive market. But the conspiracy ensured that the price of the winning bid was supracompetitive and output-reducing. *Addyston Pipe*, 85 F. at 274. The court did not find that the competition among the manufacturers within the bounds of the bid-rigging scheme redeemed the restraint.

*Toys "R" Us* provides another illustration. Suppose the toy manufacturers in that case competed with one another over the amount of product Toys "R" Us would buy from each. This competition for Toys "R" Us's business would not alter the basic fact that the horizontal agreement to sell exclusively to Toys "R" Us reduced output.

111

Although we have found that the bid-rigging allegations suffice to plead a § 1 claim for purposes of Federal Rule of Civil Procedure 8(a)(2), defendants insist that plaintiffs must surmount not only this general requirement, but also the heightened pleading standard set forth in Rule 9(b). That Rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).[48] Defendants contend the antitrust claims here "sound in fraud" and argue that the complaints fail to satisfy Rule 9(b)'s particularity requirement. Defendants' Comm. Br. 31. Plaintiffs, on the other hand, maintain Rule 9(b) is inapplicable to the alleged antitrust conspiracies.

In *Lum v. Bank of America*, we stated that Rule 9(b) requires fraud to be "pled with particularity in *all* claims based on fraud." 361 F.3d 217, 220 (3d Cir. 2004). Accordingly, although we acknowledged that "antitrust claims generally are not subject to the heightened pleading requirement of Rule 9(b)," we found that standard applicable to a complaint in which "the antitrust claim [was] based on fraud—on misrepresentations in the information given to consumers and on misrepresentations in the information given to . . . independent financial publications." *Id.*; *see id.* at 228 ("Because plaintiffs

---

[48]The Rule nonetheless allows "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." *Id.*

112

allege that the defendant[ banks] accomplished the goal of their conspiracy [to set an artificially high floor on interest rates by agreeing to raise the prime rate] through fraud, the Amended Complaint is subject to Rule 9(b).").  Citing *Lum*, the District Court here agreed with defendants that Rule 9(b) applied to plaintiffs' allegations of antitrust conspiracy, as they were "predicated on fraud."  2007 WL 1100449, at *8.  As both plaintiffs and defendants appear to agree,[49] however, the District Court's final dismissal order rested only on *Twombly*'s general pleading standard; the court did not appear to make a separate determination as to whether plaintiffs' allegations satisfied the particularity requirement of Rule 9(b).[50]  Insofar as we find that

---

[49]*See* Plaintiffs' Comm. Br. 14 n.3; Defendants' Comm. Br. 31.

[50]In its initial October 3, 2006 opinion, the District Court found that plaintiffs' First Amended Complaint did "not specifically identify the entities which allegedly conspired with each Broker Defendant" in the alleged broker-centered conspiracies.  2006 WL 2850607, at *13.  Granting leave to amend, the court instructed plaintiffs to file a "supplemental statement of particularity" setting forth, "with the degree of particularity required under Rule 9(b), the identity of the conspirators and the role of each Defendant in the alleged conspiracies." *Id.* at *14.  Reviewing these revised pleadings in its second dismissal order filed on April 5, 2007, the court pronounced itself "satisfied . . . with the level of specificity

plaintiffs have satisfied the *Twombly* standard with respect to defendants alleged to have engaged in bid rigging in the asserted Marsh-centered commercial conspiracy, we will remand for the District Court to determine in the first instance the extent, if any, to which Rule 9(b) applies to those § 1 claims, and whether plaintiffs pleadings are sufficiently particularized.[51] We express

---

contained in the Particularized Statements which identify the majority of the conspirators and their roles in the conspiracy." 2007 WL 1100449, at *15. But the court found that these allegations were insufficient to show "that the conduct alleged, *i.e.*, the consolidation of the insurance markets and the steering of certain customers based on contingent commission payments, constitutes a *per se* illegal horizontal customer or market allocation scheme." *Id.* at *18. It is unclear whether Rule 9(b) played a role in this determination. In its final antitrust opinion, filed on August 31, 2007, and dismissing plaintiffs' claims with prejudice, the District Court appeared to apply only *Twombly*'s plausibility standard. *See*, 2007 WL 2533989, at *18–19. Having determined that both complaints failed to satisfy this general standard, the court had no occasion to test plaintiffs' allegations against the heightened pleading requirements of Rule 9(b).

[51]The District Court's Rule 9(b) analysis should be directed to the specific antitrust conspiracy we have found adequately pled for purposes of Rule 8(a)(2)—namely, a horizontal agreement among certain of Marsh's insurer-partners not to

no opinion on these issues here.

## ii. The Global Conspiracy

Overlaying the broker-centered conspiracies, plaintiffs aver, was a "global conspiracy." In this alleged scheme, the defendant brokers, "with the complicity of the Defendant Insurers," EB SAC ¶ 301, agreed "to conceal from the general public and other brokers [i.e., non-conspiring brokers]" the existence of the broker-centered conspiracies and the details of the contingent commission agreements. *Id.* ¶ 314. Plaintiffs contend that this "agreement not to disclose the Contingent Commission agreements and resulting profits was a naked horizontal restraint of informational output that directly affected the price of insurance." *Id.* ¶ 303.

The District Court concluded that the complaints' factual allegations fail to plausibly imply horizontal non-disclosure agreements among the defendant brokers or the defendant insurers. 2007 WL 2533989, at *19. We agree. Plaintiffs explain that defendants engaged in similar broker-centered schemes, which were all structured by similar contingent commission agreements. Plaintiffs further note that these schemes "were very successful and yielded enormous profits," and that "[t]he Broker and Insurer Defendants were thus heavily invested in their Broker-Centered schemes during the Class Periods and did not want to risk losing their resulting profits by

compete for incumbent business.

115

disclosing their schemes to each others' [sic] clients." EB SAC ¶ 313. In other words, no broker could expose its competitors' contingent commission agreements without drawing unwelcome attention to its own golden-egg-laying goose. Having just cogently explained why each broker had ample independent motive to avoid disclosure, however, the complaints discordantly conclude: "Therefore [the defendants] *agreed* not to [disclose]." *Id.* (emphasis added); *accord* Comm. SAC ¶¶ 355–56. We cannot credit this *ipse dixit*, which is in conflict with its own premises.

Plaintiffs contend that "[i]n a truly competitive environment, brokers could utilize information about another broker's charging of supra-competitive premiums through inclusion of Contingent Commissions . . . to compete for that broker's business. An economically rational broker would maximize its opportunity to increase market share by telling its rival's customers they are paying too much for their insurance." EB SAC ¶ 315. But this argument fails, much like the *Twombly* plaintiffs' contention that the defendant ILECs' reluctance to challenge one another's regional monopolies bespoke agreement. *See Twombly*, 550 U.S. at 567–69. Reaping "enormous profits" from their own furtive use of contingent commission agreements, the brokers had no desire to upset the apple cart.[52]  *See id.* at 568; *see also id.* (noting that the

_____

[52]The Employee Benefits complaint "alleges that the brokers knew, through industry studies and other means, that disclosure

116

complaint "does not allege that competition . . . was potentially any more lucrative" than the defendants' behavior during the relevant period).

Nor do plaintiffs' other proffered "plus factors" plausibly imply a horizontal agreement among the brokers. The Commercial complaint alleges that the defendant brokers "issued substantially similar purported 'disclosure' statements modeled after the CIAB's position statement" advising brokers on how to respond to questions regarding contingent commissions. Comm. SAC ¶ 452. According to plaintiffs, these statements misleadingly disguised the existence and effect of the contingent commission agreements. But neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy. *Cf. Twombly*, 550 U.S. at 567 n.12 (rejecting the contention that the defendants' common membership in a trade

---

of [the contingent commission] arrangements would cause a decrease in commission income (which was almost exclusively profit to the brokers) of between 5% to 25%." Plaintiffs' EB Br. 20. But this fact does nothing to strengthen the inference that the brokers' similar silence on contingent commissions was the product of an agreement. The "obvious alternative explanation" remains: each broker decided, perhaps on the basis of the same industry studies, that disclosure was not in its best interest, just as each ILEC in *Twombly* decided that competition with the other regional monopolies would not benefit its bottom line.

117

union, combined with parallel conduct, plausibly suggests conspiracy); *Elevator Antitrust Litig.*, 502 F.3d at 51 (finding that allegations that the defendants used similar contractual language did not plausibly imply conspiracy because "similar contract language can reflect the copying of documents that may not be secret"). While these allegations indicate that the brokers had an opportunity to conspire, they do not plausibly imply that each broker acted other than independently when it decided to incorporate the CIAB's proposed approach as the best means of protecting its lucrative arrangements from hostile scrutiny. *See Petruzzi's*, 998 F.2d at 1242 n.15 ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." (internal quotation marks omitted)).

Even if we read the complaint to assert that the defendant brokers collaborated in crafting these allegedly misleading disclosures (insofar as these defendants allegedly "control the affairs of . . . CIAB," Comm. SAC ¶ 515, which produced the "position statement" allegedly incorporated into defendants' disclosures to clients), this still would be insufficient to show a horizontal agreement not to disclose one another's contingent commissions. If proven, this allegation would plausibly show that defendants agreed to work together to determine the best way of disguising activity in which each engaged. But this allegation would not plausibly imply that the decision to disguise that activity (namely, the alleged use of contingent commissions as part of a scheme to steer customers to particular insurers) was itself the product of an agreement—not, at least,

118

in the face of the complaint's many allegations showing that each defendant had ample independent motive to conceal its own contingent commission arrangements. A contrary holding would be tantamount to finding that any collaborate effort to refine a "pernicious industry practice," *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2892700, at *24 (so describing the conduct alleged by plaintiffs), plausibly suggests a conspiracy among all industry participants not to reveal the fact that other participants engage in the same practice. Where, as here, the "obvious alternative explanation" for such an industry practice is that each member of the industry believes its profits would suffer without the practice, it is not plausible to infer that each member's decision not to expose its competitors' use of the practice—that is, not to engage in mutually assured destruction—is the product of an agreement.[53]

_____

[53]Plaintiffs describe the alleged "Global Conspiracy" as "the Broker Defendants' agreement not to disclose or advertise truthful pricing information and to limit consumer information about price." Comm. SAC ¶ 358. This language, however, elides the significant difference between this case and those in which defendants are alleged to have agreed to refrain from disclosing information about their *own* practices. *Cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 759–62 & n.1 (1999) (describing FTC's allegations that dentists agreed not to engage in advertising about pricing discounts or quality of service). When each defendant would be expected to have an independent motive to disclose information about its own product or services

In the Employee Benefits Case, plaintiffs allege that "Defendants executed substantially similar disclosure policies regarding contingent compensation matters, including failing to disclose contingent compensation information to ERISA plan administrators on Form 5500s, as required by governmental regulations." EB SAC ¶ 324. Plaintiffs also allege instances in which defendants exchanged information about how they accounted for, and reported, this compensation. These allegations, like the other allegations of shared information and similar disclosure practices, are insufficient. They imply only that each defendant had a similar motive to obfuscate the structure of the brokers' compensation, and that they sought the most effective means to achieve this obfuscation.[54] They do not

_____

(such as when that information would presumably enhance the value of that product or services to potential customers), the fact that defendants made parallel decisions not to do so conceivably raises a suspicion of agreement. Here, by contrast, the allegation is that defendants agreed not to disclose unflattering information about their competitors' practices. But given that each defendant is alleged to have engaged in the same practice, so that such disclosure would inevitably be self-defeating, the inference that the lack of disclosure is the result of agreement is implausible.

[54]Plaintiffs do not contend that the exchange of information about reporting techniques was itself unlawful, but argue only that this communication evinces a horizontal agreement to report

120

provide a "reason to infer that the [defendants] had agreed among themselves to do what was only natural anyway." *Twombly*, 550 U.S. at 566.

Finally, plaintiffs point to the similar nature of each broker-centered conspiracy, as well as the allegedly similar confidentiality agreements the brokers inserted into the vertical contracts with each of their partner insurers. But these allegations of parallel conduct do not qualify under *Twombly* as a basis for a plausible inference of horizontal agreement among the brokers or insurers. Having reviewed the entirety of the Global Conspiracy pleadings, we concur with the District Court's conclusion: "While Plaintiffs present facts to support the possibility of inadequate disclosures by the brokers to the insureds, the Complaints are bereft of allegations to demonstrate that this was more than brokers adopting sub-par disclosure methods to protect their own, lucrative agreements." 2007 WL 2533989, at *19. Plaintiffs' attack on the pervasive use of contingent commissions to exploit insurance brokers' power over their clients—and the use of similar techniques to disguise

_____

the brokers' compensation improperly on Form 5500. Notably, some of the particular exchanges detailed by plaintiffs actually appear to undermine the inference of an agreement *not* to disclose. *See, e.g.*, EB RPS ¶ 63 (noting an e-mail from one insurer to another expressing "surprise[]" that the addressee had *not* been reporting its commission payments "given our conversation on this topic earlier this year").

121

this activity—may allege a "pernicious industry practice," but they do not plausibly imply an industry-wide conspiracy.

## 2. The McCarran-Ferguson Act

Defendants argue that whether or not plaintiffs have adequately pled the elements of their Sherman Act claims under the Federal Rules of Civil Procedure, the conduct alleged in the complaints is exempt from federal antitrust regulation under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015. Section 2(b) of the McCarran-Ferguson Act provides:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That . . . the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b). Section 3(b) of the Act provides that "[n]othing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b).

The second, proviso clause of Section 2(b)—which is the

122

clause relevant to this appeal—"provides a statutory antitrust exemption for activities that (1) constitute the 'business of insurance,' (2) are regulated pursuant to state law, and (3) do not constitute acts of 'boycott, coercion or intimidation.'" *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1133 (3d Cir. 1993) (quoting *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 219–20 (1979)). Rejecting defendants' arguments, the District Court concluded that the conduct alleged by plaintiffs is not part of the "business of insurance" and is thus not exempt from plaintiffs' antitrust claims. *See Royal Drug*, 440 U.S. at 210 (noting that if the challenged agreements "are not the 'business of insurance' within the meaning of § 2(b) of the McCarran-Ferguson Act . . . then the Agreements are not exempt from examination under the antitrust laws"). We agree.

The Supreme Court observed in *Royal Drug* that "the [Act] does not define the 'business of insurance.'" 440 U.S. at 211. But the Court noted that, insofar as the Act limits the scope of federal antitrust statutes, its interpretation is subject to the "well settled" rule "that exemptions from the antitrust laws are to be narrowly construed." *Id.* at 231. Furthermore, the Court thought it significant "that the statutory language in question here does not exempt the business of insurance companies from the scope of the antitrust laws. The exemption is for the 'business of insurance,' not the 'business of insurers' . . . ." *Id.* at 210–11. The mere fact that it is the conduct of insurance companies that is challenged here is, therefore, not dispositive.

In *Royal Drug* itself, the plaintiffs, independent

123

pharmacies, challenged agreements between Blue Shield, a health insurer, and three "participating pharmacies." Under the agreements, Blue Shield's policyholders could purchase prescription drugs from the participating pharmacies at a price of $2 per prescription, and Blue Cross would reimburse the pharmacy for the cost of acquiring the drug prescribed. By contrast, policyholders who selected a non-participating pharmacy were required to pay the full retail price charged by the pharmacy and could then seek reimbursement from Blue Shield for 75% of the difference between that price and $2. The independent pharmacies asserted these agreements violated § 1 of the Sherman Act, while Blue Shield contended it was exempt from the antitrust laws under the McCarran-Ferguson Act.

The Court held that the agreements did not constitute the "business of insurance." "The fallacy of the [defendants'] position," the Court explained, "is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that policyholders will be unable to pay for prescription drugs during the period of coverage, and the agreements between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations. . . . The Pharmacy Agreements . . . do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield." *Id.* at 213–14. It is true, the Court conceded, that these business arrangements with third-party providers could affect Blue Shield's costs, which could in

124

turn affect the premiums it charges. *Id.* at 214. But this relationship to the "business of insurance" was too attenuated. Defendants may have been able to demonstrate that the Pharmacy Agreements lowered Blue Shield's expenses, and that these savings might be passed on to policyholders in the form of lower premiums. "But, in that sense, every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer." *Id.* at 216–17. If the "business of insurance" were interpreted so expansively, "almost every business decision of an insurance company could be included in the [term]. Such a result would be plainly contrary to the statutory language, which exempts the 'business of insurance' and not the 'business of insurance companies.'" *Id.* at 217. Another factor that influenced the Court's conclusion was that "[t]he Pharmacy Agreements are not 'between insurer and insured.' They are separate contractual arrangements between Blue Shield and pharmacies engaged in the sale and distribution of goods and services other than insurance." *Id.* at 216.

Looking back on its decision in *Royal Drug*, the Court later distilled three criteria for determining whether particular conduct constitutes the "business of insurance": "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v.*

125

*Pireno*, 458 U.S. 119, 129 (1982). The Court added, however, that "[n]one of these criteria is necessarily determinative in itself." *Id.*

In *Pireno*, the challenged conduct was a health insurer's use of a professional association's peer review committee to examine chiropractors' statements and charges and render an opinion on the necessity of treatments and the reasonableness of charges paid for them. The Court held that the use of the association did not implicate the transfer of risk because "[p]eer review takes place only after the risk has been transferred by means of the policy, and then it functions only to determine . . . whether the insured's loss falls within the policy limits," that is, whether the insured's loss is, under the terms of the policy, among the risks that has been transferred to the insurer. *Id.* at 130 (internal quotation marks omitted). Furthermore, the Court found that the insurer's relationship with the peer review committee "is not an integral part of the policy relationship between insurer and insured" because "the challenged arrangement . . . is obviously distinct from [the insurer's] contracts with its policyholders." *Id.* at 131. "Finally, as respects the third . . . criterion," the Court concluded "it is plain that the challenged peer review practices are not limited to entities within the insurance industry." *Id.* at 132. Accordingly, the challenged practice was not the "business of insurance" under the McCarran-Ferguson Act and so was not entitled to exemption from federal antitrust law. *Id.* at 134.

The Supreme Court's analysis in *Royal Drug* and *Pireno*

126

was informed by an extensive inquiry into the Act's legislative history. "The law was enacted in 1945 in response to [the Supreme Court's] decision in *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533" (1944). *Royal Drug*, 440 U.S. at 217. The defendants in *South-Eastern Underwriters* had been charged with, inter alia, conspiring to fix insurance rates and commissions, but the district court had dismissed the indictment on the strength of a long line of jurisprudence suggesting "that the insurance industry was not a part of interstate commerce subject to [federal] regulation under the Commerce Clause." *Royal Drug*, 440 U.S. at 217; *see, e.g.*, *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183 (1868) ("Issuing a policy of insurance is not a transaction of commerce."). The Supreme Court reversed, "holding that the business of insurance is interstate commerce, and that the Congress which enacted the Sherman Act had not intended to exempt the insurance industry from its coverage." *Royal Drug*, 440 U.S. at 217.

As the Court has explained, the primary purpose of the McCarran-Ferguson Act was "to preserve state regulation of the activities of insurance companies, as it existed before the *South-Eastern Underwriters* case." *Id.* at 218 n.18; *see Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1231 n.5 (2d Cir. 1995) ("[S]tate insurance legislation is exempt from the restrictions of the Dormant Commerce Clause as a result of the McCarran-Ferguson Act."). This purpose is embodied in the first clause of section 2(b). "[T]he applicability of the antitrust laws to the insurance industry" was only "[a] secondary

127

concern." *Royal Drug*, 440 U.S. at 218. Although the House of Representatives initially approved a bill that would have entirely exempted the insurance industry from federal antitrust laws, the Act as passed created only a "partial exemption from those laws. Perhaps more significantly, however, [the Act] embod[ies] a legislative rejection of the concept that the insurance industry is outside the scope of the antitrust laws—a concept that had prevailed before the *South-Eastern Underwriters* decision." *Id.* at 220.

The Court also found that the legislative history sheds some light on the scope of that exemption—that is, on which particular activities within the insurance industry Congress intended to exempt. This history, the Court concluded, "strongly suggest[s] that Congress understood the business of insurance to be the underwriting and spreading of risk." *Id.* at 221. More specifically, the "primary concern" of Congress "was that cooperative ratemaking efforts be exempt from the antitrust laws" because such concerted efforts were understood to be necessary to ensure the adequate capitalization of insurance companies. *Id.* The Court quoted a report by the National Association of Insurance Commissioners (NAIC):[55] "[I]t would be a mistake to permit or require the unrestricted competition contemplated by the antitrust laws to apply to the

---

[55]"The views of the NAIC are particularly significant, because the Act ultimately passed was based in large part on the NAIC['s proposed] bill." *Id.*

128

insurance business.  To prohibit combined efforts for statistical and rate-making purposes would be a backward step in the development of a progressive business." *Id.* at 221–22 (quoting 90 Cong. Rec. A4405 (1944)) (emphasis omitted).  During the floor debates, Senator Ferguson explained the purpose of the bill in a similar manner:

> This bill would permit—and I think it is fair to say that it is intended to permit—rating bureaus, because in the last session we passed a bill for the District of Columbia allowing rating.  What we saw as wrong was the fixing of rates without statutory authority in the States; but we believe that State rights should permit a State to say that it believes in a rating bureau.  I think the insurance companies have convinced many members of the legislature that we cannot have open competition in fixing rates on insurance.  If we do, we shall have chaos.  There will be failures, and failures always follow losses.

*Id.* at 223 (quoting 91 Cong. Rec. 1481 (1945)); *see also id.* (noting that "[t]he consistent theme of the remarks of other Senators also indicated a primary concern that cooperative ratemaking would be protected from the antitrust laws").  The Court also found instructive President Roosevelt's statement when signing the bill: "Congress did not intend to permit private rate fixing, which the Antitrust Act forbids, but was willing to permit actual regulation of rates by affirmative action of the

129

States." *Id.* at 224 (quoting [1944–45 Volume] *The Public Papers and Addresses of Franklin D. Roosevelt* 587 (Samuel I. Rosenman ed., 1950)).

On the basis of this history, one might narrowly construe the "business of insurance" to encompass only public ratemaking efforts, not purely private collaboration unauthorized or unsupervised by state agencies. Dicta in *Royal Drug* suggest otherwise, however. The Court observed that the Act's legislative history does not indicate exactly "which of the various practices alleged in the *South-Eastern Underwriters* indictment Congress intended to be covered by the phrase 'business of insurance'"; nonetheless, it noted that the indictment had charged "that the defendants had fixed their . . . premium rates," and it concluded that the legislative history *did* make clear "that the fixing of rates is the 'business of insurance.'" *Id.* at 224 n.32. Since the *South-Eastern Underwriters* defendants appear to have been charged with private rate-fixing, *see South-Eastern Underwriters*, 322 U.S. at 535–36, the implication is that such activity falls within the scope of the Act's antitrust exemption.

Relying in part on this reasoning, the United States Court of Appeals for the Eighth Circuit has explicitly rejected the claim that private agreements among insurance companies to fix rates do not fall within the "business of insurance." *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1555–57 (8th Cir. 1989). The court agreed with the defendants that if joint rate setting is the business of insurance when authorized by

130

the state, "it makes little sense to say that cooperative rate setting, without state involvement, is not within the business of insurance. It is the setting of the rates which constitutes the business of insurance. This characterization is not dependent upon the identity of the rate setters." *Id.* at 1556 n.7; *cf. Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 318–25 (D.C. Cir. 1982) (finding that an alleged horizontal conspiracy by five automobile insurance companies to fix the price of automobile body damage repair work was the "business of insurance" for purposes of the McCarran-Ferguson Act's antitrust exemption).[56]

Our Court has also had occasion to interpret the scope of the "business of insurance." In *Owens v. Aetna Life & Casualty Co.*, decided after *Royal Drug* but before *Pireno*, we held that alleged cooperation between two insurers "in the decision to file in New Jersey only a single mass market rating-schedule, and perhaps a very high individual policy rate . . . would fall within

---

[56]Furthermore, as commentators have observed, a construction of the "business of insurance" that limited the concept to state-authorized collaboration would arguably "be so narrow as not to go beyond the state action antitrust exemption" set forth in *Parker v. Brown*, 317 U.S. 341, 350–52 (1943), thus rendering the Act's antitrust exemption superfluous. Jonathan R. Macey & Geoffrey P. Miller, *The McCarran-Ferguson Act of 1945: Reconceiving the Federal Role in Insurance Regulation*, 68 N.Y.U. L. Rev. 13, 28 n.58 (1993).

131

even the narrowest reading" of the "business of insurance" for purposes of the Act's antitrust exemption.  654 F.2d 218, 232 (3d Cir. 1981).  Analyzing Supreme Court precedent, we stated that "[t]he earmark of insurance is the underwriting and spreading of risks in exchange for a premium."  *Id.* at 224; *see Royal Drug*, 440 U.S. at 211 n.7.  At the same time, however, we noted that the "business of insurance" "encompasses . . . more than making contracts between an insurer and an insured." *Owens*, 654 F.3d at 224.  Specifically, we found

> it is clear that at least the following activities are the business of insurance, either because they pertain to risk-spreading or to the contract between the insurer and the insured:
> 1. preparing and filing a rating-schedule, either on behalf of an individual company or jointly through a rating bureau;
> 2. deciding upon rating classification differences between individual policies and group marketing plans, either individually or jointly through a rating bureau;
> 3. authorizing agents to solicit individual or group policies;
> 4. accepting or rejecting coverages tendered by brokers.

*Id.* at 225–26 (footnote omitted).

The dissenting opinion in *Owens* did not dispute the

132

majority's conclusions about the scope of the "business of insurance." Instead, it argued that the majority had mischaracterized the alleged activity before it. The dissent believed the proper McCarran-Ferguson Act question concerned not ratemaking, as the majority had concluded, but rather "whether a conspiracy by insurance companies to divide markets can be construed as a matter of law to constitute 'the business of insurance' within the meaning of the McCarran-Ferguson Act." *Id*. at 236–37 (Sloviter, J., dissenting). In the dissent's view, the Act "was enacted to protect the arrangements necessary to preserve the writing of insurance within and under regulation of the respective states. . . . [T]he scope of the statute can be no broader than protection of insurance company activities that can rationally be claimed to need anticompetitive regulation." *Id*. at 242 (internal quotation marks omitted). Accordingly, the dissent believed it was "unlikely that Congress thought it was protecting agreements whereby an insurance company would completely withdraw from writing one type of insurance within the state." *Id*. Nonetheless, the dissent was "reluctant to suggest that no agreement between insurance companies which may result in withdrawal from a market can ever be the business of insurance, because we do not know enough of the economic and business stuff out of which these arrangements emerge to be certain." *Id*. at 244 (internal quotation marks omitted). What could be said for certain, the dissent concluded, was that the District Court had erred in finding "that the alleged division of markets constitutes 'the business of insurance' as a matter of law." *Id*. at 245; *see also Maryland v. Blue Cross & Blue Shield Ass'n.*,

133

620 F. Supp. 907, 917 (D. Md. 1985) ("[I]n order to meet the first *Pireno* requirement the defendants must show the challenged territorial allocation is related positively to underwriting and ratemaking; that is, that exclusive geographic territories directly facilitate risk spreading and transfer through the provision of insurance." Because "[t]he parties have submitted affidavits which raise material factual issues" as to this question, summary judgment is inappropriate.).

With this precedent in mind, we turn to the case before us. As the disagreement between the majority and dissent in *Owens* illustrates, the precise characterization of the defendants' conduct can be dispositive. Here, having dismissed several antitrust claims for failure to satisfy *Twombly*'s pleading standard, we are left with plaintiffs' allegations that Marsh's insurer-partners agreed with one another not to compete for incumbent business. Applying the *Pireno* criteria to this alleged conduct, we agree with defendants (as did the District Court) that the third criterion is met because the parties to this alleged agreement are all entities within the insurance industry. *See Pireno*, 458 U.S. at 129 (asking "whether the practice is limited to entities within the insurance industry"). There is also a strong argument that the agreement would be "an integral part of the policy relationship between the insurer and the insured," *id.* (describing the second criterion), insofar as it would affect the insurers from which a prospective purchaser could obtain coverage.

On the basis of the complaint before us, however, we

134

cannot conclude that the alleged agreement "has the effect of transferring or spreading a policyholder's risk." *Id.* (describing the first criterion). Given the Supreme Court's declaration that "underwriting or spreading of risk [is] an indispensable characteristic of insurance," *Royal Drug*, 440 U.S. at 212, we think the failure to satisfy this first criterion is decisive. *See id.* at 220–21 ("References to the meaning of the 'business of insurance' in the legislative history of the McCarran-Ferguson Act strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk.").

Our conclusion as to the first criterion rests on the fact that plaintiffs do not allege that defendants' agreement involved who could receive insurance coverage, or the type of coverage they could obtain. *Cf., e.g.*, *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991) (holding that an alleged conspiracy among members of the insurance industry to restrict the terms of coverage of commercial general liability insurance qualified as the "business of insurance"), *aff'd in part, rev'd in part on other grounds sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993). Plaintiffs allege only that defendants colluded in order to influence with which of them a given policy could be placed. In other words, the complaint asserts conduct affecting not *whether* or *to what extent* a prospective insurance purchaser would transfer its risk to an insurer, but merely to *which* insurer that risk would be transferred. *See* Comm. SAC ¶ 100 (stating that under the Marsh-centered commercial conspiracy, "the incumbent [insurer] who hits a [premium] target *and provides*

135

*the coverages requested* is protected" (internal quotation marks omitted) (emphasis added)); *id.* ¶ 106 (relating a statement by a Marsh employee that "if the incumbent [insurers] meet their target price *and does [sic] the coverage we want*, [Marsh Global Broking] will protect them and make sure they get the business" (internal quotation marks omitted) (emphasis added)). While discovery may reveal facts warranting a reassessment, we cannot say that defendants' challenged agreement, as alleged in the complaint, affected the spreading of risk within the meaning of the "business of insurance."

*Royal Drug*'s examination of the purpose of the McCarran-Ferguson Act bolsters this conclusion. As the Supreme Court explained, in carving out only the "business of insurance" from federal antitrust regulation—and not the "business of insurance companies"—Congress had in mind "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement," as well as "other activities of insurance companies [that] relate so closely to their status as reliable insurers that they too must be placed in the same class." *Royal Drug* at 215–16 (quoting *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 460 (1969)). We think it noteworthy that in this passage the Court twice referred to the reliability of insurers—the second time in defining the open-ended class of unenumerated activities that would fall within the "business of insurance." Indeed, a focus on reliability was at the heart of what the Court described as "the primary concern of both representatives of the insurance

136

industry and the Congress," namely "that cooperative ratemaking efforts be exempt from the antitrust laws." *Id.* at 221 (explaining "the widespread view" at the time of the McCarran-Ferguson Act's passage "that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation").

Here, not only is defendants' alleged agreement not to compete for incumbent business different than the cooperative ratemaking efforts described in *Royal Drug*, but it also appears to have been unrelated to reliability; it does not involve any restriction on the type of coverage offered or the risk profile of insurable entities. *Royal Drug* emphasized that Congress understood the "business of insurance" as bound up with actuarial considerations intrinsic to the underwriting process, but the collusion alleged by the complaint is not addressed to these considerations. Defendants' alleged agreement was designed to ensure only that, once an insurer had won a client's business—by providing the client with an acceptable coverage package at an acceptable premium—another insurer would not attempt to poach that business by offering a more attractive price when it came up for renewal.

Nor does this alleged conduct fall into any of the categories of the "business of insurance" we set forth in *Owens*, each of which also implicated reliability issues. *See Owens*, 654 F.2d at 225–26 (majority opinion). The alleged agreement does not involve rating schedules or rating classification differences. Nor does it involve authorizing agents to solicit particular types

137

of policies. The final category, "accepting or rejecting coverages tendered by brokers," *id.* at 226, may seem at first blush to describe defendants' alleged behavior, in which non-incumbent insurers refused to compete for the incumbent's renewal business. But in the context of *Owens*, "accepting or rejecting coverages tendered by brokers" is best understood as referring to attempts by insurers to discriminate among brokers based on the type of policy tendered. *See id.* at 233 (noting plaintiff's "claim that there was a conspiracy to drive him out of business"). The majority did not address whether a bare agreement to divide the market (either geographically or by customer) would constitute the business of insurance. *See id.* at 234–37 (Sloviter, J., dissenting). Examining *Royal Drug*, we believe a horizontal agreement not to compete for renewal business, at least as alleged here, is not within the scope of activity exempted by the McCarran-Ferguson Act. Such an agreement is incidental to the processes of risk assessment and underwriting deemed integral to the "business of insurance" by the Supreme Court.

Defendants dispute this analysis. Noting that plaintiffs' theory of injury rests on a claim that insurance customers paid higher prices for insurance as a result of the alleged agreement, defendants argue that the allegations go directly to the heart of the insurance contract. In defendants' view, to deny that the alleged agreement among the insurers implicates the transfer of risk is to artificially segregate the element of premium price from the element of risk spreading; since premiums are the price

138

paid for transferring risk, conspiracies that have the direct effect (if not necessarily the explicit purpose) of driving up premium prices necessarily affect risk spreading.

We do not deny that premiums are an integral part of the transfer of risk. But as the District Court accurately observed, *Royal Drug* stands for the proposition that "more than a mere impact on the price of premiums must be demonstrated" in order "[t]o establish that a particular practice has a substantial connection to the spreading and the underwriting of risk." 2006 WL 2850607, at *9. Without question, if defendant insurers agreed not to compete with one another for renewal business, the premiums charged for renewal policies would presumably be higher than in a competitive market. But we think there is an important difference between an agreement not to compete to sell a given package of insurance coverage and an agreement to fix the rates for such coverage. As noted, exempting cooperative ratemaking from federal antitrust regulation was one of the key purposes of the McCarran-Ferguson Act because such joint ratemaking was deemed necessary at times in order to protect insurers from underestimating risk and the attendant threat of insolvency.[57] The kind of agreement alleged here,

---

[57]*Cf. Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56 (1st Cir. 2005). The plaintiffs in that case alleged a horizontal agreement among private insurers not to provide compulsory automobile insurance, in violation of the Sherman Act. According to the plaintiffs, the insurers had stakes in a

however, would not serve such a purpose. Rather than guarantee that every insurer will offer a given coverage package at the same prescribed rate, the alleged agreement here, taken

publicly created entity providing such insurance and believed they would ultimately reap greater profits if they did not compete with the price set by that entity (which was fixed by Puerto Rican law, although private insurers were allowed to charge a lower premium in order to compete to provide the compulsory insurance). The plaintiffs also alleged that the private insurers had colluded to coerce brokers to refrain from selling compulsory insurance contracts through private companies.

The Court of Appeals for the First Circuit decided that the challenged conduct constituted the "business of insurance" under the second clause of section 2(b) of the McCarran-Ferguson Act. The court determined that "[h]orizontal agreements among insurers to fix the price and to issue policies only through the residual market are within the business of insurance." *Id*. at 67. Unlike defendants' alleged agreement here, the insurers' conduct in *Arroyo-Melecio* was rate fixing in the classic sense: because of the public scheme of compulsory insurance, it had the effect of ensuring that no one could purchase insurance except at the price prescribed by the public entity. The compulsory insurance scheme and public entity in *Arroyo-Melecio* also brought that case much closer to the McCarran-Ferguson Act's concern to exempt public ratemaking from federal antitrust regulation.

140

alone, would leave it to each incumbent insurer to assess its risk of loss for itself, and then to determine its own profit margin by setting the price/premium without fear of competition. In short, there is nothing about the alleged agreement that is particular to the business *of insurance*; it is simply an agreement not to compete to sell a particular product to a particular customer, which would be expected—in any industry, *see, e.g.*, *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) (examining alleged agreement among fat and bone rendering companies not to bid on one another's existing accounts)—to yield a higher price than would prevail in a competitive market. The mere fact that the product here happens to be insurance is not enough to trigger the McCarran-Ferguson Act's exemptions. *Cf. Royal Drug*, 440 U.S. at 213–214 n.9 ("[I]t does not follow that because an agreement is necessary to provide insurance, it is also the 'business of insurance.'").

Defendants do not dispute that *Royal Drug* held that the fact that challenged behavior has an impact on premiums is not enough to make it the "business of insurance" for purposes of the McCarran-Ferguson Act's antitrust exemption. Defendants point out, however, that while the agreement found not to be the "business of insurance" in *Royal Drug* was between insurers and third-party benefit providers, here it is between only insurers and directly involves the formation of the insurance contract between insurer and insured (and not merely, as in *Royal Drug*, the specific manner in which the insurer would perform

141

obligations assumed under a preexisting contract).  In *Sabo v. Metropolitan Life Insurance Co.*, we stated that "whatever the precise contours of the insurance business phrase may be, there is nothing more basically 'insurance' than the sale of an insurance contract."  137 F.3d 185, 191 (3d Cir. 1998).  Applying this principle, we found that the McCarran-Ferguson Act precluded a RICO claim alleging that the defendant insurance company had, inter alia, engaged in "a 'churning' scheme, whereby [the defendant] encouraged and coerced agents to fraudulently trade insurance policies in order to accumulate commissions and decrease the value of outstanding policies."  *Id.* at 187.  According to defendants, "*Sabo* could not more clearly dispose of the 'business of insurance' question in this case," as "[t]he 'sale of an insurance contract' is at the core of Plaintiffs' antitrust claims here."  Defendants' EB Br. 67.

Defendants overlook, however, an important distinction between *Sabo* and this case.  Because *Sabo* involved a RICO rather than an antitrust claim, it was governed by the first clause of § 2(b) of the McCarran-Ferguson Act.  That clause provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  This "first clause . . . impos[es] what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically

142

requires otherwise." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993). Both clauses incorporate the phrase "business of insurance," but as the Supreme Court has emphasized, the respective protections afforded to state law under the two clauses are of different scopes. "The first clause commits laws 'enacted . . . for the purpose of regulating the business of insurance' to the States, while the second clause exempts only 'the business of insurance' itself from the antitrust laws." *Id.* at 504. Because "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' . . . necessarily encompasses more than just the business of insurance," *id.* at 505, judicial determinations made when applying one clause may not be dispositive when applying the other. As *Sabo* itself explained, "*Fabe* makes clear [that] the *Royal Drug* test is only a starting point in the analysis for non-antitrust cases." 137 F.3d at 191 n.3; *see also* Jonathan R. Macey & Geoffrey P. Miller, *The McCarran-Ferguson Act of 1945: Reconceiving the Federal Role in Insurance Regulation*, 68 N.Y.U. L. Rev. 13, 22 (1993) ("[I]t appears that the meaning of [the 'business of insurance'] varies depending upon whether the case involves antitrust [i.e., clause two] or other regulatory [i.e., clause one] matters."). Accordingly, we cannot reflexively transplant *Sabo*'s holding into our analysis under the second clause of § 2(b).

In fact, a close reading of the Supreme Court's cases may counsel against indiscriminately classifying all conduct involving the "sale of an insurance contract" as the "business of insurance" for purposes of the Act's antitrust exemption. *Sabo*

143

relied heavily on *SEC v. National Securities, Inc.*, in particular
its statement that "[t]he selling and advertising of policies" falls
"within the scope of the [Act's preemption of federal law]." 393
U.S. at 460; *see Sabo*, 137 F.3d at 190–92. *National Securities*,
like *Sabo*, was a case applying the first clause of § 2(b). When
the Court later attempted in *Royal Drug* to define the "business
of insurance" for purposes of clause two, it quoted from the
same paragraph of *National Securities* on which *Sabo* drew. *See
Royal Drug*, 440 U.S. at 215–16. Notably, however, the *Royal
Drug* Court omitted the passage about "the selling and
advertising of policies" and included only the second part of the
paragraph, which, as noted, focused on the issue of "reliability."
*Id.* In light of *Fabe*, we interpret this to mean that although any
state law that regulates "the selling and advertising of
insurance" will qualify as a "law enacted by [a] State for the
purpose of regulating the business of insurance" under clause
one of the McCarran-Ferguson Act, "the selling and advertising
of insurance" is not the "business of insurance" under clause
two unless it has some effect on "reliability" or underwriting
issues.[58] As noted, based on the face of the complaint, we
cannot say that defendants' alleged behavior satisfies this

---

[58]*Cf. Blue Cross*, 620 F. Supp. at 917 (qualifying the
proposition "that the selling and advertising of policies is part of
the business of insurance" by noting that the Supreme Court
"decided the *National Securities* case many years before *Royal
Drug* and *Pireno*, cases purporting to narrow the 'business of
insurance' definition").

standard.

Furthermore, even if *Sabo*'s holding were directly applicable to this case, plaintiffs' allegations here are distinguishable. Whereas the *Sabo* plaintiff challenged a scheme by which defendants allegedly churned insurance policies—that is, bought and sold them with excessive frequency—plaintiffs here complain that defendants agreed *not* to sell them insurance. *Cf. Owens*, 654 F.2d at 242 (Sloviter, J., dissenting) ("It appears . . . unlikely that Congress thought it was protecting [from antitrust regulation] agreements whereby an insurance company would completely withdraw from writing one type of insurance within the state. Aetna's argument [to the contrary] seems to turn protection of the 'business of insurance' into the 'business of non-insurance.'"). And unlike the agreement alleged here, the alleged churning of policies in *Sabo* arguably did affect the coverage terms of the policies themselves, as they "decrease[d] the value of outstanding [life insurance] policies." *Sabo*, 137 F.3d at 187.

In sum, although the scope of the agreement alleged by plaintiffs has been refined since the District Court first passed on the issue of the McCarran-Ferguson Act, we agree with the court's conclusion that defendants' alleged conduct does not constitute the "business of insurance" for purposes of the Act's antitrust exemption. Accordingly, the Act does not provide a basis for dismissing plaintiffs' Sherman Act claims.

### 3. Antitrust Conclusion

145

Because the McCarran-Ferguson Act does not bar plaintiffs' claims (at least, not at this stage of the litigation), our earlier *Twombly* analysis is dispositive. Given the long path our discussion has taken, a brief synopsis of that analysis is in order. The Supreme Court has made clear that courts confronted with a motion to dismiss must assess whether the complaint contains "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. "Determining whether a complaint states a plausible claim to relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950; *see also Arar v. Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009) (Parker, J., dissenting) ("Plausibility . . . depends on a host of considerations: The full factual picture presented by the complaint, the particular cause of action and its elements, and the available alternative explanations [for the facts alleged].") *cert. denied*, 2010 WL 390379 (U.S. June 14, 2010). Some claims will demand relatively more factual detail to satisfy this standard, while others require less.

In the context of claims brought under § 1 of the Sherman Act, plausibility is evaluated with reference to well-settled antitrust jurisprudence that "limits the range of permissible inferences from ambiguous evidence." *Matsushita*, 475 U.S. at 588. In particular, "when allegations of parallel conduct are set out in order to make a § 1 claim," that conduct must be placed in "some setting suggesting the agreement necessary to make out

146

a § 1 claim." *Twombly*, 550 U.S. at 557.  In other words, the complaint must allege some "further circumstance," "something more than merely parallel behavior," "pointing toward a meeting of the minds." *Id.* at 557, 560.  If, in the circumstances alleged, the asserted "parallel conduct . . . could just as well be independent action," then the complaint has failed to plead a § 1 claim. *Id.* at 557.

Here, the bid-rigging allegations supply the requisite "further circumstance."  Because they plausibly suggest an unlawful horizontal conspiracy not to compete for incumbent business, plaintiffs have adequately met Rule 8(a)(2)'s requirement for setting forth a § 1 claim against those defendants in the asserted Marsh-centered commercial conspiracy who are alleged to have participated in bid rigging.  This agreement to divide the market, if proven, would be a naked restraint of trade subject to per se condemnation. *See Leegin*, 551 U.S. at 886; *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 310–11 (3d Cir. 1983) (observing that "a horizontal agreement to allocate customers" is "ordinarily . . . a per se violation" (citing *United States v. Topco Assocs.*, 405 U.S. 596, 606–12 (1972))), *rev'd on other grounds sub nom. Matsushita*, 475 U.S. 574 (1986).[59]

_____

[59]Even if we concluded that a per se rule were inappropriate and instead applied a quick look analysis (as plaintiffs urge in the alternative), we would still condemn the alleged restraint.  As noted, defendants have not put forward a plausible

With respect to the remaining antitrust claims, however, plaintiffs have failed to plead facts plausibly supporting their allegations of horizontal conspiracies to unreasonably restrain trade, notwithstanding their conclusory assertions of agreement. Given plaintiffs' exclusive reliance on a per se or quick look analysis, the absence of a horizontal agreement is fatal to their § 1 claims.[60] Accordingly, these antitrust claims must be dismissed, as the District Court concluded.

## B. RICO Claims

Plaintiffs also claim that defendants' alleged conduct violated the Racketeer Influenced and Correct Organizations (RICO) Act, 18 U.S.C. § 1962(c), (d). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d) makes it unlawful "for any person to conspire to violate" § 1962(c).

---

justification for a naked horizontal agreement not to compete for renewal customers.

[60]As noted, *see supra* Section II.A.1.a., plaintiffs who seek to condemn a vertical agreement must proceed under the traditional rule of reason, which requires plaintiffs to demonstrate anticompetitive effects in the relevant market.

To plead a RICO claim under § 1962(c), "the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). According to the statute, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In the Commercial Case, plaintiffs allege the existence of one legal-entity enterprise, the Council of Insurance Agents and Brokers (CIAB), and six association-in-fact enterprises corresponding to the six broker-centered antitrust conspiracies discussed above. In the Employee Benefits Case, plaintiffs plead five association-in-fact enterprises corresponding to the broker-centered conspiracies alleged in their antitrust claims.

According to the RICO statute, a "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). "These predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *Lum*, 361 F.3d at 223; *see* 18 U.S.C. § 1961(1) (defining "racketeering activity"). Plaintiffs assert that the defendant brokers in both the Commercial Case and Employee Benefits Case committed "numerous acts of mail and wire fraud" in furtherance of the enterprises to which they allegedly belonged. Comm. SAC ¶ 510; *accord* EB SAC ¶ 520. More specifically, plaintiffs allege that defendants "knowingly and intentionally

149

made misrepresentations" in materials disseminated by mail and wire, "wherein they routinely represented that they would act in the best interests of their clients in providing unbiased advice and assistance in the selection of insurance products and services relating thereto and that they would act as fiduciaries of their clients in placing insurance on the best terms possible and at the best price available." Comm. SAC ¶ 535; EB SAC ¶ 539. At the same time, plaintiffs charge, defendants "knowingly and intentionally . . . concealed material facts," such as "the steering of insurance placements from the Broker Defendants to the Insurer Defendants," and the fact "that the Broker Defendants were not acting in the best interest of their clients but were instead acting on behalf of themselves and the Insurer Defendants who were associated with the Broker's enterprise to further their financial interests at the expense of their clients." Comm. SAC ¶ 535; EB SAC ¶¶ 539–40. In the Employee Benefits case, plaintiffs also allege that defendants violated 18 U.S.C. § 1954;[61] *see* 18 U.S.C. § 1961(1) (including violations

---

[61]Section 1954 provides:

Whoever being—

> (1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan; or
>
> (2) an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such

plan; or

(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or

(4) a person who, or an officer, counsel, agent, or employee of an organization which, provides benefit plan services to such plan

receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined under this title or imprisoned not more than three years, or both: *Provided*, That this section shall not prohibit the payment to or acceptance by any person of bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of his duties as such person, administrator, officer, trustee, custodian, counsel, agent, or

151

of 18 U.S.C. § 1954 among the enumerated racketeering activities). Plaintiffs assert that "[e]ach payment of a Contingent Commission . . . is a violation of Section 1954 and . . . is intended to influence the advice that the Defendant Brokers give to the plan sponsors, plan administrators and/or plan participants." EB SAC ¶ 535.

In their motion to dismiss the RICO claims, defendants argued that plaintiffs had failed adequately to plead the enterprise and conduct elements of their § 1962(c) claims, and that they had failed adequately to plead predicate acts of racketeering. The District Court granted the motion, finding that plaintiffs had insufficiently pled both the enterprise and conduct elements of the § 1962(c) claims based on the alleged broker-centered enterprises, and had insufficiently pled that defendants conducted CIAB "through a pattern of racketeering activity." Having determined that plaintiffs had failed to allege adequately that any defendant had violated § 1962(c), the court also dismissed the claims of conspiracy under § 1962(d). 2007 WL 2892700, at *33; *see id.* at *13 (holding that "in the event *all* substantive RICO claims in the action are dismissed, a plaintiff cannot bring a § 1962(d) claim").

### 1. Legal Standards

---

employee of such plan, employer, employee organization, or organization providing benefit plan services to such plan.

152

## a. Section 1962(c)

### i. The Enterprise Element

The RICO statute "describes two categories of associations that come within the purview of the 'enterprise' definition. The first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers 'any union or group of individuals associated in fact although not a legal entity.'" *United States v. Turkette*, 452 U.S. 576, 581–82 (1981) (quoting 18 U.S.C. § 1961(4)). As the District Court here explained, when the enterprise asserted is a legal identity, such as "a legitimate business or organization . . ., the need to allege and prove the existence of enterprise structure can be met without great difficulty, since all aspects of the enterprise element . . . are satisfied by the mere proof that the entity does in fact have a legal existence." 2007 WL 2892700, at *9; *see, e.g.*, *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 786 (9th Cir. 1996) ("[C]orporate entities ha[ve] a legal existence . . ., and the very existence of a corporation meets the requirement for a separate [enterprise] structure." (internal quotation marks omitted) (alteration in original)); *see also Boyle v. United States*, 129 S. Ct. 2237, 2249 (2009) (Stevens, J., dissenting) ("In cases involving a legal entity, the matter of proving the enterprise element is straightforward . . . .").

The statutory language does not, however, specify the essential features of an association-in-fact enterprise. The Supreme Court attempted to explicate this concept in *Turkette*,

153

where it reviewed a First Circuit decision limiting the definition of "enterprise" to legitimate organizations. The Supreme Court reversed, stating that "[t]here is no restriction upon the associations embraced by [§ 1961(4)'s] definition [of enterprise]: an enterprise includes any union or group of individuals associated in fact. On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope . . . ." *Turkette*, 452 U.S. at 580.

The First Circuit had expressed concern that including criminal organizations within the definition of "enterprise" would effectively collapse the distinction between the "enterprise" and "pattern of racketeering" elements of a § 1962(c) violation. *Id.* at 582. The Supreme Court agreed that the "enterprise" and the "pattern of racketeering activity" were distinct elements of a § 1962(c) claim. But the Court rejected the argument that preserving this distinction required the exclusion of illegitimate organizations from the definition of "enterprise." *Id.* at 583. In setting forth its own understanding of this distinction, the Court suggested several features defining an association-in-fact enterprise:

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or

154

> informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.

*Id.* (internal citation omitted).

Interpreting this language from *Turkette*, we identified three elements essential to an association-in-fact enterprise. *United States v. Riccobene*, 709 F.2d 214, 221–24 (3d Cir. 1983). We stated that, first, such an enterprise must have "some sort of structure . . . within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis." *Id.* at 222. Second, "the various associates [must] function as a continuing unit. This does not mean that individuals cannot leave the group or that new members cannot join at a later time. It does require, however, that each person perform a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization." *Id.* at 223 (internal quotation marks and citation omitted). Finally, we

155

reiterated *Turkette*'s requirement that the association-in-fact be "an entity separate and apart from the pattern of activity in which it engages." *Id.* (quoting *Turkette*, 452 U.S. at 583). As we understood this last requirement,

> it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.

*Id.* at 223–24.

In evaluating the sufficiency of plaintiffs' pleadings here, the District Court understandably relied heavily on *Riccobene*. *See* 2007 WL 2892700, at *9–11. After the District Court had dismissed plaintiffs' claims, and after we had heard argument in this appeal, the Supreme Court decided *Boyle v. United States*, 129 S. Ct. 2237 (2009). *Boyle* sought to clarify the required attributes of an association-in-fact enterprise in order to resolve conflicts that had developed among the courts of appeals over the proper interpretation of the *Turkette* factors. *Id.* at 2243. Rejecting several proposed ways of cabining the definition of an "enterprise," the *Boyle* Court highlighted several elements of the

156

RICO statute that pointed toward a capacious construction of the term. Most significant was the statute's specific description of possible enterprises. *See* 18 U.S.C. § 1961(4) (stating that an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). "This enumeration of included enterprises is obviously broad, encompassing '*any* . . . group of individuals associated in fact.' The term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle*, 129 S. Ct. at 2243 (quoting 18 U.S.C. § 1961(4)) (emphasis in *Boyle*) (internal citation omitted).[62] In addition, "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Id.* (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947).

Informed by these background principles, the Court expounded the necessary elements of an association-in-fact enterprise. Such an enterprise must have a structure.

---

[62]The Court noted that § 1961(4), which lists entities "include[d]" in the term "enterprise," "does not purport to set out an exhaustive definition of the term," and that, "[a]ccordingly, this provision does not foreclose the possibility that the term might include, in addition to the specifically enumerated entities, others that fall within the ordinary meaning of the term 'enterprise.'" *Boyle*, 129 S. Ct. at 2243 n.2.

157

Specifically, it "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 2244.[63] But the Court saw "no basis in the language of RICO" for requiring a particular type of organizational structure. *Id*. at 2245. An association-in-fact enterprise, it explained,

> need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles;

---

[63]*Boyle* thus sees what we described in *Riccobene* as the second element, i.e., continuity, as an inherent component of the structure requirement. *See Boyle*, 129 S. Ct. at 2244 ("Section 1962(c) . . . shows that an 'enterprise' must have some longevity, since the offense proscribed by that provision demands proof that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'"). In other words, while *Riccobene* used the term "structure" to describe one of several necessary features of an "enterprise," *Boyle* appears to use "structure" as an overarching term encompassing all of the requisite elements: common purpose, relationships among those associated with the enterprise, and the continuity necessary to allow the associates to pursue the enterprise's purpose.

158

different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 2245–46; *see also id.* at 2243 & n.3 (rejecting, as "extratextual," the dissent's argument "that the definition of a RICO enterprise is limited to 'business-like entities'" (citing *id.* at 2247–50 (Stevens, J., dissenting)). *Boyle* makes clear, in other words, that although the structure requirement demands that "the parts" of the association in fact must be "arranged or put together to form a whole," the statute does not prescribe any particular arrangement, as long as it is "sufficient to permit [the enterprise's] associates to pursue the enterprise's purpose." *Id.* at 2244 (internal quotation marks omitted).

    *Boyle* also clarified the relationship between the

"enterprise" and "pattern of racketeering activity" elements of a § 1962(c) claim. The petitioner in *Boyle* had objected to the trial judge's jury instructions, which had stated that "the existence of an association-in-fact [enterprise] is sometimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* at 2247. In the petitioner's view, the judge should have specified that, to qualify as a RICO enterprise, the association's structure must go "beyond that inherent in the pattern of racketeering activity." *Id.* at 2244. The Supreme Court found the petitioner's proffered language unnecessary. If the language "is interpreted to mean that the existence of an enterprise is a separate element that must be proved," the Court explained, "it is of course correct. . . . [T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Id.* at 2245 (quoting *Turkette*, 452 U.S. at 583). Indeed, the Court thought it was "easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not establish the existence of an enterprise." *Id.* at 2245 n.4. If, for example, "several individuals, *independently and without coordination*, engaged in a pattern of crimes listed as RICO predicates[,] . . . [p]roof of these patterns would not be enough to show that the individuals were members of an enterprise." *Id.* (emphasis added). Nor would proof of a conspiracy to commit a RICO predicate offense "necessarily establish that the defendant[s] participated in the affairs of an . . . enterprise through a pattern of . . . crimes." *Id.* at 2246. While "a conspiracy is an inchoate crime

160

that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy," § 1962(c) "demands much more: the creation of an 'enterprise'—a group with a common purpose and course of conduct—and the actual commission of a pattern of predicate offenses." *Id.* The Court did not believe, however, that the petitioner's suggested language was necessary in order to avoid a merger of the crime proscribed by § 1962(c) and simple conspiracy to commit a predicate offense. Instead, the Court found that the statute's requirement of a pattern of predicate acts, plus the requirement of an enterprise structure—liberally defined as "a group with a common purpose and course of conduct"—was sufficient to preserve the distinction.

Not only was it unnecessary to require proof of a structure "beyond that inherent in the pattern of racketeering activity," but the phrase was also potentially misleading. For "if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect." *Id.* at 2245. As the Court had observed in *Turkette*, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* (quoting *Turkette*, 452 U.S. at 583); *see also id.* at 2246 n.5 ("Even if the same evidence may prove two separate elements, this does not mean that the two elements collapse into one."). In other words,

161

"proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.* at 2247.[64] For this reason,

[64]Writing in dissent, Justice Stevens agreed with the majority that "[t]here may be cases in which a jury can infer [the existence of an enterprise] from the evidence used to establish the pattern of racketeering activity." *Id.* at 2249 (Stevens, J., dissenting). But he believed that should "be true only when the pattern of activity is so complex that it could not be performed in the absence of structures or processes for planning or concealing the illegal conduct beyond those inherent in performing the predicate acts." *Id.* By that standard, Justice Stevens found the jury instructions approved by the majority to be "plainly deficient." *Id.* at 2251. In allowing the jury to "'find an enterprise where an association of individuals, without structural hierarchy, forms solely for the purpose of carrying out a pattern of racketeering acts,'" the instructions failed, he argued, to "require the Government to prove that the alleged enterprise had an existence apart from the pattern of predicate acts." *Id.*; *see also id.* at 2250 ("By permitting the Government to prove [the 'enterprise' and 'pattern of racketeering activity'] elements with the same evidence, the [majority] renders the enterprise requirement essentially meaningless in association-in-fact cases."). By contrast, the majority held that an association-in-fact enterprise need not *do* anything other than engage in the pattern of racketeering activity, so long as it has the requisite structural features (common purpose, interrelationships among

the trial judge's instructions to the jury, which explained that a RICO enterprise could be "form[ed] solely for the purpose of carrying out a pattern of racketeering acts," and that "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure," were "correct and adequate." *Id.* at 2242, 2247 (internal quotation marks omitted).

In short, *Boyle* holds that the RICO statute defines an "enterprise" broadly, such that the "enterprise" element of a § 1962(c) claim can be satisfied by showing a "structure," that is, a common "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 2244; *see id.* at 2245 ("[A]n association-in-fact enterprise is simply a continuing unity that functions with a common purpose."). "[A]fter *Boyle*, an association-in-fact enterprise need have no formal hierarchy or

---

its associates, and longevity). *Cf. Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc) (concluding that "the Supreme Court's statement in *Turkette* that an 'enterprise' is 'an entity separate and apart from the pattern of activity in which it engages'" is not a requirement "that an associated-in-fact enterprise have a structure beyond that necessary to carry out its pattern of illegal racketeering activities," but rather "merely a statement of the obvious: The enterprise and its activity are two separate things. One is the enterprise. The other is its activity.").

163

means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity." *United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir.), *cert. denied*, 130 S. Ct. 656 (2009). To the extent our cases have interpolated additional requirements into the statute, they are abrogated by *Boyle*.

Neither *Turkette* nor *Boyle* (nor *Riccobene*, for that matter) specifically addressed requirements for pleading civil RICO claims.[65] Plaintiffs contend these cases speak only to which "attributes of an enterprise must ultimately be proven"; they do not define what must be plead in the complaint. Plaintiffs' EB Br. 70.[66] Citing our opinion in *Seville Industrial*

---

[65]*Turkette* evaluated a challenge to the validity of a criminal indictment; *Boyle* reviewed jury instructions in a criminal case; and *Riccobene* evaluated a challenge to the sufficiency of the evidence supporting a criminal RICO conviction.

[66]*Boyle* was decided after the parties filed their briefs in this appeal. Although plaintiffs' argument distinguishing burdens of proof from pleading burdens thus does not explicitly refer to *Boyle*, its logic would seem to call for interpreting that decision, like *Turkette* and *Riccobene*, as addressed only to burdens of proof.

Plaintiffs also argue, in the alternative, that their allegations adequately plead the enterprise features set forth in the *Turkette/Boyle* line of cases. *See infra.*

164

*Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984), plaintiffs argue that it is sufficient at the pleading stage simply to identify the entities of which the alleged association-in-fact enterprise is composed. If that were the standard, plaintiffs would have satisfied it, as they have named the defendant broker and defendant insurers within each alleged broker-centered enterprise. *See* Comm. SAC ¶ 502; EB SAC ¶ 523.

Plaintiffs, however, misconceive the pleading standard. To begin with, *Seville* was decided before the Supreme Court held in *Bell Atlantic Corp. v. Twombly* that Federal Rule of Procedure 8 requires plaintiffs to plead "enough factual matter" to state "a claim to relief that is plausible on its face." 550 U.S. at 556, 570. But putting *Twombly* aside for the moment, we are skeptical that *Seville*, read purely on its own terms, deems it sufficient merely to identify the members of an alleged association-in-fact enterprise. It is true that *Seville* found neither *Turkette* nor *Riccobene* "speaks to what must be pleaded in order to state a cause of action." *Seville*, 742 F.2d at 790. It is also true that *Seville* concluded the complaint before it was adequately pled because the plaintiff had "identified the four entities it believed were the enterprises that had been marshalled against it." *Id.* (stating that "[t]he rules of pleading require nothing more at this early juncture than that bare allegation"). We find it significant, however, that *Seville* involved legal-entity enterprises, not associations in fact. *See id.* at 789–90. Each of the four enterprises alleged there consisted solely of a named

defendant—either a corporation or a natural person. Simply identifying these legal entities was sufficient to "put the defendant[s] on notice," *id.* at 790, of the nature of the enterprises alleged (and, for that matter, to indicate the existence of the features set forth in *Turkette*).

When the asserted enterprise, however, is not itself a legal entity, but rather an association of legal entities, simply identifying the allegedly associated components does not serve to put defendants on notice of the RICO claim alleged against them—just as merely listing the names of alleged conspirators would not give defendants adequate notice of an alleged conspiracy. For that reason, even before *Twombly*, some courts required plaintiffs to provide more detail in pleading the existence of an association-in-fact enterprise. *See, e.g.*, *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 646 (7th Cir. 1995) (agreeing "with the district court that plaintiff's naming of a string of entities does not allege adequately an enterprise").

In any case, it is clear after *Twombly* that a RICO claim must plead facts plausibly implying the existence of an enterprise with the structural attributes identified in *Boyle*: a shared "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 129 S. Ct. at 2244; *see Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009) (upholding dismissal of RICO claims because, inter alia, the plaintiff's allegations of an association-in-fact enterprise "do not indicate how the different actors are associated and do not

166

suggest a group of persons acting together for a common purpose or course of conduct"); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (finding that the complaint "fail[s] to plead the existence of . . . the so-called association in fact enterprise" because it does not plausibly "tie[] together the various defendants allegedly comprising the association in fact into a single entity that was formed for the purpose of working together," that is, "acting in concert"); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (stating generally that *Twombly* "'requires a complaint with enough factual matter (taken as true) to suggest' [each] required element" of the claim alleged). To require less would ignore *Twombly*'s interest in "insist[ing] upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" to an "inevitably costly and protracted discovery phase." *Twombly*, 550 U.S. at 558 (internal quotation marks omitted); *see id.* at 557–58 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) (noting that the potential cost of such cases may have an "in terrorem" effect on defendants, coercing settlement of even groundless claims). As other courts have recognized, the concern expressed in *Twombly* is just "as applicable to a RICO case, which resembles an antitrust case in point of complexity and the availability of punitive damages and of attorneys' fees to the successful plaintiff. RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th

167

Cir. 2008).[67]

In *Twombly*, this concern focused on the agreement element of § 1 of the Sherman Act. Because § 1 allows plaintiffs to bring suit against conspiracies, it has the potential to impose liability on a large number of defendants. To prevail, however, a § 1 plaintiff must show not simply that the defendants all engaged in similar wrongdoing, but that they agreed to undertake concerted action in restraint of trade.

The enterprise element of RICO claims is a close analogue of § 1's agreement element. Unless a plaintiff is required at the pleading stage to suggest plausibly the existence of an enterprise structure—unless a plaintiff must "allege something more than the fact that individuals were all engaged in the same type of illicit conduct during the same time period," *Elsevier*, 692 F. Supp. 2d at 307—the RICO statute's allowance for association-in-fact enterprises becomes an open gateway to the imposition of potentially massive costs on numerous defendants, regardless of whether there is even a hint of the collaboration necessary to trigger liability.

### ii. The "Conduct" Element

Mere association with an enterprise does not violate §

---

[67]We do not imply that *Twombly*'s pleading standard is applicable only to "big" cases, but we note that the "practical" reasons for this standard, *see Twombly*, 550 U.S. at 557–58, are particularly evident in such cases.

1962(c). To be liable under this provision, a defendant must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The Supreme Court has held that the "conduct or participate" element requires a defendant to "have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). More precisely, "one is not liable under [§ 1962(c)] unless one has participated in the operation or management of the enterprise itself." *Id.* at 183. "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. "Outsiders" may also meet the statutory requirement if they "exert control over" the enterprise, but such outsider defendants must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 184–85. Accordingly, the Supreme Court found that an outside accounting firm did not "conduct or participate, directly or indirectly, in the conduct" of a farmer cooperative's affairs when it prepared and presented audit reports to the cooperative's board, reports that allegedly failed to disclose all of the information necessary to assess the solvency of the cooperative. *Id.* at 185–86; *see also Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539–40 (3d Cir. 1993) ("It cannot be said that by merely performing what are generic financial and related services to an insurance company, even if they are later found to be deficient, an accounting firm has opened itself to liability under the federal racketeering statute.").

### iii.  The Requisite Nexus

Simply pleading that a defendant "participated in the operation or management" of an enterprise, however, is not enough to make out a violation of § 1962(c).  The defendant must have done so "through a pattern of racketeering activity." In other words, there must be not only a "nexus between the [defendant] and the conduct [of] the affairs of an enterprise," *Univ. of Md.*, 996 F.2d at 1539, but also a nexus between the conduct of those affairs and the pattern of racketeering activity, *see Banks v. Wolk*, 918 F.2d 418, 424 (3d Cir. 1990).  The plain language of the statute requires that the "pattern of racketeering activity" be a means by which the defendant "participate[s], directly or indirectly, in the conduct of [the] enterprise's affairs."  In *United States v. Provenzano*, we adopted the Second Circuit's test for determining when a defendant "conducts the activities of an enterprise through a pattern of racketeering." 688 F.2d 194, 200 (3d Cir. 1982) (citing *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980)).  The test is satisfied if (1) the defendant "is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or (2) the predicate offenses are related to the activities of that enterprise."  *Id.* (quoting *Scotto*, 641 F.2d at 54).

The Second Circuit has repudiated this standard, however, finding it inconsistent with the definition of "conduct" subsequently set forth by the Supreme Court in *Reves*.  *United States v. Wong*, 40 F.3d 1347, 1372 (2d Cir. 1994) ("Although

170

*Reves* does not mention *Scotto*, 'we have recently recognized that the Supreme Court's holding in *Reves* . . . is irreconcilable with the relevant portion of our decision in *Scotto*.'" (quoting *United States v. Viola*, 35 F.3d 37, 40 (2d Cir. 1994)); *see also Bldg. Indus. Fund v. Local Union No. 3*, 992 F. Supp. 162, 179 n.10 (E.D.N.Y. 1996) ("To the extent that *Scotto* held that a person may be liable under RICO simply because the requisite nexus exists between his activity and the affairs of the enterprise, it was overruled by the Supreme Court's decision in *Reves* [], holding that a person must be involved in the 'operation or management' of an enterprise to be liable under RICO.").

We agree with the Second Circuit that the *Provenzano*/*Scotto* standard is no longer good law.[68] Given

_____

[68]We recited the *Provenzano* standard post-*Reves* in *United States v. Irizarry*, 341 F.3d 273, 304 (3d Cir. 2003), without addressing the potential tension with *Reves* or acknowledging that the Second Circuit had recognized the standard's abrogation. *Irizarry*'s invocation of the standard appears to be dicta, as our opinion noted that the argument to which it was addressed had been waived. *Id.* In any case, the issue in *Irizarry* was whether the judge should have instructed the jury that it could not convict under § 1962(c) unless the government showed "that the defendant's motive in committing the predicate act was to further the affairs of the enterprise." *Id.* In finding, correctly, that "a defendant can commit a predicate act that is

171

*Reves*, the inquiry must be whether the defendant participated in the "operation or management" of an enterprise's affairs, and if so, whether he did so "through a pattern of racketeering activity." As the plain language of the statute indicates, the nexus element requires a plaintiff to show that the defendant participated in the conduct of the enterprise's affairs (per *Reves*) through—that is, "by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of," *United States v. Brandao*, 539 F.3d 44, 53 (1st Cir. 2008) (internal quotation marks omitted)—a pattern of racketeering activity.[69]

---

detrimental to the enterprise so long as the evidence establishes the requisite nexus between the predicate act and the enterprise," *id.*, we had no occasion to address any other aspects of the *Provenzano* standard.

[69]Although we adopt *Brandao*'s definition of the statutory term "through," we believe the decision inverts the relationship specified by § 1962(c). *Brandao* states that "[a] sufficient nexus . . . exists . . . if the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of [i.e., 'through'] his association with the enterprise." 539 F.3d at 53 (internal quotation marks omitted). But the statute provides that a defendant must participate in the conduct of an enterprise's affairs through the racketeering activity. *See* 18 U.S.C. § 1962(c). This language dictates that it is the predicate acts of racketeering that must be the "means."

172

## b. Section 1962(d)

Under § 1962(d), it is unlawful to conspire to violate any of the substantive provisions of RICO. 18 U.S.C. § 1962(d); *see* 18 U.S.C. § 1962(a)–(c) (substantive provisions).[70] In certain circumstances, a defendant may be held liable under § 1962(d) even where its own actions would not amount to a substantive RICO violation. *Salinas v. United States*, 522 U.S. 52, 65 (1997) (stating that a conspirator can violate § 1962(d) "in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion")[71]; *see Smith v. Berg*, 247

---

[70]Here, § 1962(c) is the only substantive provision invoked by plaintiffs' complaints.

[71]In *Salinas*, the Supreme Court explained § 1962(d)'s relationship to general conspiracy doctrine:

> The relevant statutory phrase in § 1962(d) is "to conspire." We presume Congress intended to use the term in its conventional sense, and certain well-established principles follow. . . . When Congress passed RICO in 1970, the American Law Institute's Model Penal Code permitted a person to be convicted of conspiracy so long as he "agrees with such other person or persons that they or one or more of them will engage in conduct that constitutes such crime." As the drafters emphasized, "so long as the purpose of

173

F.3d 532, 537 (3d Cir. 2001) (stating that, under *Salinas*, a defendant "who opts into or participates in a conspiracy" to violate § 1962(c) may be liable "even if the defendant did not personally agree to do . . . *any* particular element" of the § 1962(c) violation); *see, e.g., Salinas*, 522 U.S. at 65 (holding that the RICO statute "does not permit us to excuse from the reach of [§ 1962(d)'s] conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying [§ 1962(c)] offense"). But a § 1962(d) claim must be dismissed if the complaint does not adequately allege "an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense," *Salinas*, 522 U.S. at 65. *See Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000); *Lightning Lube, Inc.*

the agreement is to facilitate commission of a crime, the actor need not agree 'to commit' the crime.". . . A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. . . . It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

522 U.S. at 63–65 (internal citations omitted).

174

*v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993); *see, e.g.*, *Edwards v. First Nat. Bank*, 872 F.2d 347, 352 (10th Cir. 1989) (finding that "the conspiracy claim falls when the substantive claim based on 1962(c) is deficient" because the alleged racketeering acts do not compose a "pattern"); *cf. Berg*, 247 F.3d at 538 (holding a defendant may be held liable for conspiring to violate § 1962(c), even if he did not operate or manage a RICO enterprise, as long as "he knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise").[72]

---

[72]*Salinas* appears to hold that a violation of § 1962(d) does not require a consummated violation of a substantive RICO provision; it is sufficient that the conspiracy have as its object acts which, if completed, would constitute a substantive violation. Whether a plaintiff who had not been injured by a substantive violation would have standing to bring a civil action for violation of § 1962(d), however, is a different question. *See* 18 U.S.C. § 1964(c) (creating a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962" and providing for triple damages); *Beck v. Prupis*, 529 U.S. 494, 501 n.6 (2000) (distinguishing "the question of what constitutes a violation of § 1962(d)" from "the meaning of a civil cause of action for private injury by reason of such a violation"). In *Beck*, the Supreme Court explained that "a civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury. Rather

## 2. Application to This Case

### a. Section 1962(c) Claims

### i. The Broker-Centered Enterprises

Plaintiffs contend they have pled facts plausibly

---

. . . a RICO conspiracy plaintiff [must] allege injury from . . . an act that is independently wrongful under RICO." *Id.* at 505–06 (abrogating *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1168–69 (3d Cir. 1989)). Accordingly, the Court held that the petitioner, who had been terminated by his employer for blowing the whistle on RICO activities, did not have standing to allege a § 1962(d) violation, since his injury was not "caused by an overt act that is . . . an act of racketeering or otherwise wrongful under RICO." *Id.* at 505. At the very least, then, *Beck* stands for the proposition that a plaintiff bringing a § 1962(d) claim for conspiracy to violate § 1962(c) must allege injury from a racketeering act enumerated in § 1961(1). But *Beck* did not make clear whether that requisite racketeering act must be part of a consummated § 1962(c) violation. Indeed, the Court explicitly reserved the question "whether a plaintiff suing under § 1964(c) for a RICO conspiracy must allege an actionable violation under §§ 1962(a)–(c), or whether it is sufficient for the plaintiff to allege an agreement to complete a substantive violation and the commission of at least one act of racketeering that caused him injury." *Id.* at 506 n.10.

176

suggesting that each defendant broker and its insurer-partners composed an association-in-fact enterprise. The District Court disagreed. Central to its conclusion was its finding that although plaintiffs had adequately alleged bilateral agreements (regarding the steering of business and the payment of contingent commissions) between each broker and its insurer-partners, plaintiffs had failed to plead facts plausibly suggesting collaboration among the insurers. The asserted hub-and-spoke structures therefore lacked a "unifying 'rim.'" 2007 WL 2892700, at *20. In the absence of a plausible "rim" or "wheel" connecting the alleged insurer "spokes," the District Court determined that while plaintiffs may have alleged parallel, bilateral structures connecting a broker to *each* of its insurer-partners, they had failed to plead "broker-centered enterprises" encompassing each broker "hub" and *all* of its strategic partners.

With respect to all but the Marsh-centered enterprise alleged in the Commercial complaint, we agree with the District Court that plaintiffs' allegations of broker-centered enterprises are fatally defective. In our analysis of the antitrust claims, we determined that, with the exception of the alleged Marsh-centered commercial conspiracy, the facts alleged in the complaints do not plausibly imply a horizontal agreement among the insurer-partners. In seeking to establish a "rim" enclosing the insurer-partners in the alleged RICO enterprises, plaintiffs rely on the same factual allegations we found deficient in the antitrust context: that each insurer entered into a similar contingent-commission agreement in order to become a

177

"strategic partner"; that each insurer knew the identity of the broker's other insurer-partners and the details of their contingent-commission agreements; that each insurer entered into an agreement with the broker not to disclose the details of its contingent-commission agreements; that the brokers utilized certain devices, such as affording "first" and "last looks," to steer business to the designated insurer; and that, in the Employee Benefits Case, insurers adopted similar reporting strategies with regard to Form 5500. As noted, these allegations do not plausibly imply concerted action—as opposed to merely parallel conduct—by the insurers, and therefore cannot provide a "rim" enclosing the "spokes" of these alleged "hub-and-spoke" enterprises.

Even under the relatively undemanding standard of *Boyle*, these allegations do not adequately plead an association-in-fact enterprise. They fail the basic requirement that the components function as a unit, that they be "put together to form a whole." *Boyle*, 129 S. Ct. at 2244 (internal quotation marks omitted). Because plaintiffs' factual allegations do not plausibly imply anything more than parallel conduct by the insurers, they cannot support the inference that the insurers "associated together for a common purpose of engaging in a course of conduct." *Id.* (quoting *Turkette*, 452 U.S. at 583); *see id.* at 2245 n.4 (stating that "several individuals" who "engaged in a pattern of crimes listed as RICO predicates" "independently and without coordination" "would not establish the existence of an enterprise"); *Elsevier*, 692 F. Supp. 2d at 307 (stating that, as

178

with a § 1 Sherman Act claim, a RICO claim pleading "nothing more than parallel conduct by separate actors" is insufficient: "there has to be something that ties together the various defendants allegedly comprising the association in fact into a single entity that was formed for the purpose of working together—acting in concert—by means of" racketeering acts); Gregory P. Joseph, *Civil RICO: A Definitive Guide* 106 (3d ed. 2010) (stating that a "rimless hub-and-spoke configuration would not satisfy the 'relationships' prong of *Boyle*'s structure requirement"); *see also Rao*, 589 F.3d at 400 (finding the plaintiff had failed to plead an association-in-fact enterprise because the "allegations do not indicate how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct"). Were the rule otherwise, competitors who independently engaged in similar types of transactions with the same firm could be considered associates in a common enterprise. Such a result would contravene *Boyle*'s definition of "enterprise."[73]

As the District Court acknowledged, although the complaints do not adequately plead these asserted broker-centered enterprises, it is possible that plaintiffs' factual allegations would provide a plausible basis for the assertion of a number of bilateral enterprises, each encompassing a broker

---

[73]We do not address the other grounds relied on by the District Court to support its conclusion that these "broker-centered enterprises" were inadequately pled.

and one of its insurer-partners, or even the assertion that individual brokers or insurers each constituted an enterprise. But the District Court determined that "Plaintiffs' three previous rounds of pleadings unambiguously indicate that Plaintiffs have no interest in asserting" such smaller-scale enterprises. 2007 WL 2892700, at *34 n.32. We agree. While plaintiffs strenuously insist they have adequately pled the existence of "broker-centered enterprises," they have conspicuously refrained, throughout the district-court proceedings and on appeal, from asserting alternative bilateral or single-entity enterprises. Accordingly, the District Court properly dismissed the claims based on these broker-centered enterprises with prejudice.

As with the antitrust claims, we reach a different conclusion with respect to the claims alleging bid rigging—the bid-rigging allegations in the Commercial complaint suffice to plead a "Marsh-centered enterprise."[74] As *Boyle* clarified, a RICO "enterprise" must have a structure, but it need not have any particular structural features beyond "a purpose, relationships among those associated with the enterprise, and

---

[74]Plaintiffs also allege a "Marsh-centered enterprise" in the Employee Benefits complaint, but they do not allege that the associates of this "enterprise" engaged in bid rigging. For the reasons given above, we agree with the District Court that plaintiffs have not adequately pled the existence of such an enterprise.

180

longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 129 S. Ct. at 2244. We think the allegations of bid rigging provide the "rim" to the Marsh-centered enterprise's hub-and-spoke configuration, satisfying *Boyle*'s requirements. The Commercial complaint alleges that Marsh prepared "broking plans" governing the placement of insurance contracts that came up for renewal. According to plaintiffs, "[t]he broking plans assigned the business to a specific insurer at a target price and outlined the coverage. The broking plans also included instructions as to which preferred Insurers would be asked to provide alternative [i.e., intentionally uncompetitive, or sham] quotes. If the incumbent Insurer hit the 'target,' it would get the business and then [Marsh employees] would solicit 'alternative' . . . quotes from other members of the conspiracy." Comm. SAC ¶ 117. The complaint also alleges the reasons why the insurers agreed to provide sham bids. For example, it relates a statement by a former employee of a defendant insurer that his employer had agreed to "provide[] losing quotes" to Marsh in exchange for, among other things, Marsh's "getting 'quotes from other [insurance] carriers that would support the [employer, at least when it was the incumbent carrier] as being the best price.'" Comm. SAC ¶ 109. This statement plausibly evinces an expectation of reciprocity and cooperation among the insurers.

In at least one sense, plaintiffs' allegations regarding the "Marsh-centered enterprise" exceed *Boyle*'s requirements. *Boyle* explicitly disavowed the need for any particular

181

organizational structure.  *Boyle*, 129 S. Ct. at 2245–46.  It upheld the conviction of a "loosely and informally organized" group of bank robbers that neither "had a leader [n]or hierarchy," nor "ever formulated any long-term master plan or agreement"; the group would meet before each robbery to "assign the roles that each participant would play (such as lookout and driver)."  *Id.* at 2241.  Here, by contrast, plaintiffs allege a hierarchical structure according to which Marsh, in accordance with its "broking plan," decided from which insurer each sham bid would be requested.  Plaintiffs adequately allege a "common interest" or "purpose," *id.* at 2244, namely to increase profits by deceiving insurance purchasers about the circumstances surrounding their purchase.  *See* Comm. ARCS 66.  The alleged reciprocal bid rigging also adequately suggests "relationships among" the insurers "associated with the enterprise[s]"; if proved, it would plausibly demonstrate the insurers "joined together" in pursuit of the aforementioned common purpose.  *Boyle*, 129 S. Ct. at 2244 (internal quotation marks omitted).[75]  Finally, the complaint alleges that the bid rigging occurred over a period of several years, plausibly alleging "that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'"  *Id.* (quoting § 1962(c)).  Accordingly, plaintiffs have adequately pled the enterprise

---

[75]Defendants do not dispute that the complaint sufficiently alleges the requisite relationships between each insurer and Marsh.

182

element of the RICO claims based on the alleged Marsh-centered commercial enterprise.[76]

_____

[76]The number of defendants alleged to have engaged in bid rigging appears to be slightly smaller than the number of defendants alleged to be associates of the Marsh-centered enterprise. *See supra* note 44. *Compare* Comm. SAC ¶ 502 (naming alleged members of an association-in-fact Marsh-centered commercial enterprise), *with* Plaintiffs' Comm. Br. 78 n.17 (claiming that the defendant insurers that engaged in bid rigging are "AIG, ACE, Axis, Chubb, XL, Munich/AmRe, Liberty Mutual, St. Paul Travelers, Fireman's Fund and Zurich"), *and* Comm. RPS ¶¶ 27–56 (detailing bid-rigging allegations). While, as noted, plaintiffs have declined to plead alternative enterprises consisting of only individual defendants or bilateral relationships, they urge us to permit them "to proceed with their RICO claims as to Marsh and the insurers explicitly alleged to have been involved in bid-rigging." Plaintiffs' Comm. Br. 78 n.17. Such a "downscaled" Marsh-centered enterprise has been adequately pled.

It may also be worth reiterating that membership in an enterprise is not the touchstone of § 1962(c) liability. Rather, it is the operation of that enterprise's affairs through a pattern of racketeering that constitutes a violation. Accordingly, although the Commercial complaint here appears to allege that each defendant was a member of the enterprise it "conducted," as a general matter defendants who are outside an enterprise may in

The District Court, proceeding without the benefit of *Boyle*, found that the bid-rigging allegations were not sufficient to plead a Marsh-centered enterprise. The court believed that the defendant insurers' participation in each bid-rigging transaction was "ad hoc." *See* 2007 WL 2892700, at *22 (stating that "in the picture painted by Plaintiffs[,] a refusal by Insurer-Defendant 'X' to provide 'B' quotes to the requesting Broker-Defendant was of little substantive consequence to consummation of [each] transaction because alternative 'B' quotes were readily available to the Broker-Defendant from a range of other Insurer-Defendants"). Given the alleged existence of Marsh's "broking plan," which designated, for each renewal contract, the insurer from which a sham bid would be solicited, we cannot say that insurer participation in bid rigging was completely "ad hoc."[77] In any case, *Boyle* makes clear that there is no need for a systematic plan ordaining in advance who

certain circumstances be held liable under § 1962(c), as the Supreme Court has acknowledged. *See Reves*, 507 U.S. at 184–85.

[77]The District Court suggested that defendant insurers may have sometimes refused Marsh's request for a false bid. But even if there were occasional refusals, we do not believe they would prove fatal to plaintiffs' enterprise allegations. *Cf. Boyle*, 129 S. Ct. at 2245 ("[N]othing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

184

is to provide a sham bid for a particular transaction; "decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 129 S. Ct. at 2245. Nor do "[m]embers of the group need [to] have fixed roles; different members may perform different roles at different times." *Id.*; *cf. id.* at 2241 (upholding RICO conviction predicated on an enterprise in which the participants never "formulated any long-term master plan or agreement" but instead assigned roles to each associate on a robbery-by-robbery basis). Furthermore, we see no indication that a RICO enterprise requires participants to have non-interchangeable, non-substitutable functions.

The District Court also appeared to believe that the bid-rigging allegations did not adequately plead interrelationships among the insurers, as opposed to simply bilateral relationships between Marsh and each insurer. As the District Court read the complaint, "an Insurer-Defendant 'X' cared little which other Insurer-Defendant would be 'accommodated' by its 'B' quotes and whether these 'B' quotes would actually be used at all by the requesting Broker-Defendant; the sole point of 'X's' interest was to ensure that 'X' would be rewarded" by the Broker, in some form, in exchange for its willingness to generate sham bids. 2007 WL 2892700, at *21. In other words, the insurers provided sham bids to the broker, at the request of the broker, in exchange for benefits provided by the broker. We agree that the complaint does not allege that the bid rigging took the form of quid pro quo transactions between insurers; Insurer "X" did not promise to provide a sham bid facilitating the renewal of Insurer

185

"Y's" account in exchange for Insurer "Y's" providing a sham bid facilitating the renewal of Insurer "X's" account. But, as noted, the complaint does allege that one reason the insurers were willing to furnish sham bids was so that they would be the beneficiaries of sham bids in the future. To be sure, an insurer might not need a sham bid to win the renewal of any particular account. It stands to reason, however, that sometimes a sham bid would be necessary—for example, when Marsh's client insisted on seeing multiple bids. In our view, the alleged agreement by insurers to provide sham bids plausibly suggests an interrelationship among the insurers—mediated through Marsh—in pursuit of achieving greater business and profits by means of deceiving insurance purchasers. Through this interrelationship, the insurers were allegedly able to advance this common interest to a greater extent than would have been possible on the strength of the bilateral relationships between Marsh and each broker alone. Under *Boyle*, this (plus the requisite longevity) is enough to plead an enterprise.

The District Court believed plaintiffs had also failed to plead the "conduct" element of their claims regarding the Marsh-centered enterprise, that is, failed to plead that defendants "conduct[ed], or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). To some extent, the District Court's conclusion appears to derive from its determination regarding the "enterprise" element of

these claims.[78]  At least one of its findings, however, appears particular to the "conduct" element.  In an implicit reference to the Supreme Court's *Reves* decision, the District Court stated that it was "not convinced" that "Defendants operated" the alleged Marsh-centered enterprise's affairs "rather than Defendants' own affairs."  2007 WL 2892700, at *31.  *Reves* explained that liability under § 1962(c) "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  507 U.S. at 185.  In *Reves*, the Court found that an outside accounting firm hired to audit an enterprise's books did not participate in the conduct of the enterprise's affairs simply by doing its job (even if its job performance was deficient).  *Id.* at 185–86; *see United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) (stating that "the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out").

Here, however, the defendants are alleged to be members of the enterprise.  It will often be the case that the interests of the enterprise are congruent with those of its members; such congruence presumably provides the incentive for members to participate in the enterprise.  We think, therefore, that "if

---

[78]The overlap between the District Court's analyses of these two elements is understandable. A defendant cannot participate in conducting the affairs of a non-existent enterprise.

187

defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact *enterprise's* affairs, and not [simply] their *own* affairs." Joseph, *supra*, at 74; *see Brandao*, 539 F.3d at 54. Here, defendants' alleged collaboration in the Marsh-centered enterprise, most notably the bid rigging, allowed them to deceive insurance purchasers in a way not likely without such collusion.

Moreover, we believe that, based on the complaint's allegations, plaintiffs have adequately pled that defendants engaged in activities constituting participation in the conduct of the enterprise. The allegations that defendant broker Marsh directed the placement of insurance contracts and solicited rigged bids from insurers plausibly imply that Marsh "participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 183. And by allegedly supplying the sham bids, Marsh's insurer-partners are also adequately alleged to have "operated" the enterprise within the meaning of *Reves*. *Cf. id.* at 184 (stating that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management"); *e.g.*, *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 978–79 (7th Cir. 1995) (finding that two businesses participated in the conduct of an association-in-fact enterprise "by knowingly implementing decisions" by the enterprise's managers to commit crimes). We thus find plaintiffs have sufficiently pled that defendants in the Marsh-centered

188

enterprise satisfied the "conduct" requirement set forth in *Reves*.[79]

In summary, we find that plaintiffs have adequately pled both the "enterprise" and "conduct" elements of the § 1962(c) claims based on the alleged Marsh-centered commercial enterprise. Accordingly, we will vacate the District Court's judgments insofar as they dismissed those claims, and we will remand to allow the District Court an opportunity to evaluate the remaining elements of those claims.[80]

### ii. The CIAB Enterprise

---

[79]Whether plaintiffs have adequately alleged that defendants participated in the conduct of the Marsh-centered enterprise's affairs "though a pattern of racketeering activity" is, of course, another matter. This question necessarily turns in part on whether plaintiffs have sufficiently pled a "pattern of racketeering activity." *See infra* note 80.

[80]In their motion to dismiss, defendants also contended that plaintiffs had failed to plead adequately a pattern of predicate offenses. In a footnote, the District Court suggested this challenge might have merit but did not conclusively adjudicate it, instead granting the motion on the ground that "Plaintiffs' pleading of the 'enterprise' and 'conduct' elements warrant dismissal without granting Plaintiffs leave to amend." 2007 WL 2892700, at *33 n.29.

189

In the Commercial Case, plaintiffs also bring § 1962(c) claims naming the Council of Insurance Agents and Brokers (CIAB), a trade organization, as a RICO enterprise. According to the complaint, the CIAB "represents the largest, most profitable of all commercial insurance agencies and brokerage firms. The Council's primary audience is CEOs and their management teams. The Council partners with its members and provides not only vital intelligence on current market conditions and trends, but also solutions to the next challenge before the need arises." Comm. SAC ¶ 513 (internal quotation marks omitted). Plaintiffs aver that defendant insurers' and brokers' association with the CIAB violated the RICO statute insofar as defendants "used vital intelligence gained through communications and meetings facilitated by CIAB and otherwise, including information about decreased profits and demand to devise [their customer allocation] scheme[s] . . . to replace competition. The [defendants] operating through the CIAB Enterprise reached consensus on how they would change the market and regarding non-disclosure" of the details of their allegedly unlawful contingent-commissions-for-guaranteed-premium-volume schemes. *Id.* ¶ 523.

The District Court acknowledged the complaint had adequately pled that the CIAB, a legal entity, was an enterprise, but it concluded the complaint failed to allege adequately that defendants had participated in the conduct of the CIAB "through" the acts of fraud pled as the requisite pattern of

190

racketeering activity.[81] In the District Court's view, the complaint's allegations "merely indicate that CIAB provided an internal and external communication tool for the members of the insurance industry. No *fact* stated in Plaintiffs' submissions indicates that Defendants' alleged predicate acts of mail and wire fraud (aimed at Defendants' clients) were related in any way to the activities of CIAB, or that Defendants committed the alleged predicate offenses through the means of CIAB, or that CIAB was somehow indispensable to Defendants in their alleged goal to commit the underlying predicate offenses." 2007 WL 1062980, at *17. Although the court believed that plaintiffs had adequately alleged that the CIAB afforded defendants an opportunity to meet and communicate about their challenged schemes, it found that simply making use of the forum provided by the Council did not plausibly imply the requisite nexus: "[W]ere Plaintiffs to allege that Defendants habitually met with each other . . . in a chain of coffee houses or through an Internet portal[,] such allegations would not render the corporation owning such chain of coffee houses or the online portal a RICO

---

[81]Plaintiffs conclusorily allege that "Defendants have conducted or participated in the conduct of the affairs of the CIAB Enterprise through a pattern of racketeering activity," Comm. SAC ¶ 527, but as *Twombly* observed, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).

enterprise for the purposes of the inquiry at bar. Neither the CIAB-based [allegations], nor the coffee house- or Internet portal-based alternative provides this Court with a fact drawing 'a nexus between [Defendants' alleged offenses] and the conduct in the affairs' of [the alleged enterprise]." *Id.* (quoting *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998)) (first alteration in District Court opinion).

As the District Court observed, plaintiffs' nexus theory appears to rest primarily on the alleged fact that the CIAB provided an "opportunity" or "forum" for defendants to discuss and advance their schemes.[82] We agree with the District Court

---

[82]*See, e.g.*, Comm. SAC ¶ 513 ("CIAB provides Defendants with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the marketplace . . . ."); *id.* ¶ 518 ("CIAB provides the Broker Defendants a forum to discuss and reach agreement with each other and with the Insurer Defendants regarding, among other things, compensation arrangements and other aspects of their relationships, what each wants and needs from the relationship, the market and market conditions, consolidation and disclosure."); *id.* ¶ 519 ("CIAB hosts 'Executive Forums' . . . [which] allow members the opportunity to 'discuss common problems and solutions.'"); *id.* ¶ 521 ("CIAB has also provided Defendants the opportunity to discuss and reach agreement on joint action in response to the regulatory investigations and

that the allegation that defendants took advantage of an opportunity to meet provided by a legitimate enterprise in the normal course of its business does not mean—or plausibly imply—that defendants were participating in the conduct of the enterprise. By extension, the allegation that defendants utilized such an opportunity to plot or discuss or otherwise facilitate a pattern of racketeering activity does not, without more, plausibly imply that defendants conducted the enterprise's affairs through a pattern of racketeering activity. If it did, any coffee house or hotel with conference facilities could, as the District Court rightly recognized, be made into a RICO enterprise merely by dint of the fact that racketeers used the facility as a meeting place. In our view, such an expansive interpretation of § 1962(c) liability would not comport with the text or purpose of the RICO statute, nor with the cases interpreting it. As we have observed in interpreting the Supreme Court's decision in *Reves*, "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *Univ. of Md.*, 996 F.2d at 1539. Similarly, we do not think a RICO violation occurs simply because an enterprise provides goods or services that ultimately benefit a defendant's racketeering efforts; in order to constitute

---

regarding disclosure issues."); *id.* ¶ 522 ("CIAB provides Defendants with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the marketplace . . . .").

193

a § 1962(c) violation, it is necessary that the defendant, in utilizing these goods or services, "participate . . . in the conduct of [the] enterprise's affairs." § 1962(c). Availing oneself of a forum provided by an enterprise does not, without more, plausibly imply that one has participated in the conduct of that enterprise's affairs.

In an apparent attempt to supply this "something more," plaintiffs allege that "[t]he purpose of the CIAB Enterprise is to further the interests of larger brokers generally and to further the Defendants' scheme specifically." Comm. SAC ¶ 524. But to claim that the purpose of the CIAB was to further the defendants' scheme is simply to assert what must be shown through well-pled factual allegations. *See Twombly*, 550 U.S. at 555; *cf. supra* note 81. And the alleged fact that the CIAB worked to further the interests of larger brokers generally does not plausibly imply the necessary nexus between defendants' racketeering activity and the conduct of the CIAB's affairs. The Chamber of Commerce exists to promote the interests of its member businesses, but this does not mean that if some of its members plot their racketeering activities at a Chamber meeting, they have participated in the conduct of the Chamber's affairs. In short, plaintiffs cannot distinguish trade unions like the CIAB from the District Court's hypothetical coffee house simply by invoking trade unions' "general" mission to advance their members' interests.

Our analysis thus confirms the District Court's conclusion that the allegations it recited were inadequate to

plead the nexus element of plaintiffs' CIAB-based RICO claims. We believe, however, that the complaint might reasonably be construed as asserting additional facts that present a closer question. Specifically, the complaint appears to allege that defendant brokers did not merely make use of the CIAB as a forum, but actually utilized its institutional machinery to formulate strategy and issue public statements in aid of their fraudulent acts. The complaint avers that the defendant brokers effectively operated and controlled the CIAB; the brokers sat on its Board of Directors. CIAB allegedly formulated a "position statement that was intended to stave off any meaningful regulatory disclosure requirements and reassure insurance purchasers that their brokers were acting in their best interests." Comm. SAC ¶ 445. "The CIAB position statement was made available for review and editing by its members before being finally approved by CIAB's Executive Committee, which included executives from Marsh, Aon, and HRH. . . . Further, one or more representatives of all of the Broker Defendants, or their predecessors, were on CIAB's Board of Directors at the time the CIAB position statement was issued." *Id.* ¶ 446. The Brokers then allegedly incorporated language from this position statement into their allegedly fraudulent disclosures. *See id.* ¶ 458 ("The [Broker] disclosures were modeled after the CIAB position statement in order to create the impression of transparency, by stating that the brokers 'may' have contingent commission agreements that might result in some additional revenue, while failing to disclose any information regarding the strategic partnerships that the Broker Defendants had entered

195

into with the Insurer Defendants or the significance of these partnerships and the contingent payments arrangements [for] the insurance placement process and the premiums charged.")

Assuming the truth of these allegations, one might arguably make a plausible inference that defendant brokers participated in the conduct of the CIAB enterprise, and furthermore, that one way they operated the enterprise was to have it craft the allegedly misleading disclosure statements incorporated by defendants into their allegedly fraudulent communications with clients (and perhaps others).[83]  This inference, however, would raise additional questions that would have to be resolved before we could conclude that plaintiffs have adequately pled their CIAB-based RICO claims.  First, under § 1962(c), which is the only substantive RICO provision invoked by plaintiffs, the defendants must be distinct from the enterprise they conduct.  *See Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 72 (3d Cir. 1994); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.  The

---

[83]This possible inference pertains only to the defendant brokers.  The complaint does not contain well-pled factual allegations plausibly implicating the defendant insurers in the creation of the disclosure statements.

196

statute's language, read as ordinary English, suggests that principle."). Here, plaintiffs appear to allege that the CIAB crafted fraudulent statements released directly to the public and incorporated into defendants' own disclosures. Defendants are alleged to have sat on the board of directors of CIAB. Although the Supreme Court has held that a corporate owner may successfully be pled as a defendant distinct from the corporate enterprise it owns, *Cedric Kushner*, 533 U.S. at 163–66, the Court's decision examined a complaint clearly alleging the defendant owner's role in the acts supposedly constituting both a "pattern of racketeering activity" and participation in the conduct of the enterprise. *See Cedric Kushner*, No. 98 Civ. 6859, 1999 WL 771366, at *1–2 (S.D.N.Y. Sept. 28, 1999), *aff'd*, 219 F.3d 115 (2d Cir. 2000), *rev'd*, 533 U.S. 158. The complaint here, by contrast, appears to say little about defendant brokers' involvement in CIAB's crafting of the allegedly fraudulent statements other than that defendants sat on CIAB's board at the time. There may therefore be a question about whether plaintiffs have adequately pled not only a connection between the CIAB and the alleged pattern of racketeering activity, but also the requisite connection between that pattern and *defendants' conduct* of the CIAB.[84]

---

[84]As noted, the requisite nexus element would not be satisfied by the mere allegation that the defendants' alleged racketeering activity benefitted from goods or services provided by the CIAB.

197

Second, there is a question about whether plaintiffs have adequately pled that defendant brokers' allegedly misleading disclosure statements constitute a "pattern of racketeering activity." In other words, even assuming plaintiffs have adequately alleged a connection between defendants' conduct of the CIAB and the statements alleged to be fraudulent, it remains to be determined whether the fraudulent nature of these statements has itself been adequately alleged. *Cf. Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290–93 (11th Cir. 2010) (holding that the district court properly dismissed plaintiffs' § 1962(c) claims because plaintiffs had not sufficiently pled the acts of mail and wire fraud alleged to form a pattern of racketeering activity). Although the District Court expressed significant skepticism about plaintiffs' allegations of fraud, its dismissal of the CIAB-based RICO claims does not appear to be based on this issue.[85]

In light of these significant questions, as well as our discussion of the nexus standard, *see supra* Section II.B.1.a.iii., we will vacate the dismissal of the CIAB-based claims. None of these questions was squarely addressed by the parties on appeal, and we believe the District Court is best positioned to decide them in the first instance. On remand, the District Court

---

[85]*See supra* note 80 and accompanying text.

may proceed in any way consistent with our opinion.[86]

**b. Section 1962(d) Claims**

The District Court dismissed the § 1962(d) RICO conspiracy claims on the ground that plaintiffs had failed to plead any viable § 1962(c) claims. Because we will vacate the dismissal of the § 1962(c) claims relating to the alleged Marsh-centered commercial enterprise and the CIAB enterprise, we will also vacate the § 1962(d) claims based on those two enterprises. We will affirm the District Court's dismissal of the remaining § 1962(d) claims because with respect to these claims, plaintiffs have failed to allege adequately "an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense." *Salinas*, 522 U.S. at 65.

**C. State-Law Claims**

A district court "may decline to exercise supplemental jurisdiction" over state-law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Having dismissed all federal-law claims, the District Court here exercised this statutory grant of discretion and dismissed plaintiffs' state-law claims. Because we will vacate in part the judgment dismissing the federal claims, we will also vacate the

---

[86]The court may choose in its discretion, for instance, to address the adequacy of plaintiffs' fraud allegations before returning to the question of the nexus between that alleged fraud and defendants' alleged conduct of the CIAB.

dismissal of the state-law claims. *See Shaev v. Saper*, 320 F.3d 373, 384 (3d Cir. 2003).

### III. Conclusion

For the forgoing reasons, we will vacate the dismissal of the Sherman Act claims with respect to defendants alleged to have engaged in bid rigging in the Marsh-centered commercial conspiracy; the dismissal of the RICO claims based on the alleged Marsh-centered commercial enterprise, with respect to those same defendants; the dismissal of the RICO claims based on the alleged CIAB enterprise, with respect to the defendant brokers; and the dismissal of the state-law claims. We will affirm the District Court's judgment in all other respects and remand for further proceedings consistent with this opinion.